# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

_____

| | | |
|---|---|---|
| **In the Matter of:** | **Case Nos**. | 29-CA-292741 |
| | | 29-CA-294928 |
| STARBUCKS CORPORATION, | | 29-CA-298919 |
| | | 29-CA-299049 |
| Respondent, | | 29-CA-300213 |
| and | | 29-CA-300564 |
| | | 29-RC-290364 |
| WORKERS UNITED, AFFILIATED | | |
| WITH SEIU, | | |
| | | |
| Charging Party. | | |

_____

_____

**Place:**  Brooklyn, New York
**Dates:**   October 19, 2022
**Pages:** 1 through 188
**Volume:**  1

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

1

```
 1                          BEFORE THE

 2                NATIONAL LABOR RELATIONS BOARD

 3    --------------------------------: Case Nos.

 4    In the Matter of:               :        29-RC-290364

 5    STARBUCKS CORPORATION,          :           29-CA-292741

 6              Respondent,           :           29-CA-294928

 7    And                             :           29-CA-298919

 8    WORKERS UNITED, AFFILIATED WITH :           29-CA-299049

 9    SEIU,                           :           29-CA-300213

10              Charging Party,       :           29-CA-300564

11    --------------------------------:

12

13

14       The above-entitled matter came on for Hearing pursuant to

15     Notice before the HON. JEFFREY P. GARDNER, Administrative Law

16      Judge, at the National Labor Relations Board, Region 29, Two

17       Metro Tech Center North, 5th Floor, Brooklyn, New York, in

18      Hearing Room 2, on Wednesday, October 19, 2022, at 10:00 a.m.

19

20

21

22

23

24

25
```

```
 1                 A P P E A R A N C E S

 2

 3    On behalf of the General Counsel:

 4

 5         MATTHEW A. JACKSON, ESQUIRE

 6         LYNDA TOOKER, ESQUIRE

 7         National Labor Relations Board

 8         Region 29

 9         Two Metro Tech Center, Suite 5100

10         Brooklyn, New York11201-3838

11         (718) 765-6202

12         Matthew.jackson@nlrb.gov

13

14    On behalf of the Respondent:

15

16         JEDD MENDELSON, ESQUIRE

17         JESSICA FAUSTIN, ESQUIRE

18         Littler Mendelson, PC

19         One Newark Center, 8th Floor

20         Newark, New Jersey 07102

21         (973) 848-4700

22         jmendelson@littler.com

23         jfaustin@littler.com

24

25
```

1

2    APPEARANCES (Continued):

3

4    On Behalf of the Charging Party:

5

6         MARIA B. HAHN, ESQUIRE

7         Cohen Weiss & Simon, LLP

8         900 Third Avenue

9         New York, New York 10022-4869

10        (212) 356-0257

11        mhahn@cwsny.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                        I N D E X
 3
 4  WITNESS              DIRECT    CROSS    REDIRECT    RECROSS
 5
 6  Mario Leon             27       95
 7
 8  David Saff            100      140        184
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        E X H I B I T S

 2     EXHIBIT                 IDENTIFIED            RECEIVED

 3   GENERAL COUNSEL'S

 4     GC-1                      10                    12

 5     GC-2                      36                    --

 6     GC-3(a)                   41                    --

 7     GC-3(b)                   41                    --

 8     GC-4(a)                   58                    --

 9     GC-4(b)                   58                    --

10     GC-5(a)                   77                    --

11     GC-5(b)                   77                    --

12     GC-6(a)                   82                    --

13     GX-6(b)                   82                    --

14     GC-7(a)                   88                    --

15     GC-7(b)                   88                    --

16     GC-8                      94                    --

17     GC-9(a) through (f)      117                   123

18     GC-10                    123                   124

19     GC-11                    125                   126

20     GC-12                    127                   127

21     GC-13                    128                   129

22     GC-14                    129                   130

23     GC-15                    130                   131

24     GC-16                    131                   137

25
```

**Burke Court Reporting & Transcription**
**(973) 692-0660**

6

```
 1
 2                    I N D E X (Continued)
 3      EXHIBIT                IDENTIFIED          RECEIVED
 4   RESPONDENT'S
 5      R-15                     168                 --
 6      R-19                     167                 --
 7      R-53                      95                  99
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S

 2                                      (Time Noted: 9:43 a.m.)

 3             JUDGE GARDNER:   On the record.  The hearing will be

 4    in order.

 5             This is a formal trial before the National Labor

 6    Relations Board in Starbucks Corporation and Workers United

 7    affiliated with SEIU.  The case numbers are five -- six I have

 8    that have been consolidated beginning with 29-CA-292741 through

 9    29-CA-300564 and the additional numbers will be in the caption.

10    It's been consolidated within objections to election case that

11    is Case Number 29-RC-290364.

12             The Administrative Law Judge presiding is myself,

13    Jeffrey P. Gardner and I am assigned to the New York Office of

14    the Division of Judges.  Any communication should be addressed

15    to that office and any requests for extensions of time should

16    be addressed to the Associate Chief Judge in that office, Judge

17    Kenneth Chu.

18             Will counsel and other representatives of the parties

19    please state their appearances for the record beginning with

20    the General Counsel?

21             MR. JACKSON:   Matthew A. Jackson.

22             MS. TOOKER:   Lynda Tooker.

23             MS. HAHN:   Maria Hahn on behalf of the Union.

24             MR. MENDELSON:   And Jedd Mendelson and Jessica

25    Faustin from the Littler firm on behalf of the Respondent.
```

```
 1              JUDGE GARDNER:   Okay.  And counsel will make sure

 2    that the Court Reporter has the correct spellings of everyone's

 3    name.

 4              Do any of the parties have a party representative

 5    that will be remaining with them during the testimony?

 6              MS. HAHN:    I believe that will be Cristian Murguia

 7    spelled C-r-i-s-t-i-a-n, M-u-r-g-u-i-a on behalf of the Union.

 8              MR. MENDELSON:   On behalf of the Respondent and we

 9    have had some colloquy prior to today concerning this, present

10    today is district manager Mario Leon, L-e-o-n.  Mr. Leon is

11    able to be here this week and then next week he's traveling and

12    we also have had prior colloquy about he's traveling and he's

13    going to appear as a witness.

14              Respondent had preliminarily asked that he be able to

15    do so then by video, but he is here this week and our

16    understanding is he's going to be called as an adverse witness.

17    When he goes away we had indicated prior to today that we

18    intended to have Daniells, double L, as the substitute

19    corporate representative and so we understood based upon that

20    prior conversation that Your Honor was inclined, I don't say

21    you committed, but inclined to permit that substitution next

22    week and so I wanted to put that on the record so there's at

23    least an effort to create some clarity around it.

24              JUDGE GARDNER:   Okay, but we didn't get to a

25    sequestration order yet although I understand there will be
```

```
 1   one, but my understanding also is that Ms. Daniells will not be
 2   present for the first number of days and my further
 3   understanding is that, in fact, Mr. Leon will be testifying in
 4   person this week.  So we'll be taking it one day at a time, but
 5   that is -- I don't have a problem with that and I haven't heard
 6   objection to that so that's how I expect we'll proceed.
 7           And this is -- we have Mr. Leon here with us and I
 8   didn't get the spelling for Cristian, the last name.  Could you
 9   say that again?
10           MS. HAHN:   M-u-r-g-i-a.
11           JUDGE GARDNER:   G?
12           MS. HAHN:   Sorry, u-i-a.
13           JUDGE GARDNER:   G-u-i-a.
14           MS. HAHN:   Yes.
15           JUDGE GARDNER:   Okay, thank you.  And you're here
16   with us as well, yes, or is that not the same person?
17           MS. HAHN:   No, that's not the same person.
18           JUDGE GARDNER:   Oh, okay.  Well, is the party
19   representative going to be joining?
20           MS. HAHN:   That's my understanding, but I'm not sure
21   about that one.
22           JUDGE GARDNER:   Okay.  Okay, if settlement
23   discussions are desired at any time during the trial, I will be
24   glad to grant a reasonable recess for that purpose.  Trial
25   developments sometimes do change attitudes and make settlement
```

1   more possible than previously thought.  Accordingly I'm

2   advising you now, before I've heard any of the testimony that I

3   do intend to offer a specific opportunity for settlement

4   discussions at two stages of the trial.  First, at the

5   conclusion of the General Counsel's case and second at the end

6   of the trial.

7           I'm telling you that now so you don't read into

8   anything I say at those times.  And if I forget to do so,

9   please do call it to my attention.  In addition, opportunities

10  for discussion of settlement will always be available upon the

11  request of the parties.

12          Okay.  Is Mr. Jackson going to be leading off for the

13  General Counsel?

14          MR. JACKSON:   Yes, Your Honor.

15          JUDGE GARDNER:   All right.  Would you please

16  introduce the pleadings and other formal papers and I will

17  address any preliminary motions after those are in evidence.

18          MR. JACKSON:   Okay.  So counsel for General Counsel

19  marks for identification GC Exhibit 1(a) through 1(ii), which

20  are an index and description of formal documents together with

21  the formal papers.

22  (General Counsel's Exhibit 1 identified.)

23          MR. JACKSON:   I'll present one copy to the Court

24  Reporter and another copy for counsel to review, but I

25  previously shared that electronically with counsel and

```
 1   Respondent counsel has, before the record opened, notified me

 2   of some omissions from the formal papers that I agree should be

 3   included and I intend to amend the formal papers when I have

 4   those documents ready.

 5        JUDGE GARDNER:   All right.  I understand those are

 6   just a number of letters that represent partial withdrawals

 7   that have been previously that are no longer before me.

 8        MR. JACKSON:   In addition there's one pretrial order

 9   of the Regional Director that was omitted as well.

10        JUDGE GARDNER:   Okay, at a convenient time you can

11   gather those up.  Once you have them all ready they can be

12   added as GC-1(jj) and etc.  Are you moving those into evidence?

13        MR. JACKSON:   Yes, Your Honor.

14        JUDGE GARDNER:   Any objection?

15        MR. MENDELSON:   With the clarification provided by

16   counsel for General Counsel no objection.

17        JUDGE GARDNER:   Okay.  And I think I would expect

18   typically that the Charging Party will not be objecting to

19   evidence that is being moved by the General Counsel so I'm

20   simply going to ask the Respondent if there's an objection when

21   I ask.  However, do inject any objection you may have at any

22   point, okay?

23        MS. HAHN:   Thank you.

24        JUDGE GARDNER:   All right.  GC-1 is received and

25   that's 1(a) through (i) with some more to come.
```

1   (General Counsel's Exhibit 1 received.)

2            JUDGE GARDNER:   Next step, I wanted to let the

3   record reflect that there have been pretrial conference calls

4   and some pretrial exchange of emails including as recently as

5   yesterday and I know at least Mr. Mendelson wanted to make a

6   representation about those on the record.  However, I would

7   invite the General Counsel to begin if there's anything that

8   they wanted specifically on the record about those.

9            MR. JACKSON:   No, Your Honor.

10           JUDGE GARDNER:   Okay.  Did the Charging Party want

11   to put anything on the record on that?

12           MS. HAHN:   No, Your Honor.

13           JUDGE GARDNER:   Okay, Mr. Mendelson, go ahead.

14           MR. MENDELSON:   Thank you, Judge.  Briefly I have

15   raised the question whether prior to district manager Leon

16   being called as an adverse witness, counsel for General Counsel

17   should provide recordings that we understand have been made of

18   him speaking to eligible voters or other persons in the store.

19           And my position was that because we're beginning

20   today and there's an alleged discriminatee whose first name is

21   Joselyn, J-o-s-e-kl-y-n, and the last name is lengthy and I

22   apologize, I haven't yet mastered saying it, it begins with a

23   C, who I'm assuming and believe based on the colloquy inviting

24   that we had was the person who made these recordings.

25           She's not able to be here today and so we're not able

1   to authenticate these recordings through her.  So I thought

2   that that circumstance would entitle the Respondent to review

3   the recordings prior to Mr. Leon's testimony and saying that I

4   should be clear that I do not anticipate Mr. Leon being able to

5   review them.  Rather, I would have had another person,

6   specifically Beth Daniells the store manager with me to listen

7   and provide some level of confidence that the recordings are

8   what they are represented to be, especially in the absence of

9   the authenticating person.

10         My understanding is that Your Honor indicated you are

11  not prepared to direct that and so I just wanted to be on the

12  record indicating that the company believes that that ruling is

13  either prejudicial or potentially prejudicial, but we'll

14  proceed and thought that the record again should reflect that

15  application and its denial.

16         JUDGE GARDNER:   Okay, I appreciate that and the

17  record should reflect that Mr. Jackson indicated he would not

18  be moving any such recordings into evidence and would be using

19  them only for impeachment of Mr. Leon during what I anticipate

20  the 611(c) -- his 611(c) testimony.  And of course, Mr. Leon is

21  in a good position to identify the voices of the recordings

22  that he is purported to be participating in and if not, that's

23  what the testimony will reflect.  And those recordings would

24  not be going into evidence without proper authentication if, in

25  fact, at a later point in the trial General Counsel seeks to

1    put them into evidence.

2         Okay, there was also some discussion prior to the

3    hearing on the various subpoenas that have been served and

4    petitions to revoke that have been served.  The subpoena from

5    Respondents and the petitions to revoke I think from General

6    Counsel and Charging Party prompted the pretrial discussion

7    that we just reviewed.

8         There's also a subpoena from the General Counsel to

9    which Respondent filed a petition to revoke, but my

10   understanding was that the parties were in communication,

11   presumably resolving at least some of those items so I would

12   ask has production been made in response to the General

13   Counsel's subpoena?

14        MR. JACKSON:   Yes, Your Honor.  Earlier this morning

15   we received electronic files consisting of approximately 4,000

16   documents from Respondent.  We have not had --

17        MR. MENDELSON:   4,000 pages.

18        MR. JACKSON:   4,000 pages of documents, excuse me.

19   Thank you.  4,000 pages and we have not had an opportunity to

20   review those documents as of yet, but given the representations

21   that Mr. Mendelson has made, I expect that the production will

22   be complete, if not nearly complete, and if there are any other

23   issues going forward, I will bring them to Your Honor's

24   attention.

25        JUDGE GARDNER:   Okay, thank you counsel for working

1  that out.  That makes things go very smoothly.  I am expecting

2  that we're going to proceed with testimony.  We did talk

3  briefly off the record about scheduling.  We'll circle back to

4  that off the record at lunch, but there may be time tomorrow

5  for review of some of those 4,000 pages if you have not had a

6  chance to review them in the breaks or this evening today, so

7  we'll address that as needed.

8          In the meantime does that leave any outstanding

9  motion or other preliminary matters that I need to address

10  prior to hearing from our first witness?

11          MR. MENDELSON:   The PTR, the petition to revoke

12  filed by the Union concerning the company's subpoena, my

13  understanding is we were going to put that off until another

14  time since that witness is not here today.

15          JUDGE GARDNER:   I think that that is correct.

16          MR. MENDELSON:   Thank you.

17          JUDGE GARDNER:   And we'll also revisit and by that

18  time there might be some -- some of those documents may have

19  been either provided or introduced into evidence prior to

20  Respondent's case and may render that whole issue moot, but we

21  will address it when we need to.

22          Anything else before we start?

23          MR. JACKSON:   Nothing from General Counsel, but I

24  would ask for just a brief recess before we get into calling

25  our first witness.  There's just a couple of documents that I

1  need for this witness and I need to go gather them.

2          JUDGE GARDNER:  Okay, and we're also -- why don't

3  you go ahead and get those and then are we going to hear

4  opening statements?

5          MR. JACKSON:  Yes, I have an opening statement.

6          JUDGE GARDNER:  Okay.  So we'll go off the record

7  momentarily, come back and --

8          COURT REPORTER:  We're off the record?

9          JUDGE GARDNER:  Yes.

10  (Whereupon, a recess was taken from 10:01 a.m. to 10:15 a.m.)

11          JUDGE GARDNER:  Let's go back on the record.

12          COURT REPORTER:  We are on the record.

13          JUDGE GARDNER:  General Counsel, you wanted to make

14  an opening statement?

15          MR. JACKSON:  Yes, Your Honor.

16          JUDGE GARDNER:  Go ahead.

17          MR. JACKSON:  At the beginning of 2022 employees of

18  Respondent Starbucks Corporation all over the United States

19  were organizing behind Charging Party Workers United.

20  Starbucks employee organizing in Buffalo, New York and other

21  parts of the country had generated widespread media attention

22  and employees at various other Starbucks stores who desired

23  Union representation took notice.

24          One such employee was Joselyn Chuquillanqui who at

25  the time worked at Starbucks store located on Great Neck Road

1   in Great Neck, New York.  Chuquillanqui reached out to the

2   Union and initiated an organizing campaign at her store and

3   began soliciting employees to sign Union authorization cards.

4        By mid-February 2022, Great Neck Road store employees

5   were genuinely enthusiastic about the prospects of Unionizing.

6   Every single employee at that store signed a Union

7   authorization card.  Numerous employees went even further to

8   publicly declare their support for the Union as 11 out of 15

9   employees on staff agreed to put their names on a letter to

10  Starbucks CEO affirming their desire for Union representation

11  and demanding that Starbucks recognize and bargain with Workers

12  United as the employees' collective bargaining representative.

13       On February 10th the Union filed with the Board a

14  petition for representation election and served a copy of the

15  petition upon Respondent.  In conjunction with filing the

16  petition, the Union published a press release about its efforts

17  to organize the Great Neck Road store among other Starbucks

18  stores and the press release featured a statement from Employee

19  Chuquillanqui expressing her support for the Union.

20       Chuquillanqui also gave statements to a prominent

21  local newspaper which published a story about the Great Neck

22  Road store on February 11th.  From that point forward

23  Respondent knew that Chuquillanqui was the employee leading the

24  Union campaign from inside the store.

25       Almost immediately after the Union went public with

1    its campaign, Respondent led by district manager Mario Leon

2    launched a virulent campaign of threats and retaliation aimed

3    at stopping the burgeoning Union movement at Great Neck dead in

4    its tracks.

5           The evidence will show that on February 11th Leon

6    visited the store and serially called employees into the back

7    room of the store one-by-one to discuss his views about the

8    Union campaign.  During multiple meetings on that date, Leon

9    threatened employees that they would not be able to attain a

10   promotion if they selected the Union as their bargaining

11   representative and solicited grievances from employees with

12   implied and express promises to remedy those grievances if

13   employees rejected Union representation.

14          The evidence will further establish that Leon made

15   numerous other threats against employees on February 11,

16   including threatening employees that if they Unionized

17   Respondent would more strictly enforce its time and attendance

18   policies, that employees would not be allowed to increase their

19   work hours by working shifts at other Starbucks stores, that

20   they would be prohibited from speaking with their managers and

21   that they could be required to participate in mandatory

22   strikes.

23          Respondent's unlawful efforts to intimidate and

24   coerce employees certainly did not stop there.  The evidence

25   will show that before the end of February Respondent sent its

1   Regional Director of Operators Alexis Vertucci, who had rarely

2   visited or spoken with employees at the Great Neck Road store,

3   to Great Neck Road in order to solicit grievances from

4   employees and impliedly promise to remedy those grievances if

5   they rejected the Union.

6          Concurrently, Store Manager Beth Daniells began

7   posting anti-Union messages in the back room of the store while

8   prohibiting employees from posting pro Union material even

9   though the evidence will establish that she permitted employees

10  to post other messages which Daniells did not find as

11  troubling.

12         The evidence will show that Daniells later began to

13  carry out the threat that Leon had made against employees to

14  more strictly enforce time and attendance policies in

15  retaliation for their Union activities as she notified

16  employees that they were no longer permitted to exchange work

17  shifts with one another without management approval, contrary

18  to Daniells lenient past practices, which had allowed employees

19  to swap shifts freely without authorization.

20         Respondent's unlawful campaign in response to the

21  employees' Union organizing activities continued relentlessly

22  throughout the period when mail ballots in the NLRB election

23  were being distributed to the Great Neck store employees.  The

24  evidence will show that on March 25, Leon interrogated an

25  employee about their activities in support of the Union and

1   similar activities by other employees.

2         Leon further threatened that if employees selected

3   the Union as their representative they would face increased

4   workloads because employees from Respondent's other stores will

5   be prohibited from working at the Great Neck Road store.  Leon

6   also told employees that they would lose cherished benefits,

7   including school tuition reimbursements, that they would have

8   no choice but to have Union dues deducted from their paychecks

9   and that Unionizing would be futile because employees would,

10  "never" be able to improve their terms and conditions of

11  employment be selecting the Union as their bargaining

12  representative.

13        The evidence will establish that Leon repeated many

14  of those same ugly threats to different employees.  Indeed, the

15  evidence will show that most if not all Great Neck Road store

16  employees were exposed to or at least knew about the unlawful

17  threats and coercive conduct perpetrated by Leon and Daniells.

18        The evidence Your Honor will hear establishing the

19  widespread dissemination of Respondent's unfair labor practices

20  is not hearsay as it will be offered as evidence of the out of

21  Court declarant's representation of his or her believe that

22  managers made certain statements not for the underlying truth

23  of whether the manager actually said those things that the out

24  of Court declarant claimed.

25        Employees were deeply troubled by the threats and

1   coercion Starbucks managers subjected them to.  Employees were
2   so disturbed their manager's conduct that they began making
3   recordings in the workplace to document Respondent's
4   violations.  Somehow Leon and Daniells found out that their
5   coercive anti-Union statements were being recorded and they
6   decided to invoke an obscure provision of Respondent's employee
7   handbook to warn employees that they may not make unauthorized
8   recordings and would face discipline if they did.

9        Leon further interrogated employees about whether
10  they or their coworkers had been making recordings while
11  Daniells told employees that she knew and was keeping a list of
12  each employee who had secretly made recording at the store,
13  unlawfully creating the impression that employees' Union
14  activities were under surveillance by Respondent.

15       Sadly, Respondent's unlawfully campaign of coercion
16  was ruthlessly effective at turning employees against the
17  Union.  The result of the election provides stark evidence of
18  its intense chilling impact that Respondent's conduct has had
19  on employees in the perspective bargaining unit.

20       Whereas the Union had enjoyed unanimous support from
21  Great Neck Road store employees before Respondent's unfair
22  labor practices, the Union failed to obtain a majority of the
23  votes cast in the election just over two months later.  The
24  evidence will thus make clear that Respondent's unlawful
25  conduct interfered with the Board's ability to conduct a fair

1  election requiring that the results of the election in Case 29-

2  RC-290364 be set aside.

3         But Respondent's illegal practices did not cease with

4  the successful scheme to undermine a fair and free election.

5  On May 4th, the day after the Union's election defeat Leon and

6  Daniells told employees that they should be relieved that the

7  Union lost the election because Starbucks was implementing wage

8  increases to employees nationwide, but only if employees reject

9  the Union representation.

10        Leon and Daniells coercive promise of benefits echoed

11  the statements that CEO Howard Schultz and other in

12  Respondent's upper management had distributed to employees at

13  the Great Neck Road store.  On May 4th, Leon and Daniells

14  desperately wanted to put the Union campaign behind them.  The

15  evidence will show that they spoke at length with Employee

16  Chuquillanqui that day to relish in the Union's election loss

17  and Leon unlawfully warned Chuquillanqui that she must stop

18  engaged in protected Union activity, which management found

19  upsetting.

20        Leon and Daniells mutually implored Chuquillanqui to

21  give up her goal of bringing the Union into the Great Neck Road

22  store, but Chuquillanqui defiantly refused.  With Chuquillanqui

23  having made it clear to them that she would continue fighting

24  for the Union, Leon and Daniells determined that she had to be

25  removed from the Great Neck Road store by any means necessary

1  if the managers were to achieve their objective of destroying

2  the Union drive once and for all.

3         Against the backdrop of timely filed Union objections

4  to the election, Respondent proceeded to target Chuquillanqui

5  for discipline under false pretenses for conduct that

6  Respondent had routinely tolerated from other employees.  On

7  June 27th Respondent issued Chuquillanqui a final written

8  warning for relatively minor time and attendance infractions

9  where the evidence will show that store management usually

10  excused such tardiness.

11         When Ms. Chuquillanqui misplaced the store key that

12  Respondent had issued her to open and close the Great Neck Road

13  store, Respondent seized on her error to fabricate a basis for

14  discharging her on July 27th.  However Respondent's stated

15  basis for the discharge cannot withstand scrutiny because the

16  evidence will show that Chuquillanqui's handling of the store

17  key did not violate any of the policies Respondent cited as

18  grounds for her termination and Respondent had a past practice

19  of tolerating employees who lose their keys.

20         Thus, the evidence will establish that Respondent's

21  claimed motivation for disciplining and discharging

22  Chuquillanqui is mere pretense, concealing it's true intent to

23  fire Chuquillanqui as the coda to its unrelenting, unlawful

24  campaign to defeat the Union at the Great Neck Road store.

25         In the wake of Respondent's extensive unfair labor

1    practices, the Union's campaign lies in shambles.  Disgusted by

2    Starbucks egregious violations, employee who had helped

3    Chuquillanqui lead the campaign have either resigned or

4    declined to seek re-employment at the store.  With

5    Chuquillanqui now removed from the workplace there are no

6    employees remaining at the store who are willing to even engage

7    with Union aides, let alone publicly support the Union

8    campaign.

9              Respondent's violation has effectively killed the

10   Union campaign at Great Neck Road store.  And the Board's

11   customary remedies are unlikely to remove the deep chill that

12   has calcified among bargaining unit employees.  The Board

13   cannot administer a fair rerun election under these

14   circumstances.  Accordingly, an order requiring Respondent to

15   immediately recognize and bargain with the Union as the

16   exclusive collective bargaining representative of Great Neck

17   Road store employees is necessary to appropriately remedy the

18   unfair labor practices established in this case.

19             Thank you.

20             JUDGE GARDNER:   Okay, thank you.  Did the Charging

21   Party have anything additional?

22             MS. HAHN:   No, Your Honor.

23             JUDGE GARDNER:   Okay.  Did Respondent want to make

24   an opening statement at this time?

25             MR. MENDELSON:   I'll reserve to the beginning of our

1   case.

2           JUDGE GARDNER:   Okay.  Is the General Counsel ready

3   to proceed with its first witness?

4           MR. JACKSON:   Yes, Your Honor.

5           JUDGE GARDNER:   Go ahead.

6           MR. JACKSON:   General Counsel calls Mario Leon.

7           JUDGE GARDNER:   Mr. Leon, you can come on up.

8           And I guess before -- have a seat.  Before I swear in

9   the witness and before we hear testimony, we should discuss

10  sequestration.

11          MR. JACKSON:   Yes, Your Honor, thank you for

12  reminding me.  The General Counsel would move, Your Honor, to

13  put in place an order of sequestration for the witness who will

14  be testifying.

15          JUDGE GARDNER:   Okay.  And I think everyone is

16  interested in that, as I understand it.  We only have one

17  person in the audience right now.  I don't know if you are

18  potentially a witness in this matter.  Okay, so be that as it

19  may, some people may come in as the hearing proceeds so I'm

20  going to go ahead and read into the record a sequestration

21  order.

22          Counsel has invoked a rule requiring that witnesses

23  be sequestered. This means that all persons who are going to

24  testify in this proceed, with specific exceptions that I will

25  tell you about, may only be present in the hearing room when

1    they are giving testimony.

2            The exceptions are alleged discriminatees, natural

3    persons who are parties -- we don't have that here --

4    representatives of non-natural parties, that's you all, and a

5    person who is shown by a party to be essential to the

6    presentation of the party's cause.  They remain in the Hearing

7    Room even if they are going to testify or have testified.

8            However, alleged discriminatees, including Charging

9    Parties may not remain in the Hearing Room when other witnesses

10   on behalf of the General Counsel or the Charging Party are

11   giving testimony regarding events as to which the alleged

12   discriminatees will be expected to testify.

13           The rule also means that from the point on until the

14   hearing is finally closed, the witness may not discuss with

15   other potential witnesses either the testimony that they have

16   given or that they intend to give.  The best way to avoid any

17   problems is simply not to discuss the case with any other

18   potential witness until after the hearing is completed.

19           Under the rule as applied by the Board, with one

20   exception, counsel for a party may not in any manner, including

21   the showing of transcripts, inform the counsel's own witness of

22   the content of testimony that has been given including by a

23   witness for the opposing side in preparation for rebuttal of

24   the testimony.

25           I expect counsel to police the rule and to bring any

1  violation of it to my attention immediately.  It is the

2  obligation of counsel to inform potential witnesses who are not

3  now present in the Courtroom of their obligations under the

4  rule.

5            Does everybody understand?

6            MR. JACKSON:   Yes, Your Honor.

7            MR. MENDELSON:   Yes, sir.

8            JUDGE GARDNER:   Okay.  In that case, Mr. Leon, could

9  you please raise your right hand?

10  Whereupon,

11                          MARIO LEON,

12  was called as a witness by and on behalf of the General Counsel

13  and, having been first duly sworn, was examined and testified

14  on his oath as follows:

15            JUDGE GARDNER:   All right, thank you very much.  I

16  am going to ask you to keep your voice up.  The proceedings are

17  being recorded and you'll see the microphone is right in front

18  of you.

19            Okay, counsel, go ahead and start.

20                       DIRECT EXAMINATION

21  BY MR. JACKSON:

22  Q.   Good morning, Mr. Leon.  Is it Leon?

23  A.   It is.

24  Q.   Okay.  And can you spell you name for the record, please?

25  A.   M-a-r-i-o, L-e-o-n.

1    Q.    By whom are you currently employed?

2    A.    I'm employed by Starbucks.

3    Q.    And what is your position in the company?

4    A.    I am a district manager.

5    Q.    And for how long have you held the position of district

6    manager?

7    A.    Four years October.

8    Q.    During the time that you have been employed as district

9    manager have you managed the same district throughout that

10   period?

11   A.    No, I have a different district now, but the Great Neck

12   store is still within my district.

13   Q.    Okay.  So -- well, have you been employed as district

14   manager through the time that you worked for Starbucks?

15   A.    No.

16   Q.    How long have you worked for Starbucks overall?

17   A.    Thirteen years.

18   Q.    What other positions have you held?

19   A.    Store manager.

20   Q.    Now, you stated that the district that you currently

21   manage is different from a district that you previously

22   managed, is that correct?

23   A.    That is correct.

24   Q.    What is the district that you previously managed?

25   A.    The district that I previously managed was District 722

```
 1   which comprised of stores on the western most point of Nassau
 2   County and a couple of stores in Queens.
 3   Q.   What is the district that you now manage?
 4   A.   I manage the north side of Nassau County, pretty much
 5   called -- it's called the Gold Coast so it's like a little
 6   further east than what I had before.  The District Number is
 7   1977.
 8   Q.   What are your job duties and responsibilities as district
 9   manager?
10   A.   My job duties are to hire managers, that's one; discipline
11   or accountability; teach, coach, mentor; execute company, you
12   know, plans, promotional plans amongst other things, yeah.
13   Q.   How many stores are there in the district you currently
14   manage?
15   A.   Twelve.
16            JUDGE GARDNER:   I'm going to interrupt for a second.
17   Is there more than one in Great Neck?
18            THE WITNESS:   There are two in Great Neck.
19            JUDGE GARDNER:   Okay.
20   BY MR. JACKSON:
21   Q.   And one of those is located at 6 Great Neck Road, correct?
22   A.   Correct.
23   Q.   And the other is located at 55 Northern Boulevard?
24   A.   That is correct.
25   Q.   And Beth Daniells is the store manager for the Great Neck
```

1   Road store, correct?

2   A.   She is.

3   Q.   And Beth Daniells has been the store manager for that

4   store at all times since at least February 1. 2022, correct?

5   A.   It's from February 1st, 2022?

6   Q.   To the present:

7   A.   To the present, yes.

8   Q.   Do you know Beth Daniells became the store manager at

9   Great Neck Road?

10  A.   Exact date I don't know, but I believe it to be over seven

11  years.

12  Q.   And Beth Daniells reports directly to you, correct?

13  A.   Beth Daniells reports directly to me.

14  Q.   Do you know how many Starbucks districts there are across

15  the United States?

16  A.   No.

17  Q.   Do you know whether other districts have 12 stores in them

18  like your district has?

19  A.   I'm positive of it.

20  Q.   So each district has 12?

21  A.   No.

22  Q.   No?

23  A.   No, not all have the same.

24  Q.   Not all have the same.  Do you know what the range is

25  between -- how many districts between each of the different

1    Starbuck's districts?

2    A.   I've seen districts with 13, I've seen some with 11, some

3    with 10.   It depends on, you know, we're a little more densely

4    populated so we can get to more stores.   Middle of the country

5    maybe they're -- there's a little more distance between stores,

6    so I don't know for sure, you know, what each district has in

7    their areas, in their portfolio.

8    Q.   To whom do you report?

9    A.   I report to Alexis Vertucci.

10   Q.   Is she your direct supervisor?

11   A.   She was.

12   Q.   She's no longer?

13   A.   She's on a TLA now so I report to Alvin Rampow now.

14   Q.   And TLa is a temporary leave of absence?

15   A.   Temporary -- temporary assignment, time limited

16   assignment.

17   Q.   Time limited, okay.   And how long has Ms. Vertucci been on

18   a time limited assignment?

19   A.   I'm going to say -- I'm going to guesstimate a month or

20   so, maybe more.

21   Q.   And before that Alexis Vertucci was your direct

22   supervisor?

23   A.   Yes.

24   Q.   And the position that she held before her temporary

25   assignment was Regional Director of Operations, correct?

1   A.    That is correct.

2   Q.    Who is directly above Ms. Vertucci in the Starbucks

3   organization hierarchy?

4   A.    That would be our Regional Vice President.

5   Q.    Who is that person currently?

6   A.    Currently it's Adam Mosdel -- Mozdel.

7   Q.    How long has Mr. Mozdel held that position?

8   A.    Not even a year yet.

9   Q.    Was Mr. Mozdel in that position on February 1, 2022?

10  A.    I'm not sure.

11  Q.    Do you know who was the preceding official who preceded

12  Mr. Mozdel?

13  A.    Tracy Gavin Bridgemont.

14          JUDGE GARDNER:   What was that last name?

15          THE WITNESS:   Tracy Gavin Bridgemont.

16          JUDGE GARDNER:   B-r-i-d-g-e-m-o-n-t.

17          THE WITNESS:   I believe that's -- I may have that

18  wrong.

19          JUDGE GARDNER:   Counsel, just be mindful, a number

20  of people have entered the room so if you know whether they

21  ought to be here or not, let me know.

22          MS. TOOKER:   These are both interns, interns from

23  our office.

24          JUDGE GARDNER:   In that case, welcome Interns.  I

25  hope

```
 1   you enjoy the trial.  Go ahead.
 2   BY MR. JACKSON:
 3   Q.   Mr. Leon, every manager in the company ultimately reports
 4   to the CEO, correct?
 5   A.   Indirectly.
 6   Q.   And Howard Schulte is currently the CEO of Starbucks,
 7   correct?
 8   A.   He's no longer the CEO of Starbucks.
 9   Q.   Howard Schultz was the CEO of Starbucks in some point in
10   2022, correct?
11   A.   Yeah, he returned internally for a brief stint, yes, until
12   they identified the CEO.
13   Q.   Do you recall what period of time in 2022 that Howard
14   Schultz was the interim CEO?
15   A.   You know, I don't.  I believe it was after February though
16   where he became interim CEO.
17   Q.   Who is the current CEO?
18   A.   I can pull up his name.
19   Q.   You don't recall right now?
20   A.   I don't recall right now.
21   Q.   Do you know when this person, whoever he or she is, became
22   the CEO?
23   A.   Approximately a month ago.
24   Q.   So around September?
25   A.   Around September, yeah.
```

1  Q.   Now before Howard Schultz became the interim CEO, a man

2  named Kevin Johnson was the CEO of Starbucks, is that correct?

3  A.   That is correct.

4  Q.   But you do not recall when Schultz replaced Johnson,

5  correct?

6  A.   I could take an educated guess.

7  Q.   What would that be?

8  A.   Probably February/March.

9  Q.   You were aware that the labor Union Workers United seeks

10 to represent employees at the Great Neck Road store, correct?

11 A.   I am aware of that, yes.

12 Q.   So I'm going to refer to Workers United as just the Union

13 going forward.  Will you understand me if I do that?

14 A.   I will.

15 Q.   You were aware that the Union filed a petition with the

16 NLRB to have an election among employees at the Great Neck Road

17 store to determine whether the Union would be their

18 representative, correct?

19 A.   Yes.

20 Q.   The Great Neck Road store is the only store in your

21 district in which a Union has filed a petition with the NLRB to

22 represent employees at the store, correct?

23 A.   That is correct.

24 Q.   You're aware that the Union filed this petition to

25 represent employees at the Great Neck Road store on February

1   10th, 2022, is that right?

2   A.    I believe that to be correct.

3   Q.    And you learned that the Union filed its petition around

4   that same time, correct?

5   A.    Can you repeat that because --

6   Q.    Yes.  You learned that the Union had filed its petition on

7   or around February 10th, correct?

8   A.    On or around, yes, more around because I don't believe –

9   yeah, I don't believe they filed on the 10th, at least I didn't

10  know about it on the 10th.

11  Q.    How did you find out about it?

12  A.    If my recollection serves me correctly, I believe Beth

13  Daniells asked me about it.

14  Q.    What did she ask you?

15  A.    She said that I came back from time away and I walk into

16  the store and partners were wearing Union pins.  She said that

17  the partners told her that they signed petitions to have the

18  Unions represent them.  She also asked me if they could wear

19  buttons because it's against dress code policy and I informed

20  her do not -- do not make them take the buttons off, leave them

21  alone was my directions to her.

22  Q.    You were aware that certain employees at the Great Neck

23  Road store sent a letter to CEO Kevin Johnson, correct?

24  A.    I was made aware of it after the fact, yes.

25        MR. JACKSON:   Could I ask the Court Reporter to mark

1    for identification a document identified as GC Exhibit 2.

2    (General Counsel's Exhibit 2 identified.)

3    BY MR. JACKSON:

4    Q.   Mr. Leon, if you will just take a moment to review the

5    document?

6    (Whereupon, the witness reviewed the document.)

7    BY MR. JACKSON:

8    Q.   Do you recognize the document?

9    A.   It looks familiar.

10   Q.   This is the letter that certain employees at the Great

11   Neck Road store sent to Kevin Johnson, correct?

12   A.   I -- I'm not certain.

13   Q.   Where have you seen this before?

14   A.   I believe that this was sent to me in an email, if it's

15   the exact same document.  I'm not sure.  It was sent in an

16   email and I forwarded it to my boss.

17   Q.   Do you remember who sent you the email with this document?

18   A.   No, I really didn't look at who sent it.  It wasn't a

19   familiar name.

20   Q.   But it was someone within Starbucks?

21   A.   No, I don't believe it to be someone within Starbucks.

22   Q.   And then you forwarded the email you received to Alexis

23   Vertucci?

24   A.   I believe that was the course of action.

25   Q.   Do you recall approximately when you received the email

1  with this document or something that looked like it?

2  A.    Probably the 11th.

3  Q.    Of February?

4  A.    February.

5           JUDGE GARDNER:   So can I understand correctly that

6  to the best of your recollection someone unaffiliated with

7  Starbucks emailed you this the day after the petition was

8  filed?

9           THE WITNESS:   I believe that to be the case.

10           JUDGE GARDNER:   But you don't recall who that was?

11           THE WITNESS:   I don't know the name.

12           JUDGE GARDNER:   Okay.  Was it someone from the

13  Union?

14           THE WITNESS:   Possibly.

15           JUDGE GARDNER:   Okay.

16           THE WITNESS:   Or the Labor Board or -- I'm not sure,

17  I'm really not sure.

18           JUDGE GARDNER:   Okay, not like a friend or a man on

19  the street?

20           THE WITNESS:   No, no one that I know.

21           JUDGE GARDNER:   Okay.

22  BY MR. JACKSON:

23  Q.   As district manager you're responsible for knowing about

24  events or developments that can affect business in the stores

25  within your district, correct?

1  A.    I am responsible for -- can you say that again?

2  Q.    Yes.  As district manager you are responsible for knowing

3  about developments or events that can affect business in the

4  stores within your district, is that right?

5  A.    Yeah, I guess you could say that.

6  Q.    So in that regard, it's part of your job to follow news

7  reports concerning or affecting stores in your district,

8  correct?

9  A.    That is not correct.

10 Q.    You're aware that the Union's petition was reported on or

11 covered by the news, correct?

12 A.    Not necessarily, meaning that I don't watch the news and

13 look at the Union stuff nor was it part of my job description.

14 And to be honest with you, I never even paid too much attention

15 to this document when it came because I thought it was like a

16 spam.

17 Q.    You receive a notification or a ping when there's a news

18 report affecting one of your stores, correct?

19 A.    That is not correct.  What do you mean by ping?

20 Q.    A ping meaning a notification of a news report on some web

21 device.

22 A.    That is absolutely not factual; I get no pings about any

23 news.

24 Q.    So your testimony is that you never saw any newspaper

25 articles regarding the Union campaign at the Great Neck Road

1   store?

2   A.   If you're saying I saw a newspaper article then no.   If

3   you're saying someone texted me a clip or a picture of Joselyn

4   on, you know, on a newspaper clip that happened later on.

5   Q.   Late on when?

6   A.   Don't remember the date, but you can probably get it

7   through the text, but as far as a newspaper article or me

8   picking up a paper, never happened.

9   Q.   Ever use the word ping?

10  A.   I never used the word ping.

11  Q.   You've never used the word ping?

12  A.   Today I used the word ping.

13  Q.   Before today?

14  A.   Ping?

15  Q.   Ping, p-i-n-g.

16  A.   Ping pong, yes, I used the word ping.

17  Q.   You never used the word ping to descript a notification

18  that you received?

19  A.   Absolutely not.

20  Q.   You're familiar with Newsday, correct?

21  A.   It's a newspaper.

22  Q.   And it's a news publication that covers stories related to

23  Long Island, New York, correct?

24  A.   I do know that it's a newspaper; where it covers, no.   I

25  don't get the newspaper at home, I don't read the newspaper, I

1    rarely ever pick up a newspaper and if I see a newspaper in the
2    stores, I throw them out.
3              Not just newspapers, magazines or anything that
4    people leave because we do have some stores where people will
5    just come in, bring stuff in, put them there, but it's not
6    something we allow.  We used to when we used to sell
7    newspapers, but we no longer do that.
8    Q.   You never saw a news report featuring a statement by
9    Employee Justin Wooster regarding his support for the Union
10   campaign?
11   A.    I do not believe I saw a newspaper report regarding Justin
12   Wooster at all.  At this time I do not recall that.
13             MR. JACKSON:   Bear with me, Your Honor, I'm just
14   preparing a document I'd like to present.
15             Was the previous document marked for identification?
16             JUDGE GARDNER:   It has been marked for
17   identification.  I have not received it.
18             MR. JACKSON:   And that was GC-2, right?
19             JUDGE GARDNER:   Yes.
20             MR. JACKSON:   Okay.  Now, I'm not sure how Your
21   Honor would like to deal with this, but we've come to a point
22   where General Counsel will be marking for identification audio
23   recordings.  In conjunction with the audio -- for each audio
24   recording, I should say starting with what I'll mark for
25   identification as GC-3(a), I prepared an accompanying exhibit

1    which consists of a transcript of select portions of the

2    recording, which I'll have marked for identification as GC

3    Exhibit 3(b).

4    (General Counsel's Exhibits 3(a) and 3(b) identified.)

5              MR. JACKSON:   I'm distributing to counsel --

6              JUDGE GARDNER:   (a) is the audio recording itself?

7              MR. JACKSON:   Correct.

8              JUDGE GARDNER:   3(b) is a transcript of portions?

9              MR. JACKSON:   Selected portions.

10             JUDGE GARDNER:   Oh, I see, with printed identified

11   times you're referring to?

12             MR. JACKSON:   Correct.

13             JUDGE GARDNER:   Okay.  And what are we doing?

14             MR. JACKSON:   Okay.  So I have marked for

15   identification GC Exhibit 3(a) and 3(b) and I'd like to present

16   the witness with the portion of Exhibit 3(a).

17             JUDGE GARDNER:   You're going to play it?

18             MR. JACKSON:   Correct.

19             JUDGE GARDNER:   Do we have the equipment?

20             MR. JACKSON:   It's just audio and I was just going

21   to play it through these speakers.

22             JUDGE GARDNER:   Okay.  Just identify what you're

23   playing.

24             MR. JACKSON:   Yes.  I'll play the portion of Exhibit

25   3(a) from time stamp 240 to 335.

```
 1            JUDGE GARDNER:   I just want to note that at least
 2    the transcript I'm holding has the first section it identifies
 3    is from 235 to 910.
 4            MR. JACKSON:   Yes.
 5            JUDGE GARDNER:   And what happens from zero to 234?
 6            MR. JACKSON:   Well, Your Honor and the parties can
 7    all review that on their own.  I don't think it's useful using
 8    hearing time to play it.
 9            JUDGE GARDNER:   I'm not suggesting that we need to
10    listen now, I just would like a representation of what is --
11    what happens from zero to 234?
12            MR. JACKSON:   There is some background noise, some
13    kind of extraneous chatter
14            JUDGE GARDNER:   Okay.  And then are we going to be
15    listening to a number of segments that take us from 235 to 910,
16    is that what I should anticipate?
17            MR. JACKSON:   I don't intend to play the entire
18    nearly seven minutes of the recording.
19            JUDGE GARDNER:   At this time with this witness.
20    Okay.  All right, so what we are listening to though is from
21    240 to?
22            MR. JACKSON:   To 335 at this times.
23            JUDGE GARDNER:   Okay.
24            MR. JACKSON:   Do you want to give any description of
25    what it's going to be or you want to play it and inquire of the
```

1   witness?

2         MR. JACKSON:   I'd like to play it and inquire of the

3   witness.

4         JUDGE GARDNER:   Okay, go ahead.

5   (Whereupon, the indicated portion of the audiotape was played.)

6   BY MR. JACKSON:

7   Q.   Mr. Leon, that is your voice heard on this recording,

8   correct?

9   A.   That is my voice.

10  Q.   And you can also identify Justin Wooster's voice as the

11  other voice we heard on the recording, correct?

12  A.   Yep.

13  Q.   What were you referring to in this recording statement

14  when you stated the Union news broke yesterday?

15  A.   The partner that reached out to me informed me that the

16  partners did sign petition cards.  I believe that's what I was

17  referring to.

18  Q.   Okay.  And you told Wooster that I know you know because I

19  received a nice ping, correct?

20  A.   I didn't hear that.

21  Q.   Can we play that again?

22  (Whereupon, the portion of the audiotape was replayed.)

23  BY MR. JACKSON:

24  Q.   You told Justin Wooster that you knew about the Union

25  campaign because you received a nice ping, correct?

1   A.   It sounds like that, yes, and by ping maybe I meant a

2   message from Beth Daniells because we do not receive pings on

3   news like.

4   Q.   So Beth Daniells told you that Justin Wooster knew about

5   the Union?

6   A.   Beth Daniells did inform me about them signing petition

7   cards yes.

8   Q.   Justin in particular?

9   A.   Didn't mention Justin.

10  Q.   How did you know that Justin knew?

11  A.   She said everybody did.

12  Q.   Beth Daniells told you that everybody knew about the Union

13  petition?

14  A.   She said that everybody signed the cards.

15  Q.   So you spoke with Justin Wooster about your views and

16  opinions concerning Unionization on February 11, correct?

17  A.   About my opinions, absolutely.

18  Q.   You spoke with him in the back room of the Great Neck Road

19  store, correct?

20  A.   I don't recall if it was in the back room or on the -- in

21  the lobby and I'll tell you, he asked me about doing the

22  condition assessment so that kind of tells me at that point I

23  was in the lobby looking at equipment and, you know, the

24  condition of the store.

25  Q.   So as far as you recall this conversation occurred in the

1  lobby, not in the back room?

2  A.    I don't recall.

3  Q.    Justin Wooster is not the only Great Neck Road store

4  employee with whom you spoke about your views and opinions

5  concerning Unionization, correct?

6  A.    Justin is not the only partner that I spoke to about my

7  opinions or experiences.

8  Q.    You spoke with Employee Joselyn Chuquillanqui about that

9  subject, correct?

10  A.    Correct.

11  Q.    You spoke with Joselyn multiple times about your views and

12  opinions concerning Unions, correct?

13  A.    I couldn't say more than two, two to three.

14  Q.    You spoke with an employee named Revnov Charaz about

15  Unions, correct?

16  A.    I don't believe I have.  I don't recall at this time

17  speaking to him about Unions specifically.  If I spoke to

18  Revnov it was about performance, not creating the environment

19  for the customers, not smiling at the customers, not saying

20  hello, not saying thank you, not living up to his job

21  expectation.  I had a conversation with him about that, about

22  Union?  I don't remember talking to him about Union.

23  Q.    You spoke with an employee named Nicole Green about

24  Unions, correct?

25  A.    Correct.

1  Q.   You spoke with Employee Munav or Jerry Sing about Unions,

2  correct?

3  A.   Correct.

4  Q.   You spoke Employee Devante Jones about Unions, correct?

5  A.   Absolutely.

6  Q.   You spoke with Employee Brianna Hines about Unions,

7  correct?

8  A.   Correct.

9  Q.   You spoke with Employee Lavender Sande about Unions,

10 correct?

11 A.   Correct.

12 Q.   Approximately how many Great Neck Road employees did you

13 speak with about Unions?

14 A.   Approximately nine.  That's an approximation.

15       MR. JACKSON:   Your Honor, could I request a brief

16 recess, five minutes?

17       JUDGE GARDNER:   Is this a natural break in the

18 testimony?

19       MR. JACKSON:   Well, I do need to prepare something

20 else that I neglected to do and I also want to use the restroom

21 so I just request five minutes.

22       JUDGE GARDNER:   Okay.  Let's take five minutes off

23 the record.

24       COURT REPORTER:   We're off the record.

25 (Whereupon, a recess was taken from 11:05 a.m. to 11:16 a.m.)

```
 1              JUDGE GARDNER:   Back on the record.  Go ahead, Mr.
 2   Jackson.
 3              MR. JACKSON:    Okay.
 4   BY MR. JACKSON:
 5   Q.   Mr. Leon, during your meeting with Justin Wooster on
 6   February 11, you told him that he would not be eligible to get
 7   promoted in the same way as he could without the Union if Great
 8   Neck Road store employees chose the Union, is that correct?
 9   A.   I don't believe that to be correct.
10   Q.   I'm going to play the recording, GC Exhibit 3(a) from time
11   stamp 728 to 833.
12   (Whereupon, the indicated portion of the audiotape was played.)
13   BY MR. JACKSON:
14   Q.   Do you recall now whether you told Justin Wooster that he
15   would not be eligible to get promoted in the same way if Great
16   Neck Road store employees Unionized?
17   A.   That's not what I told him.  I never said that he will not
18   get promoted if you go on to a Union.  I gave him my opinion
19   about, you know, what happens when you're in a Union, educating
20   him, absolutely.
21   Q.   But that portion of GC Exhibit 3(a) that is what you told
22   Justin Wooster, correct?
23   A.   That is how I -- what I told him, not how I told him.
24   Q.   Now, isn't it true that as of February 11 of 2022 you
25   understood that Beth Daniells had a practice or tendency of
```

1    excusing employee lateness or tardiness?

2    A.    That is not true.

3    Q.    You believe that if an employee arrived late to work Beth

4    Daniells may informally ask the employee to come on time as

5    opposed to disciplining them, correct?

6    A.    I'm not aware, that's not my scope of work.  I'm not

7    following every partner's time cards, it's too -- I just can't

8    do that.  Managers have that position so if they have a

9    discussion with a partner Darrell can have that discussion,

10   that is, you know, their scope of work.  I don't follow every

11   partner's time card or prescribe disciplinary action.

12   Q.    But your understanding about the conditions in the Great

13   Neck Road store was that Beth Daniells was empathetic towards

14   employees regarding lateness, correct?

15   A.    Do I think Beth Daniells is empathetic around lateness?

16   A.    As of February 11.

17   Q.    Beth Daniells has a history of holding partners

18   accountable for time and attendance infractions, yes, but she

19   talked to them initially, make them aware like, hey, here are

20   the standards, right, and here's where I see you deviating from

21   the standards, let's fix that before she went to corrective

22   action, I believe that's the case.

23          I believe that's the case for every manager, but if

24   the behavior persists and persists and persists and persists

25   and persists it's out of our hands, like this is partners are

1   going to be held accountable.  That's just commonplace, that's

2   not something new or just started because a Union, you know,

3   came in, that's just how we do work.

4   Q.   So you didn't tell Justin Wooster that if the Union came

5   in something in that regard would change?

6   A.   I don't believe so.  I believe if I gave him an opinion of

7   mine or an experience or something that someone relayed to me

8   about their experience within the Union maybe I shared that.  I

9   possibly shared my opinion with him, yeah, I possibly did.

10  Don't recall it at the time, but yes, I could have shared my

11  opinion with him.

12  Q.   Okay, I'm going to --

13  A.   That was in an effort to educate partners on what they

14  were getting involved in.

15          MR. JACKSON:   I'm going to play for the witness a

16  portion of GC Exhibit 3(a) from time stamp 833 to 910.

17  (Whereupon, the indicated portion of the audiotape was played.)

18  BY MR. JACKSON:

19  Q.   That is your voice we just heard on that portion of the

20  recording, correct?

21  A.   That is my voice.

22  Q.   And that reflects accurately what you told Justin Wooster,

23  correct?

24  A.   That reflects me sharing my opinion about how we deal with

25  it so that I explained the current state.  You may come in

```
 1   late, Matthew's going to talk to you and say, hey, you know

 2   what, you're late, let's fix this, let's remedy this and if you

 3   continue to be late then it's going to probably go to

 4   corrective action.

 5           From what I learned from Beth, she working in a Union

 6   shop I believe she mentioned, she goes when you came in late

 7   that was an infraction against you.  I shared that just so that

 8   partners were aware.  It was again my opinion, my experience,

 9   nothing more than that.

10           I'm sure that in this document you'll see that I said

11   plenty of times I'm not here to swear you, I'm not prescribing

12   anything to you, right, you do what you want to do just educate

13   yourself, just be knowledgeable, that's it.  That was my whole

14   intent, okay?  Never did I threaten anybody, okay.

15           JUDGE GARDNER:   Okay, I'm going to stop you.

16   There's no question pending.

17           Go ahead.

18   BY MR. JACKSON:

19   Q.   As of February 11 2022, employees at the Great Neck Road

20   store were eligible to work shifts for hours at other Starbucks

21   locations, correct?

22   A.   Yes.

23   Q.   You told Justin Wooster that if employees at that store

24   Unionized that they would likely not be allowed to work at

25   other stores, correct?
```

1   A.    What day did you say I said that to him?

2   Q.    February 11.

3   A.    I don't recall if that's the day I said that to him, but I

4   did mention to him an experience that we shared with the

5   British Columbia store, partners could not work in two

6   different sets of rules, right?  So a Union partner or a non-

7   Union partner could not come into a Union shop.  Am I mistaken

8   in saying that?

9        And a Union partner cannot work in a non-Union shop

10  because there are two different sets of rules.  A non-Union

11  partner cannot go to a collective bargaining or all of these

12  things that a Union is required to do?  I don't believe I

13  shared anything that's false there.  I believe that that was

14  educating the partner and that's my opinion.

15  Q.    You're aware that employees at the Great Neck Road store

16  occasionally would work shift at other stores to pick up extra

17  money, correct?

18  A.    I'm aware that partners from all stores are allowed to go

19  and work in another store, not just the Great Neck store, all

20  stores except in the case of the British Columbia store which

21  went through the collective bargaining and they have a contract

22  now and those partners cannot work in other stores.

23        I don't know if that's, you know --

24        MR. MENDELSON:   Excuse me, there are times you

25  interrupt him and I'd ask you not to do that.

1   BY MR. JACKSON:

2   Q.    Please continue your answer, sir.

3   A.    I was just asking can I not share that with the partners

4   that are --

5          JUDGE GARDNER:    Well, he can answer the question.

6   Go ahead

7          THE WITNESS:    Okay.

8   BY MR. JACKSON:

9   Q.    You're aware that employees, partners took advantage of

10  that opportunity that Starbucks provided them in order to earn

11  more money, correct?

12  A.    I didn't discuss it with the partners and what their

13  reasons were.  They did that.

14  Q.    But you allowed them to take advantage of those

15  opportunities, correct?

16  A.    When those opportunities arise partners would pick up

17  shifts, yes.

18  Q.    All right.  I'd like to play the portion of GC Exhibit

19  3(a) from time stamp 1012 to 1125.

20  (Whereupon, the indicated portion of the audiotape was played.)

21  BY MR. JACKSON:

22  Q.    Do you recall now whether you told Justin Wooster that he

23  would not be able to work at other stores if the Great Neck

24  store -- the Great Neck Road store Unionized?

25          MR. MENDELSON:    Objection.

```
 1              JUDGE GARDNER:   What's the objection.

 2              MR. MENDELSON:   I think the question

 3    mischaracterizes what we listened to.

 4              JUDGE GARDNER:   Okay, I'll overrule that objection.

 5              THE WITNESS:   Is there any way to hear the

 6    conversation leading up to that or are you just going to play

 7    it by snippet?

 8              JUDGE GARDNER:   Okay.  Well, we have been listening

 9    like in order, I think, and I'm not even sure there was a gap,

10    but no, he's playing what he's playing and you can let him know

11    if it sounds out of context or if it isn't you or if you, as

12    you said a number of times don't agree with his

13    characterization of what you said.

14              THE WITNESS:   I don't agree with the

15    characterization of what I said.  I believe I stand on the

16    position I explained right before that.  I --

17              JUDGE GARDNER:   Okay, let me ask.  Earlier that

18    counsel asked where this conversation is taking place.  I think

19    you said that you think it was the lobby, but weren't quite

20    sure.

21              THE WITNESS:   Yeah.

22              JUDGE GARDNER:   And my question is whether having

23    listened to these if it is refreshing your recollection at all

24    as to where and if in fact it is just one place or are you

25    moving at all?
```

```
 1            THE WITNESS:   I believe --
 2            JUDGE GARDNER:   It's quite a time now to be standing
 3    in the lobby, it seems.
 4            THE WITNESS:   Yeah, I believe these are not one
 5    conversation, I believe the conversation around the audit took
 6    place in the lobby and I believe some of it took place in the
 7    back room so there was movement.
 8            JUDGE GARDNER:   At some later date or you think you
 9    carried the conversation in --
10            THE WITNESS:   I don't believe we carried the
11    conversation, I believe that it was another -- like part of
12    another conversation or maybe another approach.
13            JUDGE GARDNER:   At a different time or something?
14            THE WITNESS:   Yeah, at a different time.  I mean
15    there's a --  just like at 2:35 p.m. to 9:10?
16            JUDGE GARDNER:   No, I believe what you're pointing
17    at on the first page of GC 3(b) is the same time stamp because
18    it is from minute two, second 35.
19            THE WITNESS:   Okay, I was going to say I was not at
20    the store that long.
21            JUDGE GARDNER:   And --
22            THE WITNESS:   So nine minutes is what you were
23    saying we're looking at, okay.
24            JUDGE GARDNER:   It is that way and that's my
25    understanding having listened to it.
```

```
 1              THE WITNESS:   Okay.
 2              JUDGE GARDNER:   But yeah, that's not from 2:35 p.m.
 3    to 9:10, okay.
 4              MR. JACKSON:   No, it is the time stamp on GC 3(b)
 5    reflects the time stamp from the document GC 3(a), the
 6    recording.
 7              JUDGE GARDNER:   Okay.  And at least was the General
 8    Counsel making a representation that this audio is -- occurs in
 9    one sitting, so to speak, even if people are standing or is --
10    does it represent a series of conversations in a continuing
11    effort at recording conversations or do you not know that
12    answer?
13              MR. JACKSON:   The authenticating witness will
14    testify that this is all part of one continuous conversation on
15    February 11.
16              JUDGE GARDNER:   Okay, all right, go ahead.
17    BY MR. JACKSON:
18    Q.   During your meeting with Justin Wooster on February 11th
19    you asked Justin to tell you what employees wanted that they
20    were not already getting from Starbucks, correct?
21    A.   Can you repeat that?  Sorry.
22    Q.   You asked Justin on February 11th to tell you what
23    employees wanted that they were not already getting from
24    Starbucks, correct?
25    A.   I don't believe I said it in that way.
```

1   Q.   You also told Justin that if he were to just tell you what
2   employees wanted that you would go and try to get it for him,
3   correct?
4   A.   I don't recall saying it like that.
5           MR. JACKSON:   I'm going to play for the witness a
6   portion of GC Exhibit 3(a) from time stamp 1,300 to 1,337.
7   (Whereupon, the indicated portion of the audiotape was played.)
8   BY MR. JACKSON:
9   Q.   That is your voice we just heard on the recording,
10  correct?
11  A.   That is my voice, yes.
12  Q.   And that's something you told Justin Wooster, correct?
13  A.   Yes.   There's more to it though.
14  Q.   Do you recall now whether you asked Justin Wooster to tell
15  you what employees wanted that they were not already getting
16  from Starbucks and that if he were to tell you that you would
17  try to get it for him?
18  A.   Yes, and I do that all the time every visit prior to the
19  Union.   This is my role.   Any road block, anything that the
20  partner is looking to acquire or has an idea about we've always
21  done this, this is not a new practice so this is just me doing
22  my role.
23  Q.   You also told Justin Wooster that he could be required to
24  participate in mandatory strikes if the Union -- if the Union
25  came into the Great Neck Road store, correct?

```
 1   A.   I shared my opinion around that, yes.

 2           MR. JACKSON:   All right, I will play for the witness

 3   a portion of GC Exhibit 3(a) from time stamp 2,114 to 2,232.

 4   (Whereupon, the indicated portion of the audiotape was played.)

 5   BY MR. JACKSON:

 6   Q.   That is your voice we just heard on that portion of the

 7   audiotape

 8   A.   That is a conversation I had with Justin.

 9   Q.   Okay.

10   A.   I'd like to hear what led up to that conversation, what

11   questions he asked me or what Union talk --

12           JUDGE GARDNER:   Again, you're going to wait till a

13   question is asked and then you can answer the question.

14           THE WITNESS:   Sorry.

15   BY MR. JACKSON:

16   Q.   You met with Justin Wooster again on March 25 to hear your

17   views again regarding Union representation, correct?

18   A.   I don't recall meeting with him on March 25th.

19   Q.   But you did speak with him again about your views on

20   Unions after February 11th, correct?

21   A.   I don't recall.

22   Q.   You spoke with Justin about a news article you had seen

23   regarding alleged threats made by Starbucks managers against

24   Great Neck Road store employees, correct?

25   A.   I don't recall.
```

1    Q.   Do you recall that you asked Justin whether he felt

2    threatened?

3    A.   I definitely don't recall that.

4    Q.   And you asked Justin about whether other employees

5    expressed to Justin that they felt threatened, correct?

6    A.   I -- say that again?

7    Q.   Yes.  You asked Justin whether he felt other employees had

8    told him that they felt threatened?

9    A.   I don't recall that conversation.

10   Q.   All right.

11           MR. JACKSON:   Again, I am having marked for

12   identification a recording I'll identify as GC Exhibit 4(a)

13   along with an accompanying transcript of selected portions of

14   the recording in GC Exhibit 4(a) which I'll have marked for

15   identification as GC Exhibit 4(b).

16   (General Counsel's Exhibits 4(a) and 4(b) identified.)

17           MS. TOOKER:   I just want the record to reflect that

18   as we are marking the recording, I am uploading them to the

19   share point site so they're available to all the parties.

20   BY MR. JACKSON:

21   Q.   All right.  Now, I'm going to play a portion of this

22   recording for you from time stamp 055 to 210.

23   (Whereupon, the indicated portion of the audiotape was played.)

24   BY MR. JACKSON:

25   Q.   Do you recall now discussing a newspaper article with

1   Justin Wooster?

2   A.    Yes.

3   Q.    That's a news article you read in Newsday, correct?

4   A.    I did not read that article.

5   Q.    You understood that there was a newspaper article about

6   employees?

7   A.    Someone mentioned the article to me.  I never read that

8   article nor did I pick up a newspaper.

9   Q.    That is your voice we just heard on the recording,

10   correct?

11   A.    That is my voice.

12   Q.    And that is something you spoke to Justin Wooster about?

13   A.    Absolutely.

14   Q.    So you never saw the Newsday article that you were

15   referencing?

16   A.    I did not.  In fact if I saw it, it was a snippet of a

17   picture like I said.

18   Q.    As of March 25 you knew that Joselyn Chuquillanqui was the

19   employee leading the Union organizing campaign at the Great

20   Neck Road store, correct?

21   A.    I actually believed it was Justin.

22   Q.    You believed it was Justin?

23   A.    Yes.

24   Q.    What led you to believe it was Justin?

25   A.    The partners told me that they went to a meeting at his

```
1    house.  I had no idea it was Chuquillanqui for a long time.
2    Q.   When did you discover that?
3    Q.   When did I discover that?  I don't know if I ever
4    discovered it.  I know she was --
5    Q.   Well, at some point you found out.
6    A.   I know she was a very vocal, you know, Union supporter,
7    but I didn't know she was the main organizer at first.  I
8    didn't know that, no.
9    Q.   You came to know that at some point, didn't you?
10   A.   Yeah, I don't remember exactly what day.
11   Q.   Okay.
12              JUDGE GARDNER:  Can I just go back to the newspaper
13   article?
14              MR. JACKSON:  Sure.
15              JUDGE GARDNER:  So you didn't read an entire
16   newspaper article, but you saw a snippet of it?
17              THE WITNESS:  I believe someone sent me the snipped
18   with a text message saying that, you know, this is an article.
19              JUDGE GARDNER:  What's in the article?
20              THE WITNESS:  That they say we're threatening the
21   partners.  I didn't read the article; I didn't pull the article
22   out.  You know, I didn't go buy a newspaper.
23              JUDGE GARDNER:  Do you know if it named you, that
24   you were the person threatening?
25              THE WITNESS:  I don't even recall.
```

```
 1              JUDGE GARDNER:   You didn't know that at that time?
 2              THE WITNESS:   No, no.
 3              JUDGE GARDNER:   Okay.
 4              THE WITNESS:   I don't recall if it named me, if it
 5   had my name in it.  It may have, it may have not, you know, I
 6   don't know.
 7              JUDGE GARDNER:   All right, go ahead.
 8   BY MR. JACKSON:
 9   Q.   So you thought Justin Wooster was the leader of the Union
10   campaign initially, correct?
11   A.   Yeah, I think most of us did.
12   Q.   And you just testified that you believed that because one
13   of the partners told you that there was a Union meeting at
14   Justin's house, correct?
15   A.   Yeah, a partner did bring that to my attention.
16   Q.   Who told you that?
17   A.   I don't remember who it was.  It could have been Jerry, it
18   could have been -- I think it was possibly Munav, I'm not sure.
19   Q.   Munav and Jerry are the same people, right?
20   A.   Yes.
21   Q.   Yes.  Do you recall how you started speaking about the
22   Union meeting with Jerry?
23   A.   I don't recall.  I know that Jerry asked me.  He said to
24   me one day, hey, I'm looking to get promoted to manager, does
25   this change anything?
```

1    A.   I said well, managers aren't part of the Union kind of

2    like referring like you don't have to worry about that, you

3    want to move up.  You know, he already had moved up to shift

4    supervisor.  If he wants to move up, you know, I said to him

5    that managers are not in the Union.  I'm not in the Union.

6    Anybody above our level wouldn't be in the Union.  I did

7    explain that to Munav, I do remember that.  Yeah, that's how we

8    started talking; he came to me and asked me a question.

9    Q.    And you asked him about a Union meeting?

10   A.   No, I didn't ask him anything about a Union meeting.  He

11   came to me.  And I'm not even sure if it was him.  Maybe it was

12   Lavender, maybe it was Nicole.  I'm not sure who told me there

13   was a meeting at that time there at Justin's house I believe he

14   said.

15   Q.   But  you did -- you do recall speaking with Jerry Singh

16   about your views concerning how Unionization might affect

17   promotions, correct?

18   A.   I remember telling him that he -- you know, that's nothing

19   he has to worry about because he can become a manager, managers

20   are not part of the Union.  He -- let me try and recall how he

21   said it.  He said how does this affect me if I'm in the Union,

22   how does it affect me to become a manager.

23          I don't remember exactly how I said it, but I said

24   managers are not part of the Union.  I believe that's how I

25   said it, managers are not part of the Union meaning, you know,

1    anybody above the hourly rate is not a part of the Union.

2    Q.   You told Justin Wooster that if employees chose to

3    Unionize then they would "never" be able to keep their existing

4    pay and benefits plus get more, is that correct?

5    A.   I don't believe I said it like that.

6    Q.   Okay.

7    A.   I'm reading it and the way I said it could mean two

8    different things.

9    Q.   Okay.

10        MR. JACKSON:   I'd like to present to the witness a

11   portion of GC-Exhibit 4(a) from time stamp 853 to 928.

12   (Whereupon, the indicated portion of the audiotape was played.)

13        THE WITNESS:   That doesn't sound the way you said

14   it.

15   BY MR. JACKSON:

16   Q.   That is your voice, correct?

17   A.   That is my voice, but it's not the way you said it.

18   Q.   And what's reflected in that portion of GC 4(a) accurately

19   reflects what you said to Justin Wooster, correct?

20   A.   This is a response to a question he had.

21   Q.   Does that accurately reflect what you told Justin Wooster?

22   Does the portion of that video --

23   A.   Yes.

24   Q.   -- recording accurately reflect what you told Justin

25   Wooster?

1  A.   Yes.

2  Q.   And you told Justin Wooster additionally that if employees

3  unionized then Union dues would be deducted from their

4  paycheck, "regardless" of anything they did, correct?

5  A.   I don't recall that.

6  Q.   You also told Justin that if employees at his store

7  unionized then employees from other stores would not be allowed

8  to work at the Great Neck Road store, correct?

9  A.   I believe we established that.

10  Q.   And you also told Justin that employees could lose

11  benefits if they unionized, correct?

12  A.   No, I believe I said all benefits would be up for

13  negotiation because legally that's how it works, collective

14  bargaining, everything is up for negotiation.

15  Q.   Do you recall that you mentioned specific benefits that

16  employees currently have that they stood to lose as a result of

17  unionization, correct?

18  A.   I don't remember saying specific benefits that they would

19  lose of not lose; I said everything is up for negotiation.

20        MR. JACKSON:   I'm going to play -- I'd like to

21  present to the witness the portion of GC -- what I've marked

22  for identification as GC Number 4(a) from time stamp 1019 to

23  1318.

24        MR. MENDELSON:   Is that 1009 or 1019?

25        MR. JACKSON:   Oh, we could do it from 1009.

1  (Whereupon, the indicated portion of the audiotape was played.)

2  BY MR. JACKSON:

3  Q.   Now, during one of the meetings with Justin Wooster --

4  well, first of all does that accurately reflect a portion of a

5  conversation you had with Justin Wooster at some point in time?

6  A.   Yes, it accurately reflect it, him reading and asking

7  questions and me clarifying what it means absolutely.  That's

8  probably like all of it, but we're not playing that part so --

9  BY MR. JACKSON:

10  Q.   What was he reading from?

11  A.   Say it again?

12  Q.   What was he reading from?

13  A.   I don't recall what he was reading from, but he was asking

14  me about those questions.

15  Q.   You gave him something to read, correct?

16  A.   I don't -- I don't recall giving him anything.  If he got

17  something, he got it.  The only thing we did was tell him go to

18  the website and look at the -- I don't even recall what the

19  website was, Starbucks, onestarbuck.com where it gave you facts

20  about what it means to unionize.  I told them all educate

21  yourselves before you make a decision.

22          That was my position.  I said I'm not prescribing

23  anything; I am not pro or for the Union.  My experience is I

24  don't think we need the Union in our store.  My opinion was,

25  not experience.  My opinion, all right, and that's what I

1    shared with them, I shared that with whoever I spoke to.  They

2    had questions; I had answers; that was that.

3    Q.   So you don't recall giving Justin Wooster a document for

4    him to read?

5    A.   If Justin says I gave him a document, I would ask him

6    about it.  I don't recall giving him anything to read.  I don't

7    recall handing anybody any documents.  I don't even recall

8    putting a post-it up.  If anything, that was the store

9    manager's role.

10   Q.   So your testimony is you don't recall handing any employee

11   any document regarding Union?

12   A.   I don't recall handing any employee any document.  I don't

13   recall that at this time, no.

14   Q.   But if Justin testified that that was true you would

15   believe that testimony?

16   A.   I would question that.

17   Q.   You would question that?

18   A.   Yeah.  I don't know it to be true.  I don't believe I

19   handed him anything.  If he wanted to see something he can

20   definitely pull it up for himself, all of this information was

21   available to him.

22            MR. JACKSON:   Can we go off the record?

23            JUDGE GARDNER:   Yes.

24   (Whereupon, there was a pause off the record from 11:56 a.m. to

25   11:58 a.m.)

```
 1            JUDGE GARDNER:   Let's go back on the record.
 2            COURT REPORTER:   We're on the record.
 3   BY MR. JACKSON:
 4   Q.   Do you recall speaking with Justin Wooster about shady
 5   practices you believe the Union was engaged in?
 6   A.   I don't recall exactly what -- what was in that
 7   conversation, but I do remember saying that I felt there was
 8   some things that they were doing that weren't okay.
 9   Q.   And one of those things were you felt that the Union
10   released a website that mimicked the Starbucks website,
11   correct?
12   A.   Yeah.
13   Q.   Do you recall that?
14   A.   Yeah, I recall that.
15   Q.   And you also mentioned a shady practice of the Unions in
16   your estimation regarding send people to block an entrance of a
17   Starbucks store?
18   A.   Yeah I believe that was not a good practice especially on
19   a Sunday, you know, when they weren't expecting the management
20   to be there, they'd send a whole bunch of people to intimidate
21   the partners,  I didn't think that was a good practice, yes, I
22   did say that.
23   Q.   Yeah, you spoke about that?
24   A.   I remember speaking about that, yeah.  I don't know if it
25   was to Justin.  I don't know who I spoke to about that, but I
```

1  know I definitely brought that up.

2  Q.   And you asked Justin whether he "aligned" with that

3  practice, correct?

4  A.   Possibly.  That was like under – you know, if I did ask

5  him, it's like is that how you like to operate, like that's my

6  -- just is that what you want to be part of, people that would

7  do such a thing?  Yeah, I think I did ask him.

8            MR. JACKSON:   Okay, I'd like to present to the

9  witness a portion of what I've marked for identification as GC

10  4-(a) from time stamp 1,659 to 1,731.

11  (Whereupon, the indicated portion of the audiotape was played.)

12            THE WITNESS:   I had that conversation, yes.

13  BY MR. JACKSON:

14  Q.   So that is your voice?

15  A.   Yeah, that's me.

16  Q.   Now, during the various meetings you had with employees

17  regarding unionization you had talking points or issues that

18  you wanted to address with the employees during each of those

19  meetings, correct?

20            MR. MENDELSON:   Objection.  I'm not sure what the

21  word meetings means in this context?

22            JUDGE GARDNER:   Well, we can clarify that.  We have

23  no foundation yet, but there are meetings of a particular type

24  when I asked about that.

25            MR. JACKSON:   Well, he testified earlier that he

```
 1   spoke with various employees at the Great Neck Road store

 2   regarding unionization, correct?

 3              THE WITNESS:   Correct.

 4   BY MR. JACKSON:

 5   Q.   So my question is during those conversations, I'll say,

 6   with employees --

 7              JUDGE GARDNER:   I would like to hear though the

 8   context of them.  We heard some testimony for Mr. Wooster that

 9   they were just talking in the lobby, the floor of the place,

10   but then maybe they made their way to the back room.  If there

11   is some practice with, you know, 9 out of 13 of the employees,

12   I would like to hear about that.  Maybe they were meetings, so

13   ask a little bit about that first and then we'll get into the

14   conversations.

15              MR. JACKSON:   Okay.

16              JUDGE GARDNER:   In other words -- I'll ask -- were

17   you --when you spoke with employees, had conversations that

18   we've been talking about are they just casual conversations

19   while they're working behind the counter or did you meet with

20   them, you know, in the back so to speak?  I don't know the

21   layout of this place.

22              THE WITNESS:   Yeah, well there -- I didn't have like

23   a meeting meeting, it was just casual conversation if you

24   happen to come to the back do you have time to chat with me?

25   Yeah, I got -- you know, I have time to chat or whatever.  If
```

1   someone said no I don't, okay, just casual conversation, no

2   meetings.  I didn't have any meetings at all.

3           JUDGE GARDNER:  Okay, and including individually?

4           THE WITNESS:  Individually, yes, like you know, I'm

5   here today, you know, if you want to talk to me you can.  You

6   know, do you have five minutes we can chat, yeah, absolutely.

7           JUDGE GARDNER:  Is there a door to wherever you

8   would --

9           THE WITNESS:  There's a door that swings, you know,

10  in and out to go from the back of the house to the front of the

11  house, yes.

12          JUDGE GARDNER:  So that you can meet privately with

13  an individual in the back?

14          THE WITNESS:  You could, yeah, if you --

15          JUDGE GARDNER:  Is that typically what happened or

16  something else?

17          THE WITNESS:  It was never really super private, it

18  was, you know, partners come in and out with their cups to get

19  ice and they'll stop, they'll join the conversation, then

20  they'll leave.

21          JUDGE GARDNER:  Okay.

22          THE WITNESS:  There was no like, oh, close the door,

23  I only want to talk to this person.

24          JUDGE GARDNER:  Got you.

25          THE WITNESS:  None of that.

1          JUDGE GARDNER:   Okay, thanks.  Go ahead, Mr.
2     Jackson.
3     BY MR. JACKSON:
4     Q.   So your testimony is that you never asked Joselyn to meet
5     with you in the back to discuss Unions?
6               MR. MENDELSON:   Objection.
7               JUDGE GARDNER:   That's a fair follow up question,
8     I'll overrule it.
9               THE WITNESS:   Did I ever invite Joselyn to the back
10    to talk about Union?  I spoke to Joselyn.  Union was probably
11    part of the topic, yeah.
12    BY MR. JACKSON:
13    Q.   So you did ask her to come to the back to speak with you
14    about Unions, correct?
15    A.   If I was in the back and -- yeah.
16    Q.   And you asked Nicole Green as well to meet with you in the
17    back to discuss Unions, correct?
18    A.   Yeah.
19    Q.   And you also asked Jerry Singh at one point or another to
20    go into the back to speak with you about Unions, correct?
21    A.   No.  You keep saying it was about Unions, it wasn't, it
22    was just casual conversation.  If Unions got brought up they
23    asked a question and we talked about it.  I didn't specifically
24    say, hey, come to the back I want to talk to you about a Union.
25    That never happened.

1  Q.   Well, you did say come to the back I want to talk to you

2  and then proceeded to speak about Unions, is that --

3  A.   You got a few minutes to talk?  Let's chat.  You know, how

4  are you doing, how are you feeling, stuff, it started out like

5  that.  Never said, hey, let's talk about the Union.  That

6  didn't happen.

7  Q.   So you recall that you asked various employees to meet

8  with you in the back, correct?

9  A.   I recall asking various employees to come - you know, if

10 they have time to come chat with me, let's do that, but that's

11 not something new, I do that every single visit before and

12 after the Union.

13 Q.   And during the course of those discussions you spoke about

14 Unions, correct?

15 A.   During the course of some of those discussions Union

16 topics would come up, yes, that is correct.

17          JUDGE GARDNER:   Have we heard how often visits

18 happened?

19          THE WITNESS:   How often visits happened?

20          JUDGE GARDNER:   Let's say pre-Union, during the

21 Union drive and lately.

22          THE WITNESS:   Pre-Union, maybe once a week, maybe if

23 that.

24          JUDGE GARDNER:   Ms. Daniells is there, I guess,

25 daily?

```
 1            THE WITNESS:   Ms. Daniells is there five days a
 2   week, sometimes six.
 3            JUDGE GARDNER:   And the district manager comes maybe
 4   once a week?
 5            THE WITNESS:   You know, it's 12 stores so maybe I
 6   may not get there once a week, maybe every other week.  If
 7   something's pressing, if someone invites you in, if somebody
 8   wants to talk to you like Joselyn and Nicole then they would
 9   call me and say they are bickering about something, they don't
10   see eye-to-eye, then I would come in in additional, but --
11            JUDGE GARDNER:   But you're not a stranger to any
12   employee who's worked even in one month?
13            THE WITNESS:   I'm not a stranger to the employees.
14   They know me.  They don't know me, like we don't have that
15   relationship that is built liken we're talking about art or
16   sneakers or like where do you live, we're just getting that off
17   the ground if they're in the store for one month, so I'm asking
18   questions like, hey, what do you like about Starbucks, you
19   know, how's your training going, how's your manager, how's your
20   schedule, are you getting enough hours.  So those are the
21   questions I would ask someone in that space of time.
22            If someone's been around a long time we have a
23   rapport, we're talking about everything like how's your living
24   situation, like what's going on, I know you were struggling
25   with this and you were thinking about quitting.  You know, it's
```

1  all --

2           JUDGE GARDNER:   Okay, I get the idea.

3           THE WITNESS:   So you know, it's a whole -- that's

4  just how it is.

5           JUDGE GARDNER:   I just wanted to know how frequent.

6           THE WITNESS:   Yeah.

7           JUDGE GARDNER:   Go ahead.

8           MR. MENDELSON:   Well, Judge, we never heard from him

9  about post -- you asked him initially pre pre-organizing which

10  is what I expect this testimony to be.

11           JUDGE GARDNER:   Yeah, that is -- I mean I was

12  curious about that and you're right, I neglected to follow up

13  to ask.

14           Did those visits increase during the -- let's call it

15  the organizing drive, the issues with the Union?

16           THE WITNESS:   Yes, they did increase.

17           JUDGE GARDNER:   And then how often about would you

18  be on site?

19           THE WITNESS:   I would say once a week.

20           JUDGE GARDNER:   Okay.

21           THE WITNESS:   If that and so it didn't increase by a

22  lot, but I felt that the manager needed a lot more support at

23  that point.

24           JUDGE GARDNER:   Okay.

25           THE WITNESS:   Because she was struggling with

 1  partners freezing her out, like not talking to her.

 2          JUDGE GARDNER:   And now more recently is it more

 3  often, less often because of the concern to what it was pre?

 4          THE WITNESS:   It's kind of like what it was pre.

 5          JUDGE GARDNER:   Maybe every once or two weeks?

 6          THE WITNESS:   Yeah, but I have a whole new district

 7  that started in July so I'm really trying to build

 8  relationships with those stores that don't know me --

 9          JUDGE GARDNER:   Okay.

10          THE WITNESS:   -- so it's taken a little more of my

11  time, but the store knows that if they need me, you know, I can

12  make time for them and come over additionally because I leave a

13  little white space in my calendar to adjust stores who have

14  concerns.

15          JUDGE GARDNER:   Okay.

16  BY MR. JACKSON:

17  Q.   During your various meetings or conversations with

18  employees regarding -- in which the subject of Union or

19  unionization came up the views and opinions you expressed were

20  the same with the various employees you spoke with about the

21  company, correct?

22  A.   Pretty much the same talking points like I'm not here to

23  prescribe, just educate.  Know what you're signing up for.

24  Don't sign -- I probably even said something like you wouldn't

25  go buy a house and go sign something without getting a -- you

1    know, looking into it first, right, so this is the same

2    process, you're about to make a decision for a lot of partners

3    and everybody may be on a different spectrum so, you know,

4    educate yourself.  That's it; that was my stand.

5    Q.   You had a meeting in the back room with Joselyn and

6    another employee named Devante Jones concerning which the topic

7    of Unions came up, correct?

8    A.   I don't recall if I had a meeting with Devante and Joselyn

9    at the same time.

10   Q.   You told both of them, like you told Justin, that they

11   would not be able to retain the same pay and benefits that they

12   enjoyed without the Union plus get more, isn't that correct?

13   A.   I don't believe that to be correct.  You're saying I told

14   them that they would not be able to get more money?

15   Q.   You told them that they would not be able to get improved

16   pay and/or benefits by having a Union, correct?

17   A.   I don't believe that to be correct.  I don't know what

18   would happen in negotiations.  I think I mentioned that

19   everything's up for negotiation, you know, and I don't have --

20   I don't sit at that table, I can't determine whether they get

21   better benefits or the Union negotiates something in lieu of

22   something else.  I think that's possibly what you're, you know,

23   you're saying.

24           MR. JACKSON:   Okay, I would like to mark for

25   identification an audio recording that I'll label as GC Exhibit

1   5(a) and I am presenting counsel, the Court Reporter, Your

2   Honor a copy of what I've marked for identification as GC

3   Exhibit 5(b), which I represent is a transcript of a selected

4   portion of a meeting between Mario Leon and Employee Joselyn

5   Chuquillanqui and Employee Devante Jones.

6   (General Counsel's Exhibits 5(a) and 5(b) identified.)

7            MR. MENDELSON:   Which one are we looking at, I'm

8   sorry?  Which time stamp?

9            MR. JACKSON:   I haven't said that yet, but I will

10  direct your attention to the time stamp 748 to 955.

11           JUDGE GARDNER:   And Ms. Tooker, when you upload it

12  to the share point can you just sink up the naming convention

13  for each of these?  It looks like you have a name, a date and

14  let's have those all be in the same format, okay?

15           MS. TOOKER:   Okay.

16           JUDGE GARDNER:   On a break, not now.

17           MR. JACKSON:   I'm presenting to the witness the

18  portion of what I've marked for identification as GC 5(a) from

19  time stamp 748to 955.

20           MR. MENDELSON:   What time stamp is it?

21           MR. JACKSON:   748 to 955.

22  (Whereupon, the indicated portion of the audiotape was played.)

23  BY MR. JACKSON:

24  Q.   Mr. Leon, that is your voice heard in that portion of the

25  audio, correct?

1    A.    Yes.

2    Q.    And the female voice we heard that's Joselyn

3    Chuquillanqui, correct?

4    A.    Yes.

5    Q.    Did you hear a third person speaking in response to a

6    question you asked?

7    A.    I believe that was Taydoe.

8    Q.    That was Taydoe.

9    A.    Yes.

10   Q.    And Taydoe is Devante Jones, correct?

11   A.    Yes.

12   Q.    And that portion of the audio recording accurately

13   reflects something you said to Devante Jones and Joselyn

14   Chuquillanqui, correct?

15   A.    Yeah, they were both present.  Actually, I was actually

16   talking -- now, I'm reflecting on it, I was talking to Devante

17   Jones and Joselyn just happened to go back there and start

18   doing dishes so she heard a portion of our conversation of what

19   I was talking about and she asked a question and I said, okay,

20   if you have time, come talk, you know, come talk to me, we'll

21   talk.  And she said I'd like to finish this up, the dishes that

22   she was doing.  That's how that led up to --

23   Q.    You called her over to join your conversation with

24   Devante, correct?

25   A.    Yeah, if -- she was curious about it.  She wanted to know

1  what I was talking about.

2  Q.   And the meeting, the initial meeting you had with Devante,

3  you ended up in the back room with him because you asked him to

4  meet with you in the back room, correct?

5  A.   No, I believe he was in the back room already.

6  Q.   And you asked to speak to him while he was there?

7  A.   Yeah, we always talk every time I was there.

8  Q.   You told Joselyn and Devante similar to what you told

9  Justin, that employees stood to lose benefits if they unionized

10  because unionizing was akin to "gambling your benefits," is

11  that correct?

12  A.   I said that all -- all aspects of the contract were up for

13  negotiation; that is correct.

14  Q.   You told them that they were gambling their benefits,

15  right?

16  A.   If I used that analogy it was just to explain to them that

17  everything is on the table.  I might have used that like it's

18  like poker chips when you go all in, right, you've got to put

19  it all in, right?  Maybe I used that analogy, yes, but that was

20  just to paint that visual like, it's up for negotiation.

21          MR. JACKSON:   I'd like to present the witness with a

22  portion of GC Exhibit 5(a) from time stamp 020 to 238.

23  (Whereupon, the indicated portion of the audiotape was played.)

24  BY MR. JACKSON:

25  Q.   Does that portion of the recording, GC-5(a) accurately

1  reflect something you said to Joselyn Chuquillanqui and Devante

2  Jones?

3  A.   Yes.  I didn't use the poker table, I used the dice.

4            MS. TOOKER:   Judge, can we go off the record for

5  just a moment?

6            JUDGE GARDNER:   Off the record.

7  (Whereupon, there was a brief pause off the record.)

8            JUDGE GARDNER:   Back on the record.

9            COURT REPORTER:   We're back on.

10 BY MR. JACKSON:

11 Q.   You had a conversation with Joselyn Chuquillanqui on about

12 April 8, 2022 during which you discussed with her Starbucks

13 policy prohibiting recordings in the workplace, is that right?

14 A.   That is correct.

15 Q.   And you discussed that topic with Joselyn because you had

16 received information that employees were in fact recording

17 conversations that they had with you and with Beth Daniells

18 about unionization, correct?

19 A.   Yes, that's correct.

20 Q.   And you asked Joselyn whether she knew that employees were

21 recording conversations, correct?

22 A.   I don't recall exactly what I said verbatim.  I know that

23 I asked her not to record me, I didn't consent.  She said -- or

24 I said that Starbucks has a policy, it's in the guide that you

25 cannot use recording devices in the store.  She informed me

```
 1  that -- let me see, how did she say it?  She said New York -- I
 2  believe she said New York State is a single party of consent, a
 3  State where only -- you know, it only takes one person to
 4  consent.
 5          I was not aware of that nor did I ever use that in my
 6  life so I said I beg to differ, you know, look it up, it's in
 7  Starbucks' policy, you can get in trouble for that.  I'm just
 8  giving you, you know, letting you know don't do it if you're
 9  doing it.
10          She said no, it's New York State law supersedes
11  whatever.  I don't know exactly what quotes, you know, how she
12  said it.  I said, well, I'll look into it and I did look into
13  it and she was right and I never brought it up again.  So in
14  that essence she educated me on that.
15  Q.   Did you ask her whether she knew people were recording in
16  the workplace?
17  A.   I don't recall.
18  Q.   All right.
19          MR. JACKSON:   I'm going to have marked for
20  identification a recording that I'll label as GC Exhibit 6(a)
21  and I'll present to counsel, the Court Reporter and this is
22  Exhibit 6(a).  And Your Honor a document that I'm marking for
23  identification as GC Exhibit 6(b) which I will represent is a
24  transcript of selected portions of the recording provided in
25  Exhibit 6(a).
```

1  (General Counsel's Exhibits 6(a) and 6(b) identified.)

2          JUDGE GARDNER:   And I'd like to present to the

3  witness the portion of GC Exhibit 6(a) time stamped 1,055 to

4  1,340.

5  (Whereupon, the indicated portion of the audiotape was played.)

6  BY MR. JACKSON:

7  Q.   The first -- well, first of all, that is your voice heard

8  on that portion of the audio, correct?

9  A.   That is my voice, but I think the biggest portion of that

10  I was talking to Beth Daniells, not Joselyn.  Joselyn was the

11  one washing the dishes and you hear all the clattering in the

12  back.  It wasn't Joselyn.  Joselyn chimed in, said something

13  about the recordings and that's where it took off.  That was

14  from was later in the --

15  Q.   So that background noise n, as far as you recall, that was

16  Joselyn washing dishes?

17  A.   Yeah, I believe that was someone washing dishes there,

18  yeah,  That's where the dish washing sink is.

19  Q.   So at the initial part of that portion of the recording

20  you were speaking with Beth Daniells?

21  A.   I believe that was Beth Daniells' voice.

22  Q.   Then at some point Joselyn came into the conversation?

23  A.   Yes.

24  Q.   And after she came -- after she interjected into your

25  conversation, you asked her whether she knew that people were

1  recording in the workplace, correct?

2  A.   I think I said it in the way it read there like, oh, so

3  that someone is recording us, yeah.

4  Q.   Okay.

5  A.   And she said no or whatever she said.

6  Q.   So what we just heard in that portion of the recording

7  accurately reflects something you said to Joselyn

8  Chuquillanqui, correct?

9  A.   Yeah.

10  Q.   You are aware that the NLRB conducted an election among

11  the Great Neck Road store employees in about May of 2022,

12  correct?

13  A.   Yeah.

14  Q.   And you're also aware that the Union did not attain a

15  majority of the votes cast by employees in that election,

16  correct?

17  A.   Correct.

18  Q.   Shortly after the election results were announced you had

19  another conversation with Joselyn I the back room of the store

20  in which you discussed the Union campaign, correct?

21  A.   I don't recall it, but yes, if you say.

22  Q.   Do you recall -- you don't recall having a conversation

23  with Joselyn the day after the election?

24  A.   The day after, I don't recall.

25  Q.   Or shortly thereafter?

1  A.    I don't recall.

2  Q.    Do you remember speaking with Joselyn and Beth Daniells

3  shortly after the Union vote regarding the campaign?

4  A.    When are we talking about?

5  Q.    On May 4th.

6  A.    May 4th and you're saying the Union campaign was when?  I

7  mean the vote went to election when?

8  Q.    Well, there's evidence in the record already that the

9  tally of ballots was completed by the NLRB on May 3rd.

10 A.    On May 3rd and on May 4th you're saying I was in the store

11 talking to Beth?

12 Q.    And Joselyn.

13 A.    I don't -- I don't recall that.  I don't remember going to

14 the store on May 4th right after the election.

15 Q.    Do you remember going to the store and speaking about wage

16 increases that Howard Schulz had announced in May?

17 A.    Did I go to the store specifically to talk about that, no.

18 Q.    Do you recall being at the store sometime in May speaking

19 about wage increases that Howard Schultz had announced?

20 A.    Yes, yes, those were common knowledge and they were posted

21 up.  They go on a weekly update so for everyone to read, yes.

22 Q.    And you spoke about that within your shot of employees,

23 correct?

24 A.    If I spoke about it to somebody, yeah, I wouldn't just say

25 it to myself, yeah.

```
1    Q.    And you also spoke about the fact that Mr. Schultz

2    intended to withhold those wage increases from employees who

3    had either unionized or who had filed a petition for a Union

4    election, is that correct?

5    A.    I can't speak for Mr. Schultz's intent.

6    Q.    No, I'm talking about what you spoke about.

7    A.    What I spoke about?

8    Q.    Yes, you spoke about the fact that these raises and Mr.

9    Schultz intended to give to his employees were only going to

10   accrue to those who had not engaged in Union activity, correct?

11   A.    So what you're saying is that the Union raises --  I mean

12   not the Union raises, the raises wouldn't go to a Union shop is

13   what you're asking and --

14   Q.    Are you aware of that?

15   A.    Yes, I'm aware of that, yeah, that's on everything that

16   comes out.  Like we cannot -- so anything that comes out, new

17   training, new this, it's been happening forever, if it's a

18   Union shop they cannot get those things without the collective

19   bargaining thing, you know, agreement.

20        They can't change the rules in the middle of a

21   collective bargaining -- like they can't go in and say, you

22   know what, we're implementing this and we're going to give it

23   to the Union without ever negotiating that.  I think that's

24   against the law from my understanding.  Now, I'm no law expert,

25   I didn't take any classes on this or anything, this just kind
```

1  of happened to me, so that being said, if I shared that, that's
2  what was shared with me.
3  Q.   So you do recall sharing information about the wage
4  increases that Howard Schultz had announced --
5  A.   Yeah, I believe all managers shared wage increases with
6  everyone, yeah.
7  Q.   And you shared that information with employees too?
8  A.   Probably did, yeah.
9  Q.   Are you aware that Joselyn said that you and Howard
10 Schultz are "Union busters" in connection with your advocacy in
11 support of the Union?
12 A.   Did she say it to me directly?
13 Q.   Are you aware that she said that?
14 A.   No.  I mean unless she said it to me directly, I don't
15 recall her saying I'm a Union buster, nut she probably felt
16 that way.  I don't recall that conversation.
17 Q.   You don't remember her every telling you that you or
18 Howard Schultz was a Union buster?
19 A.   If she said it, she said.  I don't know, I didn't take it
20 with a grain of salt.  Like if she said it, she said it.  I
21 don't recall, I don't recall whether she said that to me.
22 Q.   And to the extent that she said that, that wasn't
23 important to you?
24 A.   What do you mean was it important to me?
25 Q.   You said you took it with a grain of salt.  What do you

1  mean by that?

2  A.   I don't remember her saying that to me.  If she said it,

3  let's hear it.  I don't recall it.

4  Q.   It's not something that bothered you?

5  A.   I think you could read these transcripts and see early on

6  that I said clearly I have no -- I'm not for or against it.

7  It's not something that bothered me, it's not something that

8  really I'm thinking too much about to be honest with you.

9  Until this happened I was not even thinking about it so I'm not

10  a Union buster, I'm not against Unions if that's what you're

11  digging for, I'm not.

12  Q.   So your testimony is that you don't care one way or

13  another whether Joselyn Chuquillanqui called you a Union

14  buster?

15  A.   Get everybody in the store to testify that.  Did I say

16  that?  I don't care one way or the other, just educate

17  yourself, get the whole story here and have them testify and I

18  guarantee you they'll all testify that I did say that at some

19  point.  Educate yourself.  I don't care either way, I'm not

20  here to prescribe or sway you.  That's the God's honest truth.

21  Q.   You never told Joselyn that she was not permitted to say

22  that you were a Union buster?

23  A.   I don't think I would take that lightly like if she said

24  that to me.  I'd take offense to it.  She's called me an oasis

25  before.  Joselyn's special, but we'll just leave that the way

1  it is.

2  Q.   I agree she's special.  Now, so you're saying that if she

3  told you you were a Union buster it didn't bother you, correct?

4  A.   If she told me I was a Union buster I'd probably take a

5  little offense to that, yeah.  I probably would have taken

6  offense to it, yeah.

7  Q.   You directed her that she was not allowed to say that,

8  correct?

9  A.   I don't recall that.

10  Q.   Okay.  I'm going to --

11  A.   I don't recall it.

12       MR. JACKSON:   I'm going to mark for identification a

13  recording that I'll label GC Exhibit 7(a) and I'm going to

14  present to counsel, the Court Reporter and Your Honor a

15  document I'll ask be marked for identification as GC Exhibit

16  7(b).

17  (General Counsel's Exhibits 7(a) and 7(b) identified.)

18  BY MR. JACKSON:

19  Q.   And I'd like to present the witness with the portion of GC

20  Exhibit 7(a) time stamped 2,357 to 2,555.

21  (Whereupon, the indicated portion of the audiotape was played.)

22       THE WITNESS:   I do recall that now.

23  BY MR. JACKSON:

24  Q.   You do recall that conversation?

25  A.   Yes, yes.

1   Q.   Do you recall now that you told Joselyn that she was not

2   permitted to say that you or Howard Schultz was a Union buster?

3   A.   I absolutely --

4        MR. MENDELSON:   Objection.

5        JUDGE GARDNER:   Overruled, go ahead.

6        THE WITNESS:   Okay, I absolutely don't believe it's

7   healthy for the work environment for partners to call anybody a

8   name. It's against our mission and values.  It's not creating

9   the environment and I absolutely stand by that, yes.  I would

10  say that again for anyone who's going around calling partners

11  names, any name, race, a sympathizer, Union buster, anything

12  like that.

13       You know, if you're calling people names that's not

14  creating the environment.  It actually goes against our

15  mission.  We treat people with dignity and respect.

16  Q.   Does that portion of the recording we just heard

17  accurately reflect a conversation -- a portion of a

18  conversation you had with Beth Daniells and Joselyn

19  Chuquillanqui?

20  A.   I don't -- say that again, Beth Daniells?

21  Q.   Does that portion of the recording we just heard

22  accurately reflect a portion of a conversation you had with

23  Beth Daniells and Joselyn?

24  A.   Yes.

25  Q.   The woman's voice who we heard, the initial part of that

1  portion of the recording, that's Beth Daniells, correct?

2  A.   I don't remember what the initial was.

3  Q.   I understand.

4  A.   But I don't know if it was Beth or Joselyn, I don't

5  remember.

6         MR. JACKSON:   Okay, can we play it again or at least

7  can we play from 2,357 to the time when the first woman's voice

8  appears?

9  (Whereupon, the indicated portion of the audiotape was

10 replayed.)

11        THE WITNESS:   That's Beth Daniells.

12 BY MR. JACKSON:

13 Q.   So that female voice is Beth Daniells.

14 A.   She said I'm a gay female and you're not being --

15 Q.   She said I'm a gay female?

16 A.   Yeah, that's what that sounded like to me.

17 Q.   And do you remember hearing Joselyn's voice at any time

18 during that portion of the recording?

19 A.   You can play it again, I don't remember.

20 Q.   That's okay, I don't -- you were the one who notified

21 Joselyn that she had been terminated, correct?

22 A.   No, no, Beth Daniells notified Joselyn that she had been

23 terminated.  I sat in as a witness which is common practice.

24 Q.   You didn't read to her the notice of separation?

25 A.   Possibly, yes.

1   Q.   So you do recall having a meeting in which Beth Daniells

2   and Joselyn were present and you presented Joselyn with the

3   notice of separation?

4   A.   Yes, the notice of separation, yes.

5   Q.   And that occurred on July 27, correct?

6   A.   I believe that to be the date, yes.

7   Q.   You made the decision to fire Joselyn, isn't that correct?

8   A.   No it's not correct.

9   Q.   Do you know who did?

10  A.   No.  That was dealt with with the Legal Department,

11  Starbucks legal and Starbucks Partner Relations.

12  Q.   You were involved in those discussions, correct?

13  A.   Not really, no.  That was Joselyn -- that was Beth talking

14  to Legal and talking to -- actually was I involved?  Yeah, I

15  did get on a call about it with Legal, with our – I think it's

16  Robin Ruddeman who's part of our attorneys.

17  Q.   What was the name?

18  A.   Robin Ruddeman, I believe.  She's a --

19  Q.   Do you remember who else was on that call?

20  A.   Pearl, Pearl, Laura, I believe Laura.

21  Q.   Laura, you don't remember her last name?

22  A.   Jack -- I'm going to butcher it so, yeah, I can get it --

23  Q.   Does it start with an H?

24  A.   Yeah, yeah.

25  Q.   So Laura H.

```
 1    A.    Yeah, Laura H.

 2    Q.    What position did Laura H have?

 3    A.    She's a Pro Team member.

 4    Q.    Pro Team?

 5    A.    Yeah, Partner Relations team.

 6    Q.    So you, Ms. Ruddeman, I think you said --

 7    A.    Yeah and Alexis, my boss.

 8    Q.    Alexis Vertucci?

 9    A.    Yeah, yeah.

10    Q.    Anyone else on that call?

11    A.    I believe that was it.

12    Q.    When did this call happen as far as you know?

13    A.    Don't recall the day.

14    Q.    How long before you met with Joselyn to notify her of her

15    discharge did that call occur?

16    A.    Very early on.

17    Q.    Very early on?

18    A.    Yeah, I'm going to say when Beth seeked guidance for the

19    infraction.  When Beth was seeking guidance, that's when I had

20    her reach out to Partner Relations and see what level of

21    support they would provide.

22    Q.    And you just referenced "the infraction."  What are you

23    referring to there?

24    A.    What I'm referring to is Joselyn's losing of the keys,

25    taking a spare set out of the safe, not informing her manager
```

**Burke Court Reporting & Transcription**
**(973) 692-0660**

```
 1   who was away, who was out of town that she had not found her
 2   set of keys.  Giving the keys to a barista to return and
 3   pretending like -- coming in the next day -- I'm not even going
 4   to say pretending, just didn't make us aware that the keys
 5   weren't secured.
 6          And Beth comes to work and learns from a barista that
 7   Joselyn had not yet found her keys and I think Beth instantly
 8   called and said, you know, we need to change the cylinder
 9   locks.  We don't know who has these keys.  And she made the
10   proper call.  That's the infraction we're talking about.
11   Joselyn didn't reach out to me for many things over the course
12   of my tenure.  She did not reach out for this.
13   Q.   Starbucks has a policy or certain rules for regarding
14   employees' handing of store keys, correct?
15   A.   I'm pretty sure we're supposed to keep them secure, yes.
16   I can't quote the policy verbatim.
17   Q.   And that policy doesn't only apply to the Great Neck Road
18   store, correct?
19   A.   Listen, that policy should be everywhere.
20   Q.   The policy applies nationwide, right?
21   A.   I would imagine, yeah.
22   Q.   I just have one more line of questioning with you, Mr.
23   Leon.
24   A.   Okay.
25   Q.   Thank you for your patience.  All right.
```

1          MR. JACKSON:   Now, Your Honor, maybe we need to go

2    off the record because my next exhibit involves a video and we

3    may need to do some tricks with the technology they presented.

4          JUDGE GARDNER:   Let's go off the record.

5          COURT REPORTER:   We're off record.

6    (Off the record from 12:49 p.m. to 12:51 p.m.)

7          JUDGE GARDNER:   On the record.

8          COURT REPORTER:   We're on the record.

9          MR. JACKSON:   Okay, I am marking for identification

10   a video which I'll label as GC Exhibit 8. (General Counsel's

11   Exhibit 8 identified.)

12         MR. JACKSON:   And I'll just play a portion of the

13   video.  Just as a sample, let's play the first 90 seconds.

14   (Whereupon, the indicated portion of the audiotape was played.)

15         MR. JACKSON:   Okay.  Can I ask Lynda to come back?

16   BY MR. JACKSON:

17   Q.   Mr. Leon, you've seen this video before, correct?

18   A.   No.

19   Q.   No?

20   A.   I don't believe I have.

21   Q.   Are you aware that employees -- well, first of all, do you

22   recognize that that's Howard Schultz in the black sweater?

23   A.   That is Howard Schultz.

24   Q.   You're aware that employees at Great Neck Road store were

25   asked to watch this video, is that correct?

1    A.   I don't -- I don't recall asking them anyone to watch a

2    video.

3            MR. JACKSON:   Okay, I have no further questions for

4    the witness.

5            JUDGE GARDNER:   Mr. Mendelson, I think you said you

6    wanted to ask a few initial cross examination questions before

7    we break for lunch on one specific topic, is that fair?

8            MR. MENDELSON:   That's correct, Your Honor.

9            JUDGE GARDNER:   Okay.  And you asked for maybe five

10   minutes.

11           MR. MENDELSON:   I'm hoping.  I have to just pull a

12   document out and then well be good.

13           JUDGE GARDNER:   Okay, go ahead.

14           MR. MENDELSON:   I have copies.  What number is that?

15           We have pre-marked certain exhibits, but had not

16   finished that process so to the extent I'm going to ask

17   everyone to mark this as Employer Exhibit 53, five three.

18           JUDGE GARDNER:   It's Respondent.

19           MR. MENDELSON:   Respondent, okay.

20           JUDGE GARDNER:   53 not 5-3?

21           MR. MENDELSON:   Correct.

22   (Respondent's Exhibit 53 identified.)

23           MR. MENDELSON:   Does the witness have it, my back

24   was turned.

25           COURT REPORTER:   Yes, sorry.

```
1              CROSS EXAMINATION
2   BY MR. MENDELSON:
3   Q.   Mr. Leon, would you please review this document and tell
4   me when you're done doing so?
5   (Whereupon, the witness reviewed the document.)
6   A.   Okay.
7   Q.   Okay, do you recognize this, sir?
8   A.   This looks like the email I sent to Alexis.
9   Q.   Yes.  Well, go - that's the reference to the email strings
10  so the top email is what you just referenced.  Go one down.
11  A.   Okay.
12  Q.   Do you recognize this email from Christina Gallo, and you
13  may not know who that is.  I'll represent to you that's a
14  lawyer with the law firm that represents the Union.  In fact,
15  Ms. Hahn is here today from that same firm and do you see to
16  whom it was sent?
17  A.   It was sent to Kevin Johnson and Mario Leon.
18  Q.   Okay.  And sir, do you have any reason sitting here today
19  -- well, let me ask first.  Do you remember receiving this
20  email?
21  A.   Not really remember it.  I didn't dive into it, but I did
22  forward it, so yes.
23  Q.   Do you have any reason to believe you did not receive it?
24  A.   No, I have no reason to believe I did not receive it.
25  Q.   Okay.  And if you look down further do you see where it
```

1    indicates that there were certain attachments?

2    A.    Yes.

3    Q.    Okay.  And I got lazy when I was putting them together.

4    General Counsel has marked today as General Counsel Exhibit

5    1(a), a document, and I'm going to show that document to you

6    now.  Take a look at it.

7    A.    Um-hum. Okay.

8    (Whereupon, the witness reviewed the document.)

9    Q.    Do you recognize that document, sir?

10   A.    I believe this is one of the attachments.

11   Q.    Okay.  Do you think you've ever seen that before?

12   A.    Right, before I sent it to -- to my boss.

13   Q.    Okay, you can put that to the side, sir.

14          MR. MENDELSON:    I have to ask Mr. Jackson a

15   question.

16   BY MR. MENDELSON:

17   Q.    Now, sir, I'm going to show you a document that Mr.

18   Jackson earlier today marked as General Counsel Exhibit 2.

19   Could you take a look at that?

20   (Whereupon, the witness reviewed the document.)

21   A.    Okay.

22   Q.    Do you have a specific recollection, sir, of receiving

23   General Counsel Exhibit 2 by email?

24   A.    No.

25   Q.    I understood you to testify on direct examination that you

 1  believed you had seen it previously.

 2  A.   I was assuming that it was something they probably sent me

 3  that I didn't read.  I don't know.

 4  Q.   Have you ever seen General Counsel Exhibit 2 posted on the

 5  Internet or in some other place of that sort?

 6  A.   It's possible.

 7  Q.   Okay.  So again, sitting here today do you have any

 8  specific recollection of receiving General Counsel Exhibit 2?

 9  A.   A general recollection of receiving it?

10  Q.   I said a specific recollection.  If I didn't say that I

11  misspoke.

12  A.   Oh, a specific recollection.  No.

13         MR. MENDELSON:   That will suffice for the moment,

14  Your Honor.

15         JUDGE GARDNER:   Okay, so we are going to take a

16  lunch break and we'll resume after lunch with the cross

17  examination of Mr. Leon.

18         MR. MENDELSON:   Yes, sir.  I have a question.  We

19  can do it off the record, I don't need to do it on the record.

20         JUDGE GARDNER:   Yeah, we're going to go off the

21  record now.

22         COURT REPORTER:   We're off the record.

23  (Whereupon, a luncheon recess was taken from 1:01 p.m. until

24  2:10 p.m.)

25

```
 1              A F T E R N O O N   S E S S I O N

 2                                    (Time:   2:10 p.m.)

 3            JUDGE GARDNER:   On the record.

 4            COURT REPORTER:   We're on the record.

 5            JUDGE GARDNER:   Okay, did Respondent have anything

 6   further at this time of Mr. Leon?

 7            MR. MENDELSON:   Your Honor, we'll resume the cross

 8   examination and/or the presentation of Mr. Leon's direct

 9   testimony on Respondent's case for when he returns as a

10   witness.

11            We would like to move Respondent's Exhibit 53 into

12   evidence.

13            JUDGE GARDNER:   Any objection?

14            MR. MENDELSON:   No objection to it, Your Honor.

15            JUDGE GARDNER:   At this time I will hear from

16   Charging Party.

17            MS. HAHN:   No objection, Your Honor.

18            JUDGE GARDNER:   Okay, R-53 is received.

19   (Respondent's Exhibit 53 received.)

20            JUDGE GARDNER:   Anything else?

21            MR. MENDELSON:   No, Your Honor, thank you.

22            JUDGE GARDNER:   Okay.  Mr. Jackson, do you have

23   another witness?

24            MR. JACKSON:   Yes.  The General Counsel calls David

25   Saff to the stand.  I believe, Your Honor, would you like the
```

1   witness to remove the mask?

2           JUDGE GARDNER:   It would be my preference.  However,

3   if you're comfort does not allow for that, you could keep it

4   on.

5           Can I ask you to raise your right hand, please?

6   Whereupon,

7                           DAVID SAFF,

8   was called as a witness by and on behalf of the General Counsel

9   and, having been first duly sworn, was examined and testified

10  on his oath, as follows:

11          JUDGE GARDNER:   Okay.  And would you make sure to

12  keep your voice up when you're answering the questions and

13  start by just spelling your first and last name for the Court

14  Reporter.

15          THE WITNESS:   Okay.  D-a-v-i-d, David Saff, S-a-f-f.

16                      DIRECT EXAMINATION

17  BY MR. JACKSON:

18  Q.   Good afternoon, Mr. Saff.

19  A.   Good afternoon.

20  Q.   Thank you for joining us today.  For whom are you

21  currently employed?

22  A.   Workers United, New York/New Jersey Joint Board.

23  Q.   Is that organization related to the Charging Party in this

24  case, Workers United affiliated with SEIU?

25  A.   Yes, it's one of the regional joint boards.

```
 1              JUDGE GARDNER:   Just right from the start if you
 2   could just elevate your voice a little bit?
 3              THE WITNESS:   Yes.
 4              MR. MENDELSON:   What was that last answer, the last
 5   part of the answer?
 6              THE WITNESS:   Yes, it's part of -- it's one of the
 7   regional joint boards of Workers United.
 8   BY MR. JACKSON:
 9   Q.   I'm going to refer to Workers United and Workers United
10   New York/New Jersey Joint Board collectively as the Union.  Do
11   you understand if I do that?
12   A.   Yes.
13   Q.   What is your position or job title in the Union?
14   A.   I'm a staff organizer.
15   Q.   When did you begin working for the Union?
16   A.   I began working with the Union early March.
17   Q.   Of what year?
18   A.   2022.
19   Q.   During the time that you have worked for the Union have
20   you been a staff organizer throughout that period?
21   A.   Yes.
22   Q.   What are your job duties and responsibilities as a staff
23   organizer for the Union?
24   A.   I work with the leads that come in or the folks who are
25   wanting to organize their stores, Starbucks stores, Starbuck
```

1   locations or other Starbucks and other coffee locations.

2   Actually any -- any work that submits a lead we follow up with.

3           I work with these workers through the whole

4   unionizing process from getting their cards signed to submit to

5   the NLRB and then throughout the election process and after,

6   during the contract negotiation process.

7   Q.   In what ways do you work with employees in connection with

8   the election process?

9   A.   Yeah, so I work with -- so folks will reach out to us and

10  we'll work with, you know, a group of the folks interested in

11  unionizing at the location.  So it's kind of a coaching thing

12  where I work with them and how to speak with their other

13  coworkers about organizing at their -- forming a Union at their

14  location and then they will go out and speak with their

15  coworkers about the Union and about what it can bring to their

16  workplace.  Yeah.

17  Q.   Have you ever worked on an organizing campaign involving a

18  Starbucks facility?

19  A.   Yes.

20  Q.   How many different Union campaigns have you worked on

21  involving a Starbucks facility where the Union either filed for

22  an election -- where the Union filed for an election at the

23  NLRB?

24  A.   I've worked on five where the Union has filed for an

25  election.

1    Q.    Can you name them?

2    A.    Astoria Boulevard; Astoria Ditmars; Nanuet, the store in

3    Nanuet; Williamsburg Reserve and this Great Neck location.

4    Q.    How does the Union typically initiate an organizing

5    campaign at a Starbucks facility?

6    A.    The Union will wait for a lead to come in through one of

7    our existing partners that we work with, one of the -- someone

8    knows a -- someone at another store that's interested in

9    organizing.  We also have an online portal where people can

10   submit organizing requests and then we have other means of

11   getting in touch with us, the Twitter and someone else.

12   Q.    What's the online portal you mentioned?

13   A.    So that's through our website where folks can fill out

14   some of their personal information and what store they work at

15   and then they reach out to us.  They have their contact

16   information listed.  We'll email them or call them through

17   that.

18   Q.    Based on your experience if no employee who works inside a

19   particular Starbucks store reaches out to the Union for help

20   with organizing, would the Union be able to sustain an

21   organizing drive at that Starbucks facility?

22   A.    No, we would not.

23   Q.    Why not?

24   A.    Because we do not -- we work with the people that reach

25   out to us.  We don't take the first step in -- in reaching out

1   to them.

2   Q.   So again based on your experience, if the Union had no

3   contact with an employee inside a particular Starbucks' store

4   would you be able to organize that store?

5   A.   No, we would not.

6   Q.   When did you begin working on the organizing campaign

7   involving the Great Neck Road store?

8   A.   I began in March of 2022.

9   Q.   What has been your role in the Union's campaign at the

10  Great Neck Road store?

11  A.   I came in to take over from Julie Kelly who was originally

12  working on this campaign and I've been working with three of

13  the workers at the time at the store to form the Union.  Yes,

14  so I was working with them and we were discussing ways to go

15  about forming the Union and having these conversations with

16  their coworkers about forming the Union.

17  Q.   You mentioned Julie Kelly.  Who is she?

18  A.   The general manager of the New York/New Jersey Regional

19  Joint Board.

20  Q.   And what is your understanding of the role Ms. Kelly had

21  in the Great Neck store organizing campaign before you joined

22  the -- started working for the Union?

23  A.   So from my understanding Joselyn had reached out to the

24  Joint Board and Julie Kelly was -- this is before I was

25  employed there and Julie Kelly was working with -- throughout

1   the initial process until she handed it off in March.

2   Q.   What, if anything, did Julie Kelly tell you about the

3   organizing campaign in the Great Neck Road store at the time

4   you assumed responsibility for this campaign?

5   A.   Yes, she had told me that they had filed with -- they had

6   filed for the Union election with 15 cards which I believe at

7   the time was the full -- was everyone at the store and that's

8   about, you know, they had filed for a Union unanimously and

9   they had submitted a letter -- they had written a letter signed

10  by 13 out of those 15 workers at the time expressing their

11  interest in unionizing.

12  Q.   Did you see that letter?

13  A.   Yes, I did.

14          MR. JACKSON:   I'm going to present the witness a

15  document, GC Exhibit 2.  It's already been marked for

16  identification.

17  BY MR. JACKSON:

18  Q.   Just take a moment to review the letter and let me know

19  when you've had a chance to do so.  Its two sides, I don't know

20  if you --

21  (Whereupon, the witness reviewed the document.)

22  BY MR. JACKSON:

23  Q.   Can you tell us what that exhibit marked as GC Exhibit 2,

24  can you tell us what that document is?

25  A.   Yeah, this document is from the represented Organizing

1    Committee at the Great Neck Starbucks location signed by 13 of

2    the members of that store.  It is to Kevin Johnson, CEO and

3    President at the time of Starbucks saying that they are

4    deciding to unionize and that they ask that Starbucks

5    recognizes the Union voluntarily and that it is signed, the

6    non-interference infraction at the polls just at the back.

7    Q.   What is that, that non-interference infraction, what is

8    that?

9    A.   It is, I believe, just a document saying that Starbucks

10   will not interfere and try to Union bust in this campaign and

11   will stay neutral and will allow the workers to decide for

12   themselves.

13   Q.   Did the Union create that document, the non-interference

14   document?

15   A.   Yes, I believe so.

16   Q.   Do you know whether the Union sent that document to

17   Starbucks in any way, shape, or form?

18   A.   I believe it was sent from an email that's giving the

19   process that we have used for the other unionized stores.  This

20   document was one posted on Twitter through one of our Twitter

21   accounts, firststarbucksworkersunited and also emailed to

22   Starbucks.

23   Q.   And what makes you believe that?

24   A.   That's how we've been -- that's how we've been sending the

25   letter the day of -- the day that we filed for the Union

1    election.

2    Q.    And do you know who the Union typically sends it to?

3    A.    Typically the CEO at the time, Kevin Johnson.

4    Q.    Anyone else?

5    A.    And the manager, the store manager and the district

6    manager, I believe so we have their emails on hand.

7    Q.    Thank you.  That's my copy.  Thank you.

8           Are you familiar with the former employee at the

9    Starbucks Great Neck Road store named Joselyn Chuquillanqui?

10   A.    Yes.

11   Q.    Did Joselyn assist the Union in any way in an organizing

12   campaign at the Great Neck Road store?

13   A.    Yes.

14   Q.    Can you describe what role Joselyn had in the Union's

15   organizing campaign?

16   A.    Joselyn was the name, leader and organizer of the Union at

17   the store.  She worked with Justin Wooster and Revna Charez as

18   well, but Joselyn was definitely the de facto leader.  I

19   believe she was at the store for a number of years and was a

20   vocal participant in the store -- a vocal -- a vocal advocate

21   for the Union both in the store and in the press as well.  She

22   signed the letter to Kevin Johnson, of course yes.

23   Q.    Did the Union haven an Organizing Committee for this

24   campaign?

25   A.    Yes, which consisted of Joselyn, Justin and Revna.

1    Q.    And what makes you identify those three as the Organizing

2    Committee?

3    A.    Those three were the three workers that we had direct

4    contact with, who would meet regularly with and discuss the

5    Union and where the store stands in terms of whether or not

6    they want to vote for the Union or not.  They also did the work

7    of planning Union meetings and having conversations with

8    coworkers about the Union.

9    Q.    And can you tell us more about what Joselyn in particular

10   did in her role as the member of the Organizing Committee?

11   A.    Yes, Joselyn, like I said, did -- had conversations with

12   folks at her store about they should join the Union, it's

13   forming again.  She also spoke publicly to the press about the

14   Union drive that she was spearheading and she also worked with

15   Justin and Revna to call -- to call meetings about adopting the

16   Union.

17   Q.    Now, before the representation election involving

18   employees at that Great Neck store did the Union ever attempt

19   to convey messages or information to employees at the store?

20   A.    Could you repeat the question?

21   Q.    Yeah.  Before the election results were announced did the

22   Union ever attempt to convey any messages or information to

23   employees at the Great Neck Road store?

24   A.    We would communicate with Justin, Joselyn and Revna about

25   updates and about things going on at the store.  If we wanted

1   to -- if someone had a question from the Union it would

2   typically go to one of those three that would then get asked to

3   me and we would try to follow up that way.

4           We also scheduled with the Organizing Committee a

5   Town Hall Meeting, I believe, during the period, voting period

6   to discuss people's questions with the Union before they submit

7   their ballots.

8   Q.   Do you recall how many meetings you organized in advance

9   of the -- with employees in advance of the election?

10  A.   Successfully organized the one Town Hall.

11  Q.   Did you ever attempt to organize a meeting and it was

12  unsuccessful?

13  A.   Yes, we attempted while Joselyn was away on vacation.

14  Justin and Revna and I attempted to organize another Town Hall,

15  but that never came to fruition until Joselyn returned.

16  Q.   And how did the Union go about inviting employees to the

17  Union meeting?

18  A.   That was through those three folks, Justin, Joselyn and

19  Revna.  They would reach out to their partners whether they

20  were texting or talking in person to invite them.

21  Q.   When was the -- when was the meeting with Great Neck store

22  employees that you participated in?

23  A.   I believe it was in April during the voting period while

24  they had to mail ballots out.

25  Q.   Do you recall specifically in April?

1    A.    I don't recall the specific date.

2    Q.    Do you remember whether it was early April or mid-April or

3    late April?

4    A.    I would -- I'm not sure, I would guess early April.  I'm

5    trying to --

6    Q.    Early April as far as you recall?

7    A.    Um-hum.

8    Q.    Is that a yes?

9    A.    Yes.

10   Q.    And where did the meeting take place?

11   A.    Over Zoom.

12   Q.    Do you recall which employees joined the meeting?

13   A.    Yes.  Justin, Joselyn and Revna, of course, and as well as

14   Brianna, Lavender, and Taydoe.

15   Q.    Due diligence each of those employees stay in the Zoom

16   meeting room throughout the time that you were meeting?

17   A.    Taydoe left early.  He was in transit and at some point

18   just jumped off the call.

19   Q.    But the other employees did stay throughout the time that

20   you all were meeting?

21   A.    Yes.

22   Q.    Do you recall whether Taydoe said anything during the

23   meeting before he left?

24   A.    He introduced himself, didn't ask any questions about the

25   Union, seemed to be listening for a little bit and then jumped

1   off.

2   Q.   Did either Brianna or Lavender say anything during the

3   meeting?

4   A.   Yes, they were asking some questions about the Union and

5   about some things that they had heard from their managers about

6   the Union.

7   Q.   What did they say they had heard from their managers?

8   A.   They had -- Brianna or Lavender was asking or maybe both

9   of them were asking about if Joselyn was being paid by the

10  Union, to which we said no, because she wasn't.  They had heard

11  that from -- one of them had heard that from Mario and so they

12  were asking about that.  They were asking about strike

13  participation, asking if strikes were mandatory and they were

14  asking about -- that's what I can recall right now.

15  Q.   Did either Brianna or Lavender explain why they believed

16  strikes might be mandatory?

17          I believe that was because of what they had heard

18  from Mar -- one of their managers.

19  Q.   What do you recall them saying about that?

20  A.   They thought that if the Union decided to go on strike

21  that they would have to go on strike as well.  Then we told

22  them that's -- the unit would vote for strike authorization and

23  that even if that happens they can choose not to go on strike.

24  Q.   Do you remember any employees during this meeting speak

25  about bargaining from scratch?

1    A.    Yes.

2    Q.    What do you recall about that?

3    A.    Lavender of Brianna was asking if they would basically

4    lose all of their benefits during the bargaining session and

5    have to start from zero essentially.

6    Q.    Did Brianna or Lavender express where they had gotten that

7    idea from?

8    A.    Yes, I believe they had heard it from one of their

9    managers.

10   Q.    Is that what they said?

11   A.    Yes.

12   Q.    Did you say anything in response to the bargaining from

13   scratch comment by Brianna or Lavender?

14   A.    Yes, I told them that bargaining would start from where

15   their current benefits and wages are now.

16   Q.    And how did you respond to their comments about mandatory

17   strike?   Oh, I'm sorry, strike that.   I think you already

18   answered that.

19          Do you recall whether Joselyn said anything in

20   response to the issues raised by Brianna and/or Lavender?

21   A.    Yes, Joselyn had brought up that she wasn't -- or had said

22   that she was not getting paid by the Union.

23   Q.    Do you remember whether she addressed any of the other

24   issues raised by Brianna or Lavender?

25   A.    I believe she did speak up during those other issues, but

1  I'm not -- I don't recall what exactly she said.

2  Q.   Do you recall whether there was any discussion about a

3  shop steward during the --

4  A.   Right, I do.  There was I believe the topic of -- I don't

5  recall exactly how the topic came up, but there was discussion

6  of how they would communicate with the Union and I discussed

7  that.  I told Lavender and Brianna that, you know, they would

8  elect a shop steward to represent the unit to relay things

9  happening at the store to the Union.

10  Q.   Did you discuss who might become the shop steward at the

11  Great Neck store if the Union was selected?

12  A.   I think I suggested Joselyn, yes.

13  Q.   Do you recall anything else that you discussed with the

14  employees during the meeting in April?

15  A.   That's all I recall now.

16  Q.   Do you know whether Justin Wooster is still employed at

17  the Great Neck Road store?

18  A.   He is not.

19  Q.   And are you aware that Starbucks fired Joselyn on July

20  27th?

21  A.   Yes.

22  Q.   Do you know whether Revnov Charez is still employed at the

23  Great Neck Road store?

24  A.   They are not.

25  Q.   Did Revnov tell you anything about the circumstances

1  surrounding the end of their employment?

2  A.   Yes.  I had seen Revnov the night of the vote count and

3  they had shown me a letter they had written to, I believe,

4  Beth, their manager, saying that they were going on strike

5  because of the parameters of the election and because of

6  Starbucks' Union busting tactics.

7  Q.   Did anything that Revnov showed you indicate whether

8  Revnov actually sent that letter to a Starbucks' manager?

9  A.   I believe she showed me as a text or as an email to the

10 manager.

11 Q.   And did that indicate anything about whether it was sent?

12 A.   Yes, it was.  She showed me, you know, as I think what you

13 collected in largest messages.  Yes, I don't know how to

14 explain it now.

15 Q.   Well, to the best of your ability could you explain that?

16 A.   Yeah.  She showed me, you know, I guess her message

17 history with that -- and the picture, the document, however she

18 uploaded it, the letter showing that it was sent to them.

19 Q.   And do you recall when Revnov showed you their letter, the

20 communication with the manager?

21 A.   Yeah, that would be the night of the Union vote counts.

22 The time maybe around 9:00 o'clock.

23 Q.   Has the absence of Justin, Revnov and Joselyn from the

24 Great Neck Road store had any impact on the Union's organizing

25 campaign?

```
 1   A.   Yes.
 2   Q.   Could you describe what that -- what have been the
 3   implications to the organizing campaign of their absence?
 4   A.   The implications have been that it's been nearly
 5   impossible to reach out to other folks to get involved with the
 6   Union because there are three primary sources of contact with
 7   the rest of their coworkers.  Their leavings and Joselyn's
 8   firing has -- has made other folks in the store more nervous to
 9   participate in the Union.  Yeah.
10   Q.   Does the Union at the present time have any direct contact
11   with any current Great Neck Road store employees?
12   A.   No, we do not.
13   Q.   Do you know who still even works there?
14   A.   I don't know the exact list, no.
15   Q.   When was the last time you had any communication with
16   someone who was presently employed at the Great Neck Road
17   store?
18   A.   Direct communication would probably be with Joselyn on the
19   last that she was fired.
20   Q.   Are you aware of any other Union official who has had
21   recent communication with the current Great Neck Road store
22   employees?
23   A.   No.
24   Q.   Since the time that Joselyn was fired from Starbucks have
25   you attempted on behalf of the Union to get help from any
```

1  current Great Neck store employee?

2  A.   Yes, we have tried to reach out to someone via Joselyn,

3  you know, with her as communicating or texting this person, but

4  they have not wanted to get involved out of fear of

5  retaliation.

6  Q.   Have you tried to get in touch with Revnov Carez within

7  the past month?

8  A.   Yes.

9  Q.   How have you attempted to contact Revnov?

10 A.   Via text.

11 Q.   And for what purpose did you try to contact Revnov?

12 A.   I was trying to get Revnov involved in this NLRB

13 proceedings to participate as a witness.

14 Q.   Have you received any communications from Revnov in

15 response to your effort to reach them?

16 A.   Yeah, they said that they were in Europe somewhere,

17 somewhere out of the country, but setting abroad and that they

18 didn't think they'd be able to participate in the trial.

19 Q.   Do you know whether Joselyn's discharge was covered by any

20 news media or publication?

21 A.   Yes, it was.

22 Q.   Did you see any news media coverage for Joselyn's

23 discharge at or around the time the first reports were

24 published?

25 A.   Yes, I did.

1  Q.   Okay.

2           MR. JACKSON:   I'm going to have marked for

3  identification -- a document I'm going to have marked for

4  identification as GC Exhibit 9.  I'm handing copies to Your

5  Honor, counsel, and the witness.

6           In fact, excuse me, Ms. Court Reporter, but I would

7  actually like to have these marked individually as GC 9(a)

8  through (e), (a) through (e) and each stapled back in there.

9           JUDGE GARDNER:   Are you sure it's not (f)?

10          MR. JACKSON:   Maybe.  Yeah, it's (a) through (f),

11 (a) through (f), excuse me.

12 (Whereupon, there was colloquy between Counsel and the Court

13 Reporter.)

14          MR. JACKSON:   That's correct, thank you.

15 (General Counsel's Exhibit 9(a) through 9(f) identified.)

16 BY MR. JACKSON:

17 Q.   So I'll start with -- I want to first call you attention

18 to GC Exhibit 9(a).  Do you recognize this document?

19 A.   Yes, I do.

20 Q.   Can you tell us what it is?

21 A.   This is an article that was published by Newsday about

22 Joselyn's firing from Starbucks.

23 Q.   Okay.  Did you -- have you ever seen that document before

24 today?

25 A.   Yes, I have.

1    Q.   Do you recall approximately when you first saw it?

2    A.   Around the end of July when this was published.

3    Q.   And how did you see it?

4    A.   Our Press Coordinator Leann who updates us whenever

5    there's coverage of the campaign sends it to us.

6    Q.   And Leann, what's her last name?

7    A.   Torre Murphy, I believe.

8    Q.   I'll just call her Leann since that's the way you seem to

9    refer to her.  Did Leann just tell you about the article or did

10   she share a copy of it with you?

11   A.   I shared a link and cut the article.

12   Q.   Okay.  Can I direct your attention to GC Exhibit 9(b)

13   which states Long Island Press in big letters at the top?

14   A.   Yes.

15   Q.   Do you recognize that document?

16   A.   Yes, I do.

17   Q.   Can you tell us what it is?

18   A.   This is an article from the Long Island Press about

19   Starbucks being accused of unfair labor practices after firing

20   Joselyn.

21   Q.   Have you seen this article before today?

22   A.   Yes.

23   Q.   Do you recall approximately when was the first time you

24   saw it?

25   A.   It was published on August 3rd and I probably saw it

1    around August 3rd or 4th.

2    Q.    What is Long Island Press, by the way?

3    A.    It's a publication covering news in Long Island.

4    Q.    What is Newsday?

5    A.    Newsday is also a popular Long Island news source.

6    Q.    And how did you come to see this Long Island Press article

7    that I've marked as GC 9(b)?

8    A.    It was also sent to me in the group chat by Leann.

9    Q.    And I direct your attention to GC 9(c).

10   A.    Yes.

11   Q.    Can you tell us what this document is?

12   A.    This is another article by the Long Island Press.  This

13   one's covering the rally that was for -- started for Joselyn at

14   the Great Neck Plaza.

15   Q.    Have you seen this article before today?

16   A.    Yes.

17   Q.    Approximately when did you first see it?

18   A.    Around August 16th or -- yeah, on August 16th.

19   Q.    And how did you see it?

20   A.    On line sent to me by Leann.

21   Q.    Did you read it at that time?

22   A.    Yes.

23   Q.    Okay.  I direct your attention to what I've marked as GC

24   Exhibit 9(d).  Can you tell us what that is?

25   A.    Yes, this is from the Amsterdam News.  This is a story

1    from –about Joselyn getting fired.

2    Q.    Have you seen this story from the Amsterdam News before

3    today?

4    A.    Yes, I have.

5    Q.    Do you remember when approximately you first saw it?

6    A.    Around August 11th.

7    Q.    And how did you come -- come across the article?

8    A.    It was also sent by Leann to me.

9    Q.    And did you read it at the time?

10   A.    Yes.

11   Q.    Can I direct your attention to what I've marked as GC

12   Exhibit 9(e)?  Can you tell us what this document is?

13   A.    This is an article from Left Voice about Starbucks firing

14   Joselyn in retaliation for organizing.

15   Q.    What is Left Voice, as far as you know?

16   A.    Left Voice is a publication covering leftist politics and

17   stories.  They get a lot of -- they do a lot of media coverage.

18   Q.    Oh, and I forgot to ask you, do you know what Amsterdam

19   News is?

20   A.    Amsterdam News I'm not quite as familiar with, but I

21   believe it covers the New York area.

22   Q.    Okay.  Have you seen this article from Left Voice at any

23   time before today?

24   A.    Yes, I have.

25   Q.    When did you first see it approximately?

1   A.   Around August 12th.

2   Q.   And how did you come across it?

3   A.   This was also sent to me by Leann.

4   Q.   Did you read it at the time?

5   A.   Yes.

6   Q.   Okay.  Can I direct your attention to what's marked as GC

7   9(f)?  Can you tell us what this document is?

8   A.   This is an article from BBC about Joselyn's firing as

9   well.

10  Q.   What is BBC?

11  A.   I believe it's British Broadcasting Center, but it is a

12  world news publication.

13  Q.   And have you seen this BBC article at any time before

14  today?

15  A.   Yes, it was sent to me on August 15 by Leann.

16  Q.   Did you read it at the time?

17  A.   Yes.

18          MR. JACKSON:   I move for the admission of GC

19  Exhibits 9(a) through (f).

20          JUDGE GARDNER:   Any objection?

21          MR. MENDELSON:   I guess I'm trying to understand the

22  purpose of the admission.  There's no assertion that the

23  content is necessarily true, is there?

24          MR. JACKSON:   No, these documents are not offered

25  for the truth of the matters asserted therein, they are offered

```
 1    for the purpose of establishing the dissemination of
 2    Respondent's unlawful -- unfair labor practice.
 3             MR. MENDELSON:   They're evidence of asserted unfair
 4    labor practices and I can't -- I can't -- I have to object if
 5    the assertion is that they demonstrate unlawful conduct.  I
 6    mean they're media reports that are asserting that there's
 7    unlawful conduct by the Employer and to that I have no
 8    objection, the document says what it says.
 9             JUDGE GARDNER:   Yeah, so --
10             MR. JACKSON:   Again, Your Honor, I'm not offering
11    these for --
12             JUDGE GARDNER:   So GC 9(a) through (f) are received
13    in that case.
14             MR. MENDELSON:   Well, I think counsel --
15             JUDGE GARDNER:   Is there an objection?
16             MR. MENDELSON:   Yes.  I thought counsel was just
17    saying they were being offered to show the dissemination of
18    reports of unlawful conduct and it's reports of alleged
19    unlawful conduct.
20             JUDGE GARDNER:   I mean that, that might be a
21    misspeak, it's only alleged and the key word in what they
22    offered is the dissemination, that is -- Chuquillanqui, I got
23    it, her separation was widely reported in local and even
24    international news media for whatever -- I'm not sure, but that
25    will get used for exactly in this case, but for that purpose if
```

1   I assume correctly that is the purpose, I will admit.

2   (General Counsel's Exhibits 9(a) through 9(f) received.)

3           JUDGE GARDNER:   Go ahead.

4   BY MR. JACKSON:

5   Q.   Did the Union itself attempt to publicize information

6   concerning or related to Joselyn's discharge?

7   A.   Yes.

8   Q.   Does the Union have a Twitter account?

9   A.   We do.

10  Q.   And do you, yourself, have a Twitter account?

11  A.   I do as well.

12  Q.   And is that separate from the Union's Twitter account?

13  A.   Yes, it's a personal account.

14          MR. JACKSON:   I'm handing to Your Honor and counsel

15  and the Court Reporter a document I'm marking as GC Exhibit 10.

16  (General Counsel's Exhibit 10 identified.)

17  BY MR. JACKSON:

18  Q.   Do you recognize the document, Mr. Saff?

19  A.   Yes, I do.

20  Q.   Can you tell us what it is?

21  A.   This was a tweet from our Union's Twitter account at

22  Workers United NY.  This one is sort of a call -- posting a

23  call to action flyer saying to orders of drinks under Rehire

24  Joselyn or Rehire Austin.

25  Q.   Who's Austin?

1   A.   Austin is another partner that was fired from Starbucks.

2   Q.   Which Starbucks location is that?

3   A.   The Astoria Ditmars location.

4   Q.   Did you write this post?

5   A.   I did not.

6   Q.   Do you know who did?

7   A.   I believe Clara Wheatley Sholar.

8   Q.   Who is Clara Wheatley Sholar?

9   A.   She's a political director.

10  Q.   And can you tell when this was posted?

11  A.   It was posted on July 28th, 2022.

12  Q.   Did you, yourself, post it?

13  A.   No.

14  Q.   Did you see it posted on line?

15  A.   Yes, I did.

16  Q.   Where did you see it posted on line?

17  A.   On Twitter.

18  Q.   And approximately when did you see it on Twitter?

19  A.   Around July 28th.

20       MR. JACKSON:   I move for the admission of GC Exhibit

21  10.

22       MR. MENDELSON:   No objection.

23       JUDGE GARDNER:   GC 10 is received.

24  (General Counsel's Exhibit 10 received.)

25       MR. JACKSON:   I'm handing to counsel, to Your Honor

1   and to the Court Reporter a document I'm marking for

2   identification as GC Exhibit 11.

3   (General Counsel's Exhibit 11 identified.)

4   BY MR. JACKSON:

5   Q.   Okay.  What is this document?

6   A.   So this is a quote Tweet, I think you call it, from the

7   Workers United New York town, which we operate and it's

8   thanking Michelle Salages for her Tweet which is posted --

9   embedded below.  The original Tweet from Michelle is talking

10  about Starbucks firing Joselyn and showing her solidarity with

11  Joselyn and Austin by posting this photo of herself.

12  Q.   Did you write this Tweet or any portion of it?

13  A.   No.

14  Q.   Do you know who did?

15  A.   Probably Clara again.

16  Q.   Okay.  And you said it's a quote Tweet, that was the

17  phrase you used?

18  A.   Yes.

19  Q.   What's a quote Tweet?

20  A.   A quote Tweet is reposting a Tweet -- a quote Tweet is

21  reposting a Tweet, but including your own message.

22  Q.   So you refer to that as quote Tweet, not re-Tweet?

23  A.   Yes.  It's -- yeah.

24  Q.   Did you see this quote Tweet from the Union posted on

25  line?

```
 1   A.    I did.

 2   Q.    Where did you see it?

 3   A.    On Twitter.

 4   Q.    Do you recall when you saw it?

 5   A.    Around July 28th as well.

 6   Q.    Do you know who Michelle Salages is?

 7   A.    I know she's a politician in the Great Neck area.

 8   Q.    And can you describe what is shown in the photographic

 9   image imbedded in the original Tweet by Michelle Salages?

10   A.    Yeah, it's a picture of Michelle holding up a cup.  She's

11   changed her -- she's put a name in, Rehire Joselyn and she's

12   standing in front of what looks like a Starbucks coffee cup

13   from Great Neck Road.

14   Q.    Have you ever been to the Great Neck Road store?

15   A.    I have.

16   Q.    What makes you say that it is Michelle Salages who's

17   standing in front of that store?

18   A.    When I was at the rally for Joselyn's reinstatement that

19   looks like the Starbucks that we were rallying in front of.

20             MR. JACKSON:    I move for the admission of GC 22.

21             MR. MENDELSON:    No objection.

22             JUDGE GARDNER:    GC 11 is received.

23   (General Counsel's Exhibit 11 received.)

24             MR. JACKSON:    I'm presenting to counsel, to Your

25   Honor and the Court Reporter a document that will be marked as
```

1  GC Exhibit Number 12.

2  (General Counsel's Exhibit 12 identified.)

3  BY MR. JACKSON:

4  Q.   Mr. Saff, do you know what this document is?

5  A.   Yes, I do.

6  Q.   What is it?

7  A.   It's another Tweet from our Page Workers United NY about

8  the showing of the same flyer in English and in Spanish telling

9  folks to show solidarity by going to Starbucks and ordering a

10 drink and putting in the names Rehire Joselyn or Rehire Austin.

11 Q.   Did you see this posted on line?

12 A.   I did.

13 Q.   You did not post it yourself, did you?

14 A.   No.

15 Q.   Do you recall where you saw it posted on line?

16 A.   On Twitter.

17 Q.   And approximately when did you see it on Twitter?

18 A.   I saw it around August 2nd.

19 Q.   I'm sorry, when did you see that?

20 A.   Around August 2nd it was posted.

21        MR. JACKSON:    I move for the admission of GC

22 Exhibit 12.

23        MR. MENDELSON:   No objection.

24        JUDGE GARDNER:   HV 12 is received.

25 (General Counsel's Exhibit 12 received.)

**Burke Court Reporting & Transcription**
**(973) 692-0660**

```
 1  BY MR. JACKSON:

 2  Q.   I'm presenting to counsel, Your Honor, and the Court

 3  Reporter a document I'll have marked for identification as GC

 4  Exhibit 13.

 5  (General Counsel's Exhibit 13 identified.)

 6  BY MR. JACKSON:

 7  Q.   Can you tell us what this document is, Mr. Saff?

 8  A.   Yeah, this is another Tweet from Workers United NY linking

 9  the article that Newsday wrote about Joselyn's firing.

10  Q.   Did you post this?

11  A.   I did not.

12  Q.   Did you see it posted on line?

13  A.   I did.

14  Q.   Approximately when did you see it posted on line?

15  A.   Around July 29th.

16  Q.   And where did you see it posted?

17  A.   I saw it posted on Twitter.

18          MR. JACKSON:   I move for the admission of GC Exhibit

19  13.

20          MR. MENDELSON:   No objection.

21          JUDGE GARDNER:   I mean can I just get a

22  clarification?  It looks like the article that got posted is GC

23  9(a).  When I say the article that got posted, the article

24  linked in that Tweet.  Am I correct or is it just they used a

25  similar stock photo?
```

1   BY MR. JACKSON:

2   Q.   So Mr. Saff, do you know the answer to that question?  The

3   article that is linked in this Tweet the same as GC Exhibit

4   9(a)?

5   A.   It is, yes.

6          JUDGE GARDNER:   So the article comes out on July

7   28th, that's GC 9(a).  And on July 29th the Union Tweets out

8   the article, correct?

9          THE WITNESS:   Correct.  Yes, Your Honor.

10         JUDGE GARDNER:   All right.  It is moved, no

11  objection, GC-13 is received.

12  (General Counsel's Exhibit 13 received.)

13  BY MR. JACKSON:

14  Q.   I just have a few more of these so I'll present them to

15  counsel, Your Honor and to the Court Reporter.  This is being

16  marked for identification as GC Exhibit 14.

17  (General Counsel's Exhibit 14 identified.)

18         JUDGE GARDNER:   Let me just ask before you continue,

19  is there going to be one each for the articles?

20         MR. JACKSON:   No, this is the last one.

21         JUDGE GARDNER:   Okay, because I wanted it to be in

22  order if that was what was happening, but okay, go ahead.

23  BY MR. JACKSON:

24  Q.   Mr. Saff, can you tell us what this document is?

25  A.   Yes, this is another Tweet from Workers United NY on

1    August 15 attaching the BBC article that we had seen.

2    Q.   Right.  So is the -- does this contain a link to an

3    article?

4    A.   It does, yes.

5    Q.   And is the link to the article that was GC Exhibit 9(f),

6    the BBC press coverage?

7    A.   Yes, it was the same article.

8    Q.   Did you see this or did you post this yourself?

9    A.   I did not post it; I saw it on Twitter.

10   Q.   Okay and approximately when did you see it on Twitter?

11   A.   Around August 15th.

12          MR. MENDELSON:   I move for the admission of GC

13   Exhibit 14.

14          MR. MENDELSON:   No objection.

15          JUDGE GARDNER:   GC 14 is received.

16   (General Counsel's Exhibit 14 received.)

17          MR. JACKSON:   I'm presenting to counsel, Your Honor,

18   and to the Court Reporter a document I'm marking as GC 15.

19   (General Counsel's Exhibit 15 identified.)

20   BY MR. JACKSON:

21   Q.   Mr. Saff, can you tell us what this document is?

22   A.   Yes.  This is another Tweet from Workers United NY.  This

23   one is publicizing a fire that we made, publicizing the rally

24   for Joselyn's brief statement.

25   Q.   And what's the image imbedded in the Tweet?

1  A.   The image imbedded is the focus of the flyer that we had

2  created to get folks out to support the statement.

3  Q.   Did you post this?

4  A.   I did not.

5  Q.   Did you see it posted on line?

6  A.   Yes, I did.

7  Q.   Where?

8  A.   I saw it on Twitter around September.

9          MR. JACKSON:   I move for the admission of GC Exhibit

10 15.

11         MR. MENDELSON:   No objection.

12         JUDGE GARDNER:   GC 15 is received.

13 (General Counsel's Exhibit 15 received.)

14         MR. JACKSON:   And finally I have a document that I

15 ask be marked for identification as GC Exhibit 16.

16 (General Counsel's Exhibit 16 identified.)

17 BY MR. JACKSON:

18 Q.   I'm going to hold off on asking you questions about that

19 and I'll ask you a different question.  Aside from posting

20 about the rally you planned in support of Joselyn, did the

21 Union do anything else to help encourage Great Neck Road store

22 employees in particular to attend the rally?

23 A.   Yes, we encouraged community allies such as the DSA,

24 Democratic Socialists of America to reach out to folks in the

25 store and to attend the rally as well.

1    Q.   Do you know if any of your allies actually did that?

2    A.   I'm -- I'm not sure, but we asked them to.

3    Q.   Do you know whether Joselyn tried to get her former

4    coworkers to attend the rally?

5    A.   I'm not sure, because she was fired at that point.

6    Q.   Did you attend a rally in support of Joselyn on August

7    15th?

8    A.   I did.

9    Q.   Where was the rally held?

10   A.   At Great Neck Plaza.

11   Q.   At what's located at Great Neck Plaza?

12   A.   That is the Starbucks Great Neck location.

13   Q.   And where at Great Neck Plaza was the rally held?

14   A.   It was under a gazebo at the corner of the parking lot.

15   Q.   Forgive me if I asked this, but did you attend?

16   A.   I did, yeah.

17   Q.   Okay.  Approximately how many other people would you

18   estimate attended?

19   A.   I would say about 50.

20   Q.   Five zero?

21   A.   Five zero, um-hum.

22   Q.   Did Joselyn attend?

23   A.   Joselyn, yes, did attend.

24   Q.   Did any Starbucks employees who were still employed at the

25   Great Neck Road store attend the rally?

1    A.    No.

2    Q.    Can you describe what occurred during the rally?

3    A.    Yeah.  We did chants and -- for Joselyn's reinstatement

4    and for Starbucks to come to the table and bargain with the

5    Union.  Starbucks partners and former partners like Joselyn and

6    current partners such as Brandy did speeches about their

7    efforts unionizing and what's going on at their stores and then

8    there was more speeches from some other unions and politicians

9    and it ended with a march to the Starbucks store and then march

10   back to the gazebo.

11   Q.    Now, you mentioned someone named Brandy?

12   A.    Yes.

13   Q.    Who's that?

14   A.    Brandy's on the Organizing Committee of Astoria Boulevard.

15   Q.    Does she work at the Astoria Boulevard Starbucks location?

16   A.    Yes.

17   Q.    Now, you mentioned a march.  Can you describe -- strike

18   that.

19         Did rally participants display any signs or banners?

20   A.    Yes, there were -- there were signs in support of the

21   Union and I think folks from their own organizations brought

22   their own signs too.

23   Q.    And when participants marched did they -- what did they do

24   as they marched?

25   A.    They were chanting as well.  I don't remember exactly what

1    the chants were.

2    Q.    Did the rally participants linger at all in front of the

3    Starbucks' store?

4    A.    Yes, we were in front of the Starbucks' store.

5    Q.    For how long did you stay in front of the store?

6    A.    Two minutes or so.

7    Q.    And what was happening during those two minutes?

8    A.    I believe some folks were chanting to rehire Joselyn.

9    Q.    What did Joselyn say when she addressed the crowd?

10   A.    Joselyn thanked everyone for coming and said that she was

11   wrongfully fired by Starbucks and talked about everything she

12   went through during the organizing campaign and after at her

13   store.  Yeah.

14   Q.    Did you address the crowd at all?

15   A.    No.

16   Q.    Did you observe any news media present during the rally?

17   A.    Yes.

18   Q.    What did you observe in that regard?

19   A.    I saw a couple of folks taking pictures and interviewing

20   Joselyn.

21   Q.    Now, do you still have before you GC Exhibit 16?

22   A.    Yes.

23   Q.    Can you tell us what that is?

24   A.    This is a Tweet posted by Workers United NY the day after

25   the rally to -- and posting pictures of the rally, yeah.

1   Q.   Did you post this?

2   A.   No.

3   Q.   Did you see it posted on line?

4   A.   I did.

5   Q.   Where did you see it?

6   A.   On Twitter.

7   Q.   And approximately when did you see it?

8   A.   On August 16th.

9   Q.   All right.  I want to call your attention to -- do you see

10  that there are some imbedded photos in the Tweet?

11  A.   Yes.

12  Q.   I want to call your attention to the photo on the left-

13  hand side of that.  Can you describe what is shown in that

14  photo?

15  A.   Yeah, it's the camera is facing a crowd that appears to be

16  marching back from the Starbucks at Great Neck towards the

17  gazebo.

18  Q.   Did you take the photo?

19  A.   I did not.

20  Q.   Do you know who did?

21  A.   It might have been Clara who was also at the rally, but

22  I'm not sure.

23  Q.   Can you tell where the photo was taken?

24  A.   Yeah, somewhere between the gazebo and Starbucks.

25  Q.   How far is the gazebo from the Starbucks store?  Your best

 1    estimate.

 2    A.    A hundred feet.

 3    Q.    Okay.  Can you tell when the photo on the left was taken?

 4    A.    Towards the end of the rally.  I don't remember exactly

 5    what time, probably around 8:00.

 6    Q.    8:00 p.m.?

 7    A.    Yes, 8:00 p.m.

 8    Q.    And what about the photo on the top right, can you tell us

 9    what's depicted in that photo?

10    A.    The top right is a crowd that is kind of horseshoed around

11    looking at a speaker that I can't see.

12    Q.    Can you tell us when this photo was taken?

13    A.    Probably around 7:30.

14    Q.    On which day?

15    A.    On August 15th.

16    Q.    And can you tell where this photo was taken?

17    A.    Under the gazebo at Great Neck Plaza.

18    Q.    Can you tell whether you were present at the time that

19    this photo was taken?

20    A.    I can't, I'm not in the picture, but I know I was around.

21    Q.    Are you in the first picture?

22    A.    No, I don't think I am either.

23    Q.    And what about the photo on the bottom right?

24    A.    The bottom right is a photo of Brandy holding a megaphone

25    addressing the crowd during her speech.

1    Q.    Can you tell where the photo was taken?

2    A.    Under the gazebo at Great Neck Plaza as well.

3    Q.    And when was it taken?

4    A.    Around 7:30 as well.

5    Q.    Did you take the photo?

6    A.    No, I don't believe so.  I think that was also taken by

7    Clara.

8    Q.    Can you tell whether you were present in the gazebo at the

9    time when this photo was taken?

10   A.    I was present.  I'm not pictured in the photo, but I was

11   there.

12             MR. JACKSON:   I move for the admission of GC Exhibit

13   16.

14             MR. MENDELSON:   No objection.

15             JUDGE GARDNER:   GC 16 is received.

16   (General Counsel's Exhibit 16 received.)

17   BY MR. JACKSON:

18   Q.    Has the Union attempted to contact any current store

19   employees at the Great Neck Road store at any time after

20   Joselyn's discharge?

21   A.    Yes, we've tried to reach some folks through Joselyn who

22   still has connections with them.

23   Q.    I'm asking a bit of a different question.  Have you,

24   yourself, or to your knowledge any other agent of the Union

25   attempted to contact any employee, current employee at the

1  Great Neck Road store since Joselyn's termination?

2  A.    No.

3  Q.    Why hasn't the Union attempted to contact the current

4  employees?

5  A.    From the way we've been running this campaign and from the

6  way we've allowed Starbucks workers to take initiative

7  similarly to how we deal with leads coming in and how we don't

8  -- we don't do these conversations ourselves until interest is

9  shown from them, we wouldn't actively reach out in that way.

10 Q.    I have one final question for you.  Based on your

11 experience and knowledge of your campaign what impact on the

12 Union's organizing efforts do you believe that Joselyn's

13 reinstatement would have?

14 A.    I believe --

15          MR. MENDELSON:    Objection, it's speculative.

16          JUDGE GARDNER:    I'll listen to his opinion about

17 that.

18          THE WITNESS:    I believe that on a larger scale, on a

19 more nationwide scale Joselyn's reinstatement would help the

20 campaign because it shows workers in other Starbucks, you know,

21 see that they would get justice if they would be wrongfully

22 terminated as well and that they would eventually get

23 reinstated.

24          In terms of Great Neck, the particular store, I don't

25 think her reinstatement would let us salvage, you know, the

1    Union campaign there just because workers have seen firsthand

2    what Joselyn and other members who have been for the Union have

3    had to converse so even with her being reinstated, I don't

4    think I would want to go through that similar process.

5            MR. JACKSON:   No further questions, Your Honor.

6            JUDGE GARDNER:   Okay.  Does the Charging Party have

7    any additional questions?

8            MS. HAHN:   No, Your Honor.

9            JUDGE GARDNER:   Does Respondent want to cross

10   examine the witness?

11           MR. MENDELSON:   Does the witness have a sworn

12   statement?

13           MR. JACKSON:   Yes.  Mr. Saff provided two affidavits

14   to the Board, which I can make available.

15           MR. MENDELSON:   How lengthy are they?

16           MR. JACKSON:   One is six pages; the other is five.

17           MR. MENDELSON:   Okay.

18           JUDGE GARDNER:   So you're going to turn over those

19   for Mr. Mendelson to review and use during his cross

20   examination.  How long do you think you need to --

21           MR. MENDELSON:   Well, Judge, I've been writing not

22   seriously, but keenly because I do have a lot of questions for

23   this gentleman.  I think the important question is you had told

24   us in a pretrial call that typically you have to shut down at

25   5:00 or 5:30, depending on some -- so I'm interested in knowing

1    what your time line is.  My objective is to finish with the

2    witness.

3              MR. JACKSON:   Yeah, Ms. Tooker, Judge, has to leave

4    at 5:00, but I'm willing to stay after that.

5              JUDGE GARDNER:   I believe the cutoff would be about

6    5:45.

7              MR. MENDELSON:   Okay, thank you.

8              Okay, Judge, there's 11 pages to read here.  I don't

9    know how substantive they are.  I've already made a bunch of

10   notes.  Sometimes when I take a little more time just to

11   organize my thoughts it goes more efficiently, but it's 3:30,

12   could I have till five to 4:00, ten to 4:00?

13             JUDGE GARDNER:   Let's do ten to 4:00 so 20 minutes

14   and then we'll start with the cross examination, okay?

15             Off the record.

16             COURT REPORTER:   We're off the record.

17   (Whereupon, a recess was taken from 3:22 pm. to 3:43 p.m.)

18             JUDGE GARDNER:   On the record.

19             COURT REPORTER:   We're on the record.

20             COURT REPORTER:

21             MR. MENDELSON:   May I proceed?

22             JUDGE GARDNER:   Yes, please.

23                        CROSS EXAMINATION

24   BY MR. MENDELSON:

25   Q.   Good afternoon, Mr. Saff.

1    A.    Good afternoon.

2    Q.    Am I saying your name correctly?

3    A.    Yeah, that's right.

4    Q.    Before you began working for the Union in March of 2022,

5    what prior experience working for or with a labor movement, if

6    any, did you have?

7    A.    Yeah, I worked with the American Federation of Teachers

8    before, immediately before this job and before that I was

9    working with the AFL-CIO in North Carolina.

10   Q.    And so how many years of prior Union related experience

11   did you have before commencing with Workers Unite in March of

12   '22?

13   A.    I would say maybe a year and a half.

14   Q.    Okay.  And did you receive any training from either --

15   from any of these unions with respect to National Labor

16   Relations Act law?

17   A.    No.

18   Q.    You're not a lawyer, I assume?

19   A.    I'm not a lawyer.

20   Q.    But in the course of performing your responsibilities my

21   understanding would be that you necessarily overlap with

22   questions that relate to National Labor Relations Act law, is

23   that fair?

24   A.    Yeah.

25   Q.    And is it fair that in the course of your experience you

```
 1  gained at least what you perceive as some Board knowledge of
 2  what is and is not lawful behavior?
 3  A.    Yes.
 4  Q.    And I just want to be clear in my own understanding of
 5  several things.  Early in your testimony in response to
 6  questions from Mr. Jackson I understood you to indicate that
 7  one of your roles is to -- I think you used the word coach
 8  employees from enterprises that express interest in organizing
 9  with the Union?
10  A.    Could you say that again?
11  Q.    Well, I thought I understood you -- the transcript will
12  reveal what it reveals that you used the word that what you do
13  is coach employees with respect to what's necessary or
14  appropriate to try to organize a Union in a particular store or
15  location.
16  A.    Yes.
17  Q.    Okay.  Now, I understood you to testify you picked up the
18  Great Neck store in terms of your responsibilities from Julie
19  Kelly in March of 2022, correct?
20  A.    Um-hum.  That's correct.
21  Q.    You have to answer audibly.  And I understood from one of
22  your two affidavits that your first one-tenth of involvement
23  was sometime in or around March of -- March 22 of 2022.
24  A.    Yes, that's correct.
25  Q.    Okay, so you and I would agree that with this organizing
```

1    drive having begun sometime around February 10 of 11 - February

2    9 or 10, you were coming into it about six weeks or so after it

3    had commenced, correct?

4    A.    Yes, that's correct.

5    Q.    And am I correct that you have no firsthand knowledge

6    about the process that evolved the acquisition of the

7    authorization cards?

8    A.    Firsthand I was not employed at the time, so no.

9    Q.    Right, Ms. Kelly, I assume, is the person who has that

10   knowledge?

11   A.    Yes.

12   Q.    Okay.  And with respect to the -- what's generally known

13   as a Dear Kevin letter, which is General Counsel Exhibit 2, I

14   can bring it to you so you can see it, sir, you don't have any

15   firsthand knowledge about whether this actually was sent to any

16   management representative?

17   A.    Firsthand, no.

18   Q.    Can you tell me second, third and fourth, what have you

19   done, if anything, to confirm that General Counsel's Exhibit 2

20   was, in fact, transmitted to someone within management at

21   Starbucks?

22   A.    I have asked Julie Kelly who told me it was sent via email

23   that we --

24   Q.    You have to speak up, sir.

25   A.    I believe that email's operational or I believe we shut

1    the email down.

2    Q.   Ms. Kelly's email?

3    A.   No, it would be through a different email, through Workers

4    United.

5    Q.   So what I'm trying to get at, sir, is there a record at

6    Workers United that would be able to confirm one way or the

7    other that General Counsel's Exhibit 2 was, in fact, sent to

8    the Starbucks manager?

9    A.   Not that I -- not that I know of.

10   Q.   Okay.  So Ms. Kelly has told you it was sent or

11   transmitted, correct?

12   A.   Um-hum.

13   Q.   You have to answer audibly.

14   A.   Yes.  Sorry, yes.

15   Q.   But she had not shown you an email or other documentation

16   that demonstrates that, in fact, it was transmitted?

17   A.   Correct.

18   Q.   Did Ms. Kelly indicate to whom it was transmitted?

19   A.   It would have -- she would have sent it to Kevin Johnson.

20   Q.   When I hear you she should have, that sounds like you're

21   talking about the normal protocol.  I'm asking whether she

22   explicitly told you she sent it to Kevin Johnson.

23   A.   I don't recall if she said one way or another.

24   Q.   Now, in one of the two affidavits I saw that you used the

25   term -- it's actually in the September 7th affidavit which is

1   the later of the two.  One is September 7th of this year and

2   the other is May 19 of this year.  Do you recall actually

3   giving these affidavits?

4   A.   Yes, I recall.

5   Q.   Okay.  In the September 7th affidavit there's a sentence

6   that reads -- at any point, sir, I can show you or ask Mr.

7   Jackson to show you a copy -- "Starbucks'," in the possessive,

8   "unlawful Union busting tactics have traumatically chilled the

9   willingness of store employees to get behind the Union."

10         Do you accept my representation that that's a

11  sentence in your affidavit?

12  A.   Yes.

13  Q.   Okay.  Now, you used the term Union busting and I want to

14  ask you how you define Union busting?

15  A.   I define Union busting as any tactic to -- to misrepresent

16  or lie about what the Union is and what it can bring to the

17  workplace.

18  Q.   Is it Union busting for Starbucks just in principle to

19  oppose being unionized at any given store?

20         MR. JACKSON:   I'm going to object as to relevance.

21         JUDGE GARDNER:   Do you want to respond?

22         MR. MENDELSON:   Well, there's a great deal of

23  testimony here, I'm not sure what the relevance is, but in this

24  case the General Counsel is seeking a bargaining order.

25  Bargaining orders, I'm speaking to generally and colloquially

 1  now.  In my experience and understanding of the law are

 2  reserved for situations where there are egregious unfair labor

 3  practices that prevent the re-running of an election, assuming

 4  arguendo an election, re-run election would be necessary.

 5          And so in the context of General Counsel putting into

 6  evidence all these media reports that speak about Union busting

 7  and the witness -- and the Tweets using that term and the

 8  witness in an affidavit having used that term, where the

 9  gravity of alleged wrongful conduct is an issue, I think I'm

10  entitled to understand his definition of Union busting.

11          JUDGE GARDNER:   And then this most recent question

12  though that --

13          MR. MENDELSON:   I pointed to him that he used the

14  term and I was asking him -- I was asking him in principle if

15  Starbucks or any Employer opposes unionization is that Union

16  busting.

17          JUDGE GARDNER:   Okay, you can answer.

18          THE WITNESS:   I think in principle it's not, but I

19  think the tactics of the Employer are.

20  BY MR. MENDELSON:

21  Q.  When you have spoken with store employees in the Great

22  Neck store, including the three Organizing Committee members,

23  but also including anyone else such as in the Town Hall, has

24  the word -- has the term Union busting been utilized?

25  A.  Yes.

1    Q.    And how have you understood employees in the Great Neck

2    store to understand the meaning of that term?

3    A.    I believe that they understand it as lying or lying about

4    the Union, lying about what the Union would mean for Starbucks

5    and for their worksite and other -- and other tactics such as

6    like threatening or taking away benefits also constitute Union

7    busting.

8    Q.    So let me just back up before I ask the next question.

9    Have you ever been involved -- I don't mean as an actual

10   participant, but have you ever been involved in a strike

11   situation?

12   A.    Yes.

13   Q.    Okay.  So -- well, you can correct me if I'm mistaken, but

14   I think Mr. Jackson asked you question and they had to do with,

15   if I'm recalling accurately, one or more employees saying that

16   Mr. Leon said word to the effect that if there's a strike, it's

17   mandatory and you do participate in that strike.  Am I correct

18   that that was something that you indicated in response to a

19   question from Mr. Jackson?

20   A.    Yes.

21   Q.    And it's also in your affidavit and I'm just trying to

22   summarize it, you indicated that when that issue arose in the

23   Town Hall, you told employees it's not compulsory that they

24   withhold their services as part of the strike; in fact that

25   they could go to work if that's what they want to do.  Is that

1    a fair distillation of what you said?

2    A.    Yes.

3    Q.    Now, sir, in real life strikes isn't it true that there's

4    enormous pressure placed upon the workers in any enterprise to

5    withhold their labor in unison to increase the effort to see

6    over the strike picketing or work stoppage?

7    A.    I wouldn't -- I wouldn't say enormous.  We might have

8    different definitions of how much pressure is put on workers,

9    but I would say at the end of the day it's up to the person if

10   they want to go on strike or not.

11   Q.    Have you ever heard -- in your self-experience have you

12   ever heard of Unions that fine people who cross picket lines

13   because they did not resign their membership in the Union?

14   A.    Could you repeat the question?

15   Q.    Have you ever heard Unions that have fined, f-i-n-e-d,

16   fined members who crossed the picket line without first

17   resigning their membership in the Union?

18   A.    I have not.

19   Q.    That's not a familiar concept to you?

20   A.    No.

21   Q.    Okay.  So isn't it the case, sir, that the line in

22   discussion about what is lawful and unlawful under the National

23   Labor Relations Act in some cases can be a rather fine or murky

24   line?

25              MR. JACKSON:   Objection, calls for a legal

1    conclusion.

2             JUDGE GARDNER:    I would say you should rephrase

3    that.

4    BY MR. MENDELSON:

5    Q.    In your conversations with employees as you relayed it in

6    testimony in the affidavit, questions about things that Mr.

7    Leon and Ms. Daniells, the store manager, said, would you agree

8    that the questions they posed to you in part relate to whether

9    or not the conduct is lawful or not?

10            You, yourself, said to me that Union busting is lying

11   or engaging in certain types of tactics and so I'm asking you,

12   sir, to confirm my understanding that sometimes determining

13   what is lawful or unlawful conduct as a lay person is murky or

14   not easy?

15   A.    Yes, it's murky.

16   Q.    And if Mr. Leon, let's say for argument's sake, said to

17   employees that when there's a strike you're going to be

18   expected to participate, is that a lie?

19   A.    Is that a --

20   Q.    Is that a lie?

21            MR. JACKSON:    Objection, calls for speculation.

22            JUDGE GARDNER:    No.  Is it a lie under your

23   definition of a lie that would constitute Union busting?

24            THE WITNESS:    Could you repeat that?

25   BY MR. MENDELSON:

 1  Q.   Yes, sir.  Did Mr. Leon lie to the employees, assuming

 2  that what they reported to you or others within the Union is

 3  accurate, that he said to them that when there's a strike in a

 4  store, they will be expected to join the strike and withhold

 5  their services?

 6  A.   It seems like a lie, but it's not.  I guess it depends

 7  what is expected, where expectations is or not.  Could you

 8  repeat the question again?

 9  Q.   Well, sir, would it be fair to say you're struggling with

10  how to answer it?

11          MR. JACKSON:   Objection.

12          MR. MENDELSON:   But he is, I'm asking him to confirm

13  that.  He hasn't answered yet.

14  BY MR. MENDELSON:

15  Q.   And you've asked me to repeat the question, but I've

16  already repeated it once.  Isn't it the case that you're having

17  difficulty answering the question because the determination of

18  whether something is allowed or not allowed or a lie or not is

19  unclear and depends upon the circumstances?

20  A.   I think I'm struggling to answer the question because it's

21  a lot of mental jumping jacks of he said/she said.  I would say

22  it's for that reason.

23  Q.   Well, your affidavit and your testimony indicated that it

24  was said to you during the Town Hall that Mr. Leon said that

25  strike participation would be mandatory, right?

1   A.   Yes.

2   Q.   And I'm asking whether that's Union busting from the

3   definition that you gave that among other things to lie about

4   something is Union busting and I'm asking whether that was a

5   lie that he told them.

6   A.   Then yes.

7   Q.   That's a lie?

8   A.   Yes.

9   Q.   And even though you acknowledged that you have no

10  knowledge of whether there are Unions that fine members for

11  crossing the picket line without having resigned?

12  A.   Correct.

13  Q.   Okay, so you don't know whether that's something that he's

14  experienced or somebody told him about which was his

15  experience?

16  A.   I don't know that.

17  Q.   Okay.

18         MR. MENDELSON:   Mr. Jackson, do you have another

19  copy of the General Counsel Exhibit 2?

20         MR. JACKSON:   Yeah, I can give the witness a copy.

21  (Whereupon, the document was handed to the witness.)

22  BY MR. MENDELSON:

23  Q.   Sir, I'm looking at the back side of General Counsel

24  Exhibit 2 which has the "non-interference of fair election

25  principals of a party's unionization.  Do you see that?

```
1    A.    (Non-audible response.)

2    Q.    You have to answer yes.

3    A.    Yes, I do.

4    Q.    And again, recognizing you're not a lawyer please read to

5    yourself Number 4 and tell me whether what Number 4 states is,

6    as you understand it, a legal obligation at the present time on

7    companies?

8    A.    Sir, do you want me to read what it says?

9    Q.    No, no, sir, I'm asking you to read it to yourself and

10   then tell me whether you understand what it says to be a legal

11   obligation at the present time on a company.

12          MR. JACKSON:   Excuse me, Mr. Mendelson, which part

13   are you directing him --

14          MR. MENDELSON:   Number 4 on the back.

15          MR. JACKSON:   The back side, thank you.

16          THE WITNESS:   This is --

17          MS. HAHN:   Objection, mischaracterizes the proposed

18   agreement.  There's no assertion here that Starbucks has any

19   obligation without signing this agreement.

20          JUDGE GARDNER:   Right, I don't think this is

21   purporting to be the law.  This is a proposal that the Union

22   apparently customarily sends and may or may not have sent this

23   time to propose like will Starbucks please do these things that

24   it's not obligated to do.  We know that.

25          MR. MENDELSON:   I understand that.  I don't know
```

1   what the witness understands, but this is a case where the

2   gravity of the alleged conduct is central to your ultimate

3   determination.  So I want to understand in various respects

4   what the Union, through this representative at the moment,

5   understands or believes what its legal obligations are or were.

6              MR. JACKSON:   I'm going to object on relevance

7   grounds.

8              JUDGE GARDNER:   Yeah, I don't really care what they

9   think, what his legal --

10             MR. MENDELSON:   Well, I will say -- I'll respect

11  your ruling, but I will say I think all of that bears on the

12  nature and substance of the conversations this witness as well

13  as others had with -- I'll use the term eligible voters in the

14  store, but I'll move on although I don't think precluding this

15  kind of examination is correct.

16  BY MR. MENDELSON:

17  Q.   Your understanding is Revna separated from the store

18  immediately after the vote tally, correct?

19  A.   Correct.

20  Q.   And there's some indication, it seems murky to m so far

21  that Revna indicated to somebody that she believed the company

22  had acted wrongfully or unlawfully in connection with the vote

23  and that that was why she was withholding the services, is that

24  your understanding?

25  A.   As well as the lawsuit, the Union vote.

1    Q.    Okay.  As you understand it and so do I, and I tried to

2    subpoena Revna, but I was told she's in London, she's no longer

3    in the United States, she's somewhere abroad in Europe,

4    correct?

5    A.    Correct.

6    Q.    And you seem to know that she's enrolled or involved in

7    some kind of schooling or educational initiative?

8            MS. HAHN:    Your Honor, may I correct for the record

9    the perceived individual's gender pronoun?

10            JUDGE GARDNER:    Yes. I'm sorry, they.

11            JUDGE GARDNER:    But there's only one Revna to the

12   best  you're able to respect Revna's choice of pronouns, use

13   they although I will understand who you're referring to.

14            MR. MENDELSON:    Understood.  I didn't intend any

15   offense directly.

16            MS. HAHN:    No, I know.

17   BY MR. MENDELSON:

18   Q.    Do you have more, even a tidbit of knowledge as to what

19   type of program Revna is participating in at this time?

20   A.    I'm not aware, no.  They have told me, but I've forgotten.

21   Q.    And based on what Revna communicated to you, is it your

22   understanding that Revna was looking at participation in that

23   program at or about the time she separated from Starbucks?

24   A.    I believe so, yes.

25   Q.    Okay.  Now, we were talking about lying a moment ago.

1  That was part, I'm not going to say all of it, it was part of

2  how you define Union busting and am I correct that lying is not

3  a good thing in your hierarchy of values?

4  A.   Yes.

5  Q.   I've seen -- I don't want to take too much time doing it,

6  but I've seen in these newspaper articles that in General

7  Counsel's Exhibits 9(a) through (f) there are some places where

8  I think I've seen that Joselyn remarked to the effect that she

9  got discharged by Starbucks because she was three minutes late

10 or three minutes late several times, is that consistent with

11 your recollection of what these articles say and what she

12 quoted, was quoted as saying?

13 A.   That's part of it, yes.

14 Q.   And that's your understanding?  She has represented to you

15 that when she was late her discipline was over a relatively

16 small amount of time such as three minutes.

17 A.   Yes.

18 Q.   Has Joselyn told you that in one instance she was late by

19 about an hour and a quarter?

20 A.   Umm --

21            JUDGE GARDNER:   Well, has she ever told you that?

22 That's the answer to the question.

23            THE WITNESS:   I guess I'm trying to think if it's an

24 incident when she did not have the keys and was at the store --

25 BY MR. MENDELSON:

1    Q.   Let me interrupt you.  I don't think so.  In fact here let

2    me try and display -- I'm having trouble finding something, but

3    I think I found it.  So on April 19, 2022, the company's

4    records report Joselyn is an hour and 15 minutes late.  Did she

5    ever tell you that she was an hour and 15 minutes late?

6    A.   If she did I don't recall it.

7    Q.   Okay.  And did Joselyn tell you that on the following days

8    she was late in the following amounts of minutes that I'll

9    tender to you in my statement and I'm not asking about the

10   specific day, I'm doing that as a point of reference, but I'm

11   trying to ascertain whether she shared with you what I

12   understand the company records show.

13           June 20 she arrived 13 minutes late; June 22 she

14   arrived ten minutes late; June 24 she arrived 14 minutes late;

15   June 26 she arrived ten minutes late.  Did she share that with

16   you?

17   A.   I don't -- I don't recall.

18   Q.   And did Joselyn share with you that when she wanted to

19   swap a shift with a fellow who goes by the name of Jerry, she

20   did not have availability to work his shift, but in order to

21   accommodate Joselyn so that she could take off the shift she

22   wanted, Beth Daniells covered the shift that she was trying to

23   swap for?

24   A.   I didn't know.

25   Q.   And so if she didn't tell you about that, you wouldn't

```
 1  know that Joselyn thanked Beth Daniells for picking up that
 2  shift for her.
 3  A.   I didn't hear that.
 4  Q.   Did not?  Did not hear that?
 5  A.   I did not hear that.
 6  Q.   And did Joselyn tell you that after Beth Daniells had
 7  repeatedly coached her, meaning spoken with her either without
 8  issuing any kind of written discipline or giving her a document
 9  in coaching, it was only because she repeatedly continued to
10  come to the store late that Beth Daniells then imposed written
11  warnings and ultimately a final written warning?
12  A.   I was not --
13          MS. HAHN:   Objection, also speculation as to the
14  word discipline that neither the witness nor Joselyn would have
15  any reason to know about.
16          JUDGE GARDNER:   Well, Joselyn might have reason to
17  know about that, but this witness would only know if Joselyn
18  ever told him about those things which is easiest enough to say
19  yes or did she never tell you anything about that?
20          THE WITNESS:   No.
21          JUDGE GARDNER:   Okay.
22  BY MR. MENDELSON:
23  Q.   And so what did Joselyn tell you about the incident that I
24  think was referenced as an infraction regarding the lost key?
25  A.   That was a while ago.  I don't remember every detail.  I
```

1  remember -- I think I remember her telling me that she had
2  misplaced a key and had to call someone to help her open the
3  store.
4  Q.   Did she tell you that after she called someone to help and
5  get a key from that person she subsequently took a key from the
6  safe?
7  A.   I don't recall that.
8  Q.   Did she tell you that after taking the key from the safe
9  she did not report that to either Mr. Leon or to Beth Daniells?
10 A.   I don't recall that.
11 Q.   Did Joselyn ever reveal to you that she corresponded with
12 Mr. Leon from time-to-time about things, you know, unrelated to
13 discipline?
14 A.   That she corresponded with --
15 Q.   Mr. Leon.
16 A.   About things unrelated to discipline, yeah.  Like ever?
17 Q.   Well, in 2022.
18 A.   Yes.
19 Q.   And what did -- did she tell you what she corresponded
20 with Mr. Leon about that was unrelated to discipline?
21 A.   I think the Union for one.
22 Q.   Anything else besides that?
23 A.   Not that I can think of.
24 Q.   Okay.  Did you understand fro that that Ms. - that Joselyn
25 knew how to get a hold of Mr. Leon if she wished to communicate

```
 1   with him?

 2   A.    Yes.

 3   Q.    Did you ever hear that Joselyn was having a dispute with

 4   Nicole, I think you said Nicole Green was the store employee

 5   and that in the course of that dispute Joselyn encouraged other

 6   employees to give Nicole the cold shoulder?

 7              MR. JACKSON:    Objection, relevance.

 8              MR. MENDELSON:    This is the person who he testified

 9   or at least somewhere along the way I heard testimony, maybe it

10   was from Mr. Leon, this was the perspective shop steward so I

11   think I'm entitled to explore what this witness, a Union

12   representative knew about Joselyn's relationship with the other

13   employees in the store.

14              JUDGE GARDNER:    Okay.    I mean and that's relevant

15   about for what?

16              MR. MENDELSON:    That's relevant to the ultimate

17   question about whether -- whether the Union can't have a fair

18   Union election, assuming arguendo there is any reason for that.

19              JUDGE GARDNER:    All right, it will be quick.    Go

20   ahead, do you have the answer?

21              THE WITNESS:    Could you repeat the question?

22   BY MR. MENDELSON:

23   Q.    Did Joselyn ever tell you or did you hear from anyone that

24   Joselyn pressed other employees to give Nicole the cold

25   shoulder?
```

1    A.    No.

2    Q.    In the Town Hall am I correct that there were slides like

3    Power Points that were utilized to show the employees who

4    attended it?

5    A.    I believe there were slides, yeah.

6    Q.    Okay.  And would any given employee who attended that Town

7    Hall have the right to show one or more of those slides to a

8    member of management?

9    A.    They would have the right to, yeah.

10   Q.    Are you aware that one or more employees who attended that

11   meeting did show one or more slides that were used in the Town

12   Hall to management?

13   A.    I'm not aware.

14   Q.    And an employee or an eligible voter showing one of those

15   slides from the Town Hall to a manager is no different than the

16   Union commenting on what the Employer had on his website where

17   it included its explanations why it thought a Union was not in

18   the interest of the employees, correct?

19   A.    No, because management -- a manager doesn't vote in the

20   Union.

21   Q.    You're saying that they're not analogous situations,

22   employees showing a manager what's on the Union slide compared

23   to the Union taking the literature on the company website and

24   making comments on it?

25             MR. JACKSON:   Objection, calls for a legal

```
 1   conclusion.
 2           JUDGE GARDNER:   I don't think it's calling for a
 3   legal conclusion, no, it's just an analogy.  If you don't think
 4   those are analogous then you can say so or not.  I mean it's
 5   just tricky to answer because it's kind of a cumbersome
 6   question.
 7           MR. MENDELSON:   I understand.
 8           JUDGE GARDNER:   I don't know if you raise it any
 9   simpler?
10           MR. MENDELSON:   I'll try to simplify it.
11   BY MR. MENDELSON:
12   Q.   Am I correct that the Union was taking material from the
13   company's website and then on its own website putting
14   commentary, arguing or taking issue with what the company said?
15   A.   That's correct.
16   Q.   Okay.  So I'm trying to suggest that that's no different
17   what the Union did that an employee, whatever reason the
18   employee had to taking one of those slides and showing it to a
19   manager.
20   A.   I don't see how that's -- no, I guess --
21   Q.   Well, you said because the manager doesn't vote.
22   A.   Correct.
23   Q.   So that raises the question, sir.  We addressed this
24   before and I'm not going to belabor it, the company has a right
25   to share its view through its managers that unionizing is not a
```

1   favorable development, correct?

2            MR. JACKSON:   Objection, calls for a legal

3   conclusion.

4            JUDGE GARDNER:   Yeah.  I think you're going to make

5   these arguments to me based on the facts, but whether he agrees

6   with you doesn't seem to be evidence I need to hear.

7            MR. MENDELSON:   Well, whether he agrees with me is

8   potentially an admission.  And the absence of an admission

9   where there should be one is also significant.  That's why I

10  think it's an appropriate question.

11           JUDGE GARDNER:   I'm going to ask you to move on to

12  the next subject.

13  BY MR. MENDELSON:

14  Q.   In your affidavit, sir, and your testimony you took issue

15  with what Mr. Leon said which you described here, I'm not sure

16  this is sufficiently accurate installation, but you didn't hear

17  what Mr. Leon said, it was told to you, that he told employees,

18  "Your bargaining would start from zero," and you said instead

19  bargaining starts at the present with what the wages and

20  benefits the employees currently have.  Am I capturing that

21  correctly?

22  A.   Yes.

23  Q.   Okay.  When the parties come into negotiation, sir, each

24  of them makes proposals for something different than what is

25  the status quo in the ordinary course, correct?

1          MR. JACKSON:   Objection, calls for speculation.

2          JUDGE GARDNER:   They come with what they're coming.

3    They might come with the terms that are currently in place and

4    a few asks to change to change them.   They come with what they

5    come.

6          MR. MENDELSON:   Well, this witness says that he

7    negotiates and there's essentially an allegation here that what

8    the company said is an unfair labor practice that would justify

9    a bargaining order so I think I'm entitled to explore what the

10   Union's understanding of those parameters is.

11         JUDGE GARDNER:   Why?

12         MR. JACKSON:   Objection, relevance.

13         MR. MENDELSON:   Because it goes to whether the

14   conduct is or is not lawful.

15         JUDGE GARDNER:   I don't think it does.   Why, what --

16   I mean if the Union thinks it's all unlawful, it's all Union

17   busting that doesn't make it Union busting.   I mean I don't

18   really care --

19         MR. MENDELSON:   I agree.

20         JUDGE GARDNER:   -- what they think.

21         MR. MENDELSON:   And if this witness was to

22   acknowledge without all of our colloquy that certain conduct is

23   lawful or permitted, then that would be meaningful too.

24         JUDGE GARDNER:   Theoretically, but I -- the witness

25   has already indicated he doesn't have a complete understanding

1    of the National Labor Relations Act and so I don't really want

2    admissions from someone who's not equipped to properly give

3    them one way or the other.

4    BY MR. MENDELSON:

5    Q.   In your affidavit you state -- this was in the December --

6    I'm sorry, the May 19th affidavit, in Paragraph 8, you state

7    that, "Store Employee Max Cook quit his job sometime in about

8    late March.  I do not know exactly when Max decided to quit,

9    but I understand from our communications with Joselyn that Max

10   was unhappy with the treatment he had received from Beth at the

11   store, in particular Beth cracking down on Max regarding his

12   lateness in a way that she had not done previously."

13           So that's what Joselyn told you, right, sir?

14   A.   Yes.

15   Q.   So tell me, sir, whether Joselyn told you any of this.  On

16   November 23, 2021, pre-petition, Max was 13 minutes late for

17   work.  Did she tell you that?

18   A.   No.

19   Q.   On November 26, 2021 Max was 14 minutes late for work and

20   left early.

21   A.   No.

22   Q.   She didn't tell you that.  On December 8th Max was

23   scheduled to begin at 5:30 and arrived 33 minutes late and the

24   store did not open on time since he was the opener.  She didn't

25   tell you that, did she?

1  A.    No.

2  Q.    Max on December 10 arrived ten minutes late.  She didn't

3  tell you that okay, and I'm going to skip past some of that.

4  On February 18 Max was scheduled to work from 6:00 a.m. to

5  10:00 a.m. and without consulting with anyone in management, he

6  swapped his shift with another partner.  Did she tell you that?

7  A.    No.

8  Q.    And on February 19 he was scheduled to work from 5:30 a.m.

9  to 11:00 a.m. and once again, without consulting with any

10  partner he swapped his shift with another employee in the

11  store.  She didn't tell you that?

12  A.    No.

13  Q.    Okay.

14          MS. HAHN:    Objection, that line of questioning

15  assumes facts that are not in evidence in this case.

16          JUDGE GARDNER:    Overruled.

17  BY MR. MENDELSON:

18  Q.    Am I correct that Justin resigned because he wanted to

19  take a position or go to school that require a schedule

20  adjustment that Beth Daniells indicated she could not

21  accommodate?

22  A.    Could you say that again?

23  Q.    Am I correct that Justin Wooster resigned from the

24  Starbucks Great Neck store because he was going to either

25  school or a job that required an adjustment of his schedule and

1   Beth Daniells told him she could not accommodate?

2   A.   I heard that was part of the reason.

3   Q.   Okay.  And what other reason, if any, do you recall

4   understanding?

5   A.   Because of the results of the election and management's

6   behavior during the election.

7   Q.   Isn't it true, sir, he resigned before the vote tally?

8   A.   Yes.

9   Q.   So it wasn't the result of the election.

10  A.   Yeah.

11  Q.   Okay.  And are you aware, sir, that the Union filed an

12  unfair labor practice charge that included an allegation that

13  the company refused -- the company's refusal to accommodate

14  Justin's request for reduced hours was unlawful?

15  A.   Could you say that again?

16  Q.   Are you aware that the Union filed an unfair labor

17  practice charge that alleged that the company's refusal to

18  accommodate Justin's request for a reduction of hours was

19  unlawful?

20  A.   Yes, I am.

21  Q.   And are you aware that the Union ultimately withdrew that

22  allegation?

23  A.   I wasn't aware of that.

24  Q.   Okay, I'll find it.

25          MR. MENDELSON:   Can you find it?

1    BY MR. MENDELSON:

2    Q.   And sir, are you aware that Revna – sorry, the Union filed

3    an unfair labor practice charge that included an allegation

4    that the company's refusal to accommodate a requested reduction

5    in hours or at least an adjustment of hours was unlawful?

6    A.   Yes.

7    Q.   And are you aware that the Union withdrew that particular

8    allegation?

9    A.   I wasn't 100 percent on each one that went forward and

10   which one was dropped.

11   Q.   So I'm going to try to refresh your recollection, sir.   If

12   it doesn't refresh you then so be it.   I'm going to show you a

13   document that's been pre-marked as Employer Exhibit 19.

14   (Respondent's Exhibit 19 identified.)

15   BY MR. MENDELSON:

16   Q.   Look at this, sir, and see if it refreshes your

17   recollection.

18   (Whereupon, the witness reviewed the document.)

19          JUDGE GARDNER:   Is this something we're anticipating

20   is going to become GC 1 double letter?

21          MR. MENDELSON:   It could, it could.

22          MR. JACKSON:   Yes, I do intend to add these to the

23   formal papers, bit I want to see if this refreshes the witness'

24   recollection.

25          JUDGE GARDNER:   Well, maybe we won't move it into

1  evidence if that was your intention, but I don't like

2  duplicates of these.

3  BY MR. MENDELSON:

4  Q.   Do you recognize this document, sir, and/or reading it

5  does it refresh your recollection as to what happen with the

6  allegation that was brought on behalf of Mr. Wooster?

7  A.   Yes, sir.

8  Q.   And what does it refresh you as to?

9  A.   That it was withdrawn.

10 Q.   Okay.  And Judge, if this is going to be part of the

11 General Counsel Exhibit 1 then I won't move the introduction of

12 it.  I just wanted to utilize it.

13       JUDGE GARDNER:   And I think the Court Reporter

14 probably did mark it though as R-10, which is fine.

15       MS. TOOKER:   No, it was pre-marked.

16       JUDGE GARDNER:   Oh, okay, yeah so R-19, but it's not

17 going to get offered so we'll just known at the end that that

18 did not go in.

19 BY MR. MENDELSON:

20 Q.   So this, sir, is General Counsel -- I'm sorry, it's

21 marked, it's identified as Respondent Exhibit 15, but if it's

22 moved it will be moved as a different number.

23 (Respondent's Exhibit 15 identified.)

24       JUDGE GARDNER:   I understand.

25 BY MR. MENDELSON:

1  Q.   Please review it, sir and tell us if you either recognize

2  it or it refreshes your recollection?

3  (Whereupon, the witness reviewed the document.)

4  A.   It refreshes.

5  Q.   So you would agree that with respect to Revna there -- the

6  allegations the Union filed on behalf of Revna in the unfair

7  labor charge was withdrawn?

8  A.   Yes.

9  Q.   Okay, thank you.  My understanding is that Revna

10  communicated to someone, I'm not sure who, that Revna was

11  striking.  To your knowledge, did anyone else ever engage in a

12  strike in conjunction with Revna?

13  A.   No.

14  Q.   You said no?

15  A.   No.

16  Q.   Now, in your testimony on direct examination as well as in

17  your affidavit I believe you indicated that there are partners,

18  partners at Starbucks that goes to baristas and shift

19  supervisors, correct?

20  A.   Correct.

21  Q.   I'll go back to using employees that don't -- that

22  employees are reluctant to participate -- reluctant to be

23  involved with the Union because of the separation of Revna,

24  Justin and Joselyn, is that a clear understanding of your

25  statements?

```
1    A.    Yes.

2    Q.    And how do you know that, sir?

3    A.    Through our attempts to reach out to them through those

4    three people, we have heard back that the folks that would be

5    willing to participate are -- don't want retaliation to come

6    for them.

7    Q.    So your knowledge or certain knowledge about that subject

8    that you just testified to comes through one or more Joselyn,

9    Justin or Revna.  You have no firsthand knowledge, no employee

10   from the store has said that to you.  And if I understood, the

11   Union has not sought to connect with any of the employees who

12   are on the voter list, who are still employed at the store

13   directly.

14   A.    Correct.

15   Q.    And you've explained that, sir, you've talked about how

16   unions typically awaits for contact from someone in an

17   enterprise as opposed to initiating contact itself with people

18   in an enterprise; is that a fair statement?

19   A.    Correct.

20   Q.    And I can go through it and maybe I should go through it,

21   I believe that of the 15 employees who are eligible voters

22   there are still seven employed at the store, is that your

23   understanding or if you don't understanding we can go through

24   the names.

25   A.    I'm not sure who's left at the store.
```

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1   Q.   Okay.  You remember Akeeb Ollie?

2   A.   Yes.

3   Q.   Am I correct that Akeeb was working in the store during

4   the -- during the period following the filing of the petition

5   with the intention of transferring to a different Starbucks

6   store?

7   A.   That's what I heard.

8   Q.   And who did you hear that from?

9   A.   I heard that from Justin.

10   Q.   Okay.  And there's a person who's name I'm not sure I'm

11   going to say right, it's Luiza, L-u-i-z-a, and the last name is

12   A-r-a-m-a.  Does that name ring a bell for you?

13   A.   Yes.

14   Q.   Is it your knowledge that she's still employed at the

15   store?

16   A.   Yes.

17   Q.   Okay.  And we already discussed Revna has separated.  You

18   have to answer verbally.

19   A.   Yes, yes.

20   Q.   And Joselyn has separated.

21   A.   Yes.

22   Q.   Max Cook is separated.

23   A.   Yes.

24   Q.   Nicole Green is still employed at the store, is that your

25   knowledge?

1   A.   Yes.

2   Q.   Someone named Yuki, Y-u-k-i, last name H-s-i-e-h is still

3   employed at the store?

4   A.   Yes.

5   Q.   T-a-y-d-o-e, I think he may have another first name like

6   Dante, Dante Jones, Taydoe Jones is no long employed at the

7   store.

8   A.   Yes.

9   Q.   Are you aware that Taydoe was fired for theft?

10  A.   Yes.

11  Q.   Okay.  Stephanie Olsen, O-l-s-e-n, is still employed at

12  the store?

13  A.   Yes.

14  Q.   Lavender Sandi, S-a-n-d-i is still employed at the store?

15  A.   Yes.

16  Q.   Abigael, A-b-i-g-a-e-l, last name T-i-o-s-h-i-t is still

17  employed at the store?

18  A.   Yes.

19  Q.   Darren Wisher, W-i-s-h-e-r, is no longer employed at the

20  store?

21  A.   Yes.

22  Q.   And Justin is separated.

23  A.   Yes.

24  Q.   So the ones who are employed, I'm just going to speak out

25  loud, still employed at the store are Luiza, Nicole, Yuki,

1  Stephanie, Lavender, Abigael.  That's six, I'm missing

2  somebody.

3           JUDGE GARDNER:   Is Kiba Lee still employed?

4           MR. MENDELSON:   He's employed by Starbucks, but at a

5  different store.

6           JUDGE GARDNER:   Okay.

7           MR. MENDELSON:   I think I'm missing somebody.

8  Luiza, Nicole Yuki, Stephanie, Lavender, Abigael.  I'll have to

9  go back and count.

10          JUDGE GARDNER:   There are 13 names that I'm working

11 off of.

12          MR. MENDELSON:   Oh.

13          JUDGE GARDNER:   In GC 2, but that's not 15 names.

14          MR. MENDELSON:   Yes.  Jerry separated from the

15 store, correct.  There's one more.  So I'll come to it if I

16 can.  Oh, you got it, okay.

17 BY MR. MENDELSON:

18 Q.  Oh, Nellie Hines, does that name ring a bell for you sir?

19 No?

20          MR. JACKSON:   She goes by Brianna.

21          MR. MENDELSON:   Oh, Brianna?

22          MR. JACKSON:   Yes.

23          MR. MENDELSON:   Okay, thank you.

24 BY MR. MENDELSON:

25 Q.  Brianna, Brianna's still employed at the store?

1  A.   Yes.

2  Q.   So seven of the 15 eligible voters are still employed at

3  the store, correct?

4  A.   Correct.

5  Q.   And while the Union's protocol or approach does not call

6  for initiating contact with a situation where it's not familiar

7  with eligible voters, in this instance the Union has

8  familiarity with either all or some of those seven, correct?

9  A.   Through Joselyn or Justin or Revna, yes.

10 Q.   Well, so the voter list included each person's personal

11 email address, personal phone number and has their personal

12 residential address, correct?

13 A.   Correct.

14 Q.   So you have the means and have had the means to contact

15 them directly, correct?

16 A.   Correct.

17 Q.   Okay.  And so the decision not to do that is a function in

18 part at least that the Union's own decision making that it does

19 not wish to contact people directly, but rather wants to do it

20 through the three former Organizing Committee members and in

21 fact has done that even though those people separated?

22 A.   Correct.

23 Q.   Okay.  Joselyn was a shift supervisor, correct?

24 A.   Yes.

25 Q.   And am I correct that a shift supervisor is responsible

 1  for running the front of the store when the store manager is

 2  not handling that, but doing administrative responsibilities?

 3          MR. JACKSON:   Objection, calls for speculation.

 4          JUDGE GARDNER:   If he knows.  I wouldn't want you to

 5  guess about that.  Do you have any information to rely on to

 6  answer that question?

 7          THE WITNESS:   I don't know the specifics of the job

 8  to answer that.

 9          JUDGE GARDNER:   Okay.

10  BY MR. MENDELSON:

11  Q.   I just want to make sure I understand something.  I think

12  you acknowledged on direct examination that the Union has

13  publicized the dispute over Joselyn's separation?

14  A.   Yes.

15  Q.   How has the Union done that besides the rally?

16  A.   Through the press releases, through Tweets, through

17  interviews with the press, yeah.

18  Q.   Okay, so that's what I was going after.  So the Union has

19  made affirmative contact with the press to put Joselyn's

20  dispute into the public domain.

21  A.   Yes.

22  Q.   And there was a reference by Mr. Jackson to a person that

23  he referred to as Leann.  I didn't catch who she is?

24  A.   The press coordinator.

25  Q.   For the Union?

1  A.    For the Union.

2  Q.    What's her last name?

3  A.    Tori-Murphy, I believe.

4  Q.    It's a hyphenated name with two names?

5  A.    Yeah, yeah.

6  Q.    Okay.  So to go back to what I was asking you before of a

7  different name, the Union has not had direct contact with any

8  of the seven named eligible voters from the election that took

9  place at the Great Neck store to ascertain from them in their

10  own words why -- strike that.

11         You've testified and it's in your affidavit that the

12  Union believed it did not have a fair election at the Great

13  Neck store because of alleged coercion and other wrongful

14  conduct by the company, correct?

15  A.    Correct.

16  Q.    The Union has not secured from these seven remaining

17  eligible voters at the Great Neck store anything to confirm the

18  Union's belief.

19  A.    I have heard from Joselyn of people she's been in contact

20  who in theory are -- as part of the amendment don't want to

21  publicly support it or show their support for fear of

22  retaliation.

23  Q.    As I understood that, sir, you said that before, but I'm

24  just asking to confirm.  The Union has not itself sought or

25  actually secured input from those seven people as to what their

1   feelings about the Union are and whether or not they believe a

2   fair election could be held?

3   A.   Correct.

4   Q.   And I may be recalling this inaccurately, in one of your

5   affidavits did you reference a store employee who at certain

6   times since the election has continued to wear a Union pin?

7   A.   Yes.

8   Q.   I don't remember that.  I don't know if you named the

9   person, but if the person is wearing a pin there would be

10  nothing confidential about that.  Do you remember who that is?

11  A.   I don't recall the specific name, no.

12  Q.   Okay, but somebody still working at the store sometime

13  subsequent to the election was wearing a Union pin?

14  A.   Yes.

15  Q.   By the way, does the Union -- does the Union have any

16  evidence that any of the employees at the Great Neck store and

17  I don't mean just those former eligible voters that had an

18  election, but any of the employees of the Great Neck store

19  today read any of the newspapers that have these accounts about

20  Joselyn that are General Counsel Exhibit 9(a) through (f)?

21           MR. JACKSON:   Objection, lacks foundation.

22           JUDGE GARDNER:   Well, he can ask it if he's aware of

23  that.

24           Are you aware of that?

25           THE WITNESS:   I'm not aware of that.

1   BY MR. MENDELSON:

2   Q.   And does the Union have any information that any of the

3   employees at the store in Great Neck look at the Union's

4   Twitter page?

5   A.   We don't know.

6   Q.   Or your Twitter page?

7   A.   No.

8   Q.   I'm responding to some portions of what are in General

9   Counsel's Exhibit 9(a) through (f).  To your knowledge does the

10  Union know how many employees were discharged by Starbucks in

11  2020?

12  A.   No.

13  Q.   Does the Union know how many employees were discharged by

14  Starbucks in 3029?

15  A.   No.

16  Q.   And just for the record, I think when Mr. Jackson asked

17  you a question on direct examination he may have spoken of the

18  Union's efforts in 2022 -- I think I'm right in what I

19  remember, I could be wrong -- just for the clarity of the

20  record, the Union began organizing in Buffalo in the late

21  summer or early fall of 2021, correct?

22  A.   I believe that's correct.

23  Q.   Okay.  And you gave some testimony on direct I just want

24  to clarify when you and Mr. Jackson were talking about the

25  rally for Joselyn there was some discussion about the Union

1   reaching out to other allies --  ally groups to try to build

2   support for that and you made some statement about the folks in

3   the store.

4          I don't know if you remember that, I was trying to

5   figure out whether you were talking about the employees in the

6   store or a broader population, employees, customers?

7   A.    Employees in the store.

8   Q.    Employees, okay.  In your May 19th affidavit in Paragraph

9   8, you said -- I may have quoted this before, I'm sorry, I just

10  want to establish a point, I do not at this time fully

11  understand the reasons why Justin left his job.  Do you recall

12  writing that?

13  A.    Yes.

14  Q.    Is that still the case, sir, that you don't have a full

15  understanding of Justin's departure?

16  A.    I think I know some of the reasons.

17  Q.    Okay, and you testified before about that, but I was just

18  trying to resolve that.

19  A.    Okay.

20  Q.    Okay?  In that same affidavit you indicated that you,

21  Joselyn and Julie met once or twice in March of 2022 and you

22  guys gave your respective assessments of employee support for

23  the Union, correct?

24  A.    Correct.

25  Q.    And at one point there was a belief that there were ten

1  employees who were strong supporters of the Union and five who

2  were either opposed the Union or undecided, right?

3  A.   Correct.

4  Q.   Is there any reason that the company's managers cannot do

5  the same things that you three did that day, that is talk among

6  themselves with their assessment of employees' support for the

7  Union?

8         MR. JACKSON:   Objection, calls for a legal

9  conclusion.

10        JUDGE GARDNER:   Yeah, I think that it does.  I don't

11 know.

12        MR. MENDELSON:   Well, I'm not asking him as a

13 lawyer, I'm asking him as a person in the field to indicate to

14 me whether he believes there's anything wrong with managers,

15 based on whatever they know, talking about how they feel the

16 employees will ultimately line up when it comes time to vote.

17        JUDGE GARDNER:   Yeah, but I mean is there -- is

18 there an allegation that managers spoke among themselves about

19 that?

20        MR. MENDELSON:   I don't believe there is, but I --

21        JUDGE GARDNER:   I don't think that would be --

22 anyone would allege that to be unlawful right, managers could

23 talk about that.  How they got that information might become a

24 subject, but I'm going to sustain the objection.

25        MR. MENDELSON:   Okay.

1   BY MR. MENDELSON:

2   Q.   Now, the affidavit also mentions -- claims that Mario was

3   fomenting the sense about whether there should be a Union by

4   spreading rumors that Joselyn was being paid by the Union; do

5   you recall that, sir?

6   A.   Yes.

7   Q.   Did anyone ever tell you that what Mario discussed was

8   that he had heard that there were other scenarios, he didn't

9   speak to Joselyn specifically, that people who are employed in

10  the store are paid by a Union to help organize?

11  A.   No, I'd heard that, the same that Joselyn was being paid

12  by the Union.

13  Q.   Do you have knowledge, apart from whether it's true or

14  not, do you have knowledge that in Buffalo there was a person

15  who was organizing I think the first store, I think among the

16  first Starbucks stores who was paid by the Union?

17  A.   Yes.

18  Q.   Okay, so that was not only something you heard, but as you

19  understand it was true?

20  A.   Yes.

21  Q.   So if Mr. Leon had understood that and had raised that as

22  an issue, he would be raising it based upon something that was

23  factual, not necessarily of Joselyn, but in another instance

24  involving a Starbucks organizing drive?

25          MR. JACKSON:   Objection, calls for speculation.

```
 1              JUDGE GARDNER:   Yeah, I do think that sounds
 2    speculative.   I mean Mr. Leon can explain his words when you
 3    examine him.   He can't really guess at what Mr. Leon was
 4    thinking.
 5              MR. MENDELSON:   Well, I wasn't asking him to guess
 6    at it.
 7    BY MR. MENDELSON:
 8    Q.   Okay, sir, you've acknowledged there was a paid organizer
 9    in Buffalo?
10    A.   Yes.
11    Q.   Okay.
12              MR. JACKSON:   Your Honor, could we just go off the
13    record for one moment?
14              JUDGE GARDNER:   Off the record.
15              COURT REPORTER:   We're off the record.
16    (Off the record.)
17              JUDGE GARDNER:   On the record.
18              COURT REPORTER:   We're on the record.
19              MR. MENDELSON:   I'm almost done, sir.
20    BY MR. MENDELSON:
21    Q.   In the September affidavit, Paragraph 4, you have a
22    statement that Joselyn informed you that there was a break in
23    at the store two days before the August 15 rally and that
24    Joselyn knew this from one of her contacts at the store.   Do
25    you know which person told Joselyn about the break in?
```

 1          MR. JACKSON:   Objection, calls for the witness to

 2   reveal the Union activities of employees not involved in the

 3   case.

 4          JUDGE GARDNER:   Yeah, let's not go there.

 5          MR. MENDELSON:   But it's not about Union support,

 6   it's about the break in.

 7          MR. JACKSON:   You're trying to elicit information

 8   about which employees may be informing the Organizing

 9   Committee.

10          JUDGE GARDNER:   Yeah, I don't think you have a

11   nefarious intent, Mr. Mendelson, but I don't want to go into an

12   area that's going to do that.

13          MR. MENDELSON:   Just a minute, Judge, I want to make

14   sure none of my colleagues have anything more for me to ask.

15          JUDGE GARDNER:   Let's go off the record.

16          COURT REPORTER:   We're off the record.

17   (Whereupon, there was a pause from 4:51 p.m. to 4:53 p.m.)

18          JUDGE GARDNER:   Back on the record.

19          COURT REPORTER:   We're on the record.

20   BY MR. MENDELSON:

21   Q.   At the beginning of your testimony on direct examination I

22   think you said that your understand was Joselyn had worked at

23   the store for years in the plural.  Is that your understanding?

24   A.   I believe she's worked at Starbucks for years.

25   Q.   Okay.

1  A.   I'm not sure.

2  Q.   So isn't it true, sir, that she's only worked -- she only

3  worked at the Great Neck store for less than a year?

4  A.   Okay.

5  Q.   You didn't know that?

6  A.   I knew she worked at Starbucks for years.

7  Q.   Okay, so you're not aware that she worked at a different

8  store and transferred to the Great Neck store sometime in the

9  fall of 2021?

10  A.   If I did, I forgot.

11  Q.   Okay.

12          MR. MENDELSON:   I have no further questions at this

13  time.

14          JUDGE GARDNER:   Okay.  Do you have any redirect?

15          MR. JACKSON:   I believe I have just a couple.

16                    REDIRECT EXAMINATION

17  BY MR. JACKSON:

18  Q.   Mr. Saff, where do you get your understanding about which

19  employees are still employed at the store?

20  A.   I get that from when I speak with Joselyn.

21  Q.   So is it true that you're not really sure who still works

22  there?

23  A.   Yes.

24  Q.   I want to make sure your testimony is clear on this.  Why

25  hasn't the Union -- why hasn't the Union reached out to current

```
 1   store employees despite having their contact information and
 2   I'm talking the period after Justin's termination?
 3   A.   Yeah, the period after Justin's termination.  From what --
 4   you know, in one sense it's because the spirit of the campaign
 5   has been running very -- led by the partners for the employees,
 6   so that that task would typically fall upon, you know, the
 7   continuing organizing members in the store.
 8           And from their reports back to me, you know, telling
 9   me that these folks are scared to get involved with the Union,
10   you know, reaching out to them even though we have their
11   contact information would seem pointless.
12   Q.   Why would it seem pointless?
13   A.   Because they would not participate with us out of fear of
14   retaliation.
15   Q.   Do you know what the Union alleged in its unfair labor
16   practice charge that it filed with the NLRB related to alleged
17   retaliation against Justin?
18   A.   Against Justin?
19   Q.   Yeah, do you know what the Union said to the NLRB in its
20   charge?
21   A.   Besides the hour cuts ones?
22   Q.   I'm asking you do you know?
23   A.   No.
24   Q.   Are you involved in managing the Union's Twitter page?
25   A.   No.
```

1  Q.   Do you know how many followers are on the Union's Twitter

2  page?

3  A.   I haven't checked it. I don't know, more than a thousand.

4  Q.   More than a thousand?  Do you keep track of which -- who

5  those more than a thousand followers are?

6  A.   No.

7  Q.   Was the Great Neck Road Starbucks open at the time of your

8  rally on August 15?

9  A.   Yes.

10 Q.   What did Revna tell you about their intention to study

11 abroad?

12 A.   That -- I don't remember everything that they wanted --

13 that I knew it was coming in the future for them.  I forget

14 when exactly they told me, but yeah.

15          MR. JACKSON:   No further questions.

16          JUDGE GARDNER:   Does the Charging Party have

17 additional questions for this witness?

18          MS. HAHN:   No, Your Honor.

19          JUDGE GARDNER:   Okay.  Any recross?

20          MR. MENDELSON:   Just one question, Judge, on

21 recross.

22          JUDGE GARDNER:   Yes.

23                     RECROSS EXAMINATION

24 BY MR. MENDELSON:

25 Q.   Just to be clear, sir, when you answered Mr. Jackson just

Case 1:22-cv-07255-ARR-JRC   Document 2-1   Filed 11/30/22   Page 188 of 215 PageID #: 318

187

```
 1    now and he asked you about retaliation, the allegations where
 2    Justin said besides hours, so apart from anything else, what
 3    was your understanding about the hours allegation?
 4    A.   That it was -- the hours allegation was alleging that
 5    Starbucks was not allowing Justin to change his hours in
 6    retaliation for turning to the media.
 7    Q.   And that allegation was withdrawn?
 8    A.   Yes.
 9              MR. MENDELSON:   Thank you, no further questions.
10              JUDGE GARDNER:   Okay.  So it sounds like you're done
11    with your testimony.  Thank you very much for joining us today.
12    You can have a seat, leave, however you please.
13    (Witness excused.)
14              JUDGE GARDNER:   I guess that's the conclusion of our
15    testimony for today.  We are anticipating -- let's do
16    housekeeping off the record.
17              COURT REPORTER:   We're off the record.
18    (Whereupon, at 5:02 p.m., the hearing in the above-entitled
19    matter was adjourned, to reconvene on Thursday, October 10,
20    2022 at 9:30 a.m., in the same place.)
21
22
23
24
25
```

1

2                    C E R T I F I C A T I O N

3

4          This is to certify that the attached proceedings done

5    before the National Labor Relations Board (NLRB), Region 29, in

6    the matter of Starbucks Corporation, Case No. 29-CA-290364 et

7    al, in Brooklyn, New York, on October 19, 2022, and was held

8    according to the record, and that this is the original,

9    complete, and true and accurate transcript that has been

10   comparted to the recording from the hearing, that the Exhibits

11   are complete and no exhibits received in evidence or in the

12   rejected file are missing.

13                                   *Mary E. Dring*

14                    _____

15

16                                   MARYBETH BURKE DRING

17

18

19

20

21

22

23

24

25

—

**—- (28)**
31:5;32:6;62:15;
75:18;80:23;85:21;
109:1;115:2;119:13;
122:22;125:23;132:2;
133:3;141:14;144:25;
146:7;153:10;157:12;
159:17;163:24;164:5;
169:5;171:4;176:20;
179:9;184:2;186:12;
187:4

**A**

**Abigail (3)**
172:16;173:1,8
**A-b-i-g-a-e-l (1)**
172:16
**ability (2)**
21:25;114:15
**able (17)**
8:11,14;12:25,25;
13:4;18:9;20:10;
52:23;63:3;76:11,14,
15;103:20;104:4;
116:18;144:6;154:12

—

**–about (1)**
120:1

**A**

**above (3)**
32:2;62:6;63:1
**above-entitled (2)**
1:14;187:18
**abroad (3)**
116:17;154:3;
186:11
**absence (5)**
13:8;31:14;114:23;
115:3;162:8
**absolutely (11)**
38:22;39:19;44:17;
46:5;47:20;59:13;
65:7;70:6;89:3,6,9
**accept (1)**
145:10
**accommodate (6)**
156:21;165:21;
166:1,13,18;167:4
**accompanying (2)**
40:25;58:13
**Accordingly (2)**
10:1;24:14
**account (5)**
123:8,10,12,13,21
**accountability (1)**

29:11
**accountable (2)**
48:18;49:1
**accounts (2)**
106:21;177:19
**accrue (1)**
85:10
**accurate (2)**
150:3;162:16
**accurately (12)**
49:22;63:18,21,24;
65:4,6;78:12;79:25;
83:7;89:17,22;147:15
**accused (1)**
118:19
**achieve (1)**
23:1
**acknowledge (1)**
163:22
**acknowledged (3)**
151:9;175:12;182:8
**acquire (1)**
56:20
**acquisition (1)**
143:6
**across (3)**
30:14;120:7;121:2
**Act (4)**
141:16,22;148:23;
164:1
**acted (1)**
153:22
**action (5)**
36:24;48:11,22;
50:4;123:23
**actively (1)**
138:9
**activities (6)**
19:15,21,25;20:1;
21:14;183:2
**activity (2)**
22:18;85:10
**actual (1)**
147:9
**actually (14)**
20:23;59:21;78:15,
15;89:14;91:14;
102:2;114:8;117:7;
132:1;143:15;144:25;
145:2;176:25
**Adam (1)**
32:6
**add (1)**
167:22
**added (1)**
11:12
**addition (2)**
10:9;11:8
**additional (5)**
7:9;24:21;73:10;
139:7;186:17
**additionally (2)**
64:2;75:12

**address (8)**
10:17;15:7,9,21;
68:18;134:14;174:11,
12
**addressed (5)**
7:14,16;112:23;
134:9;161:23
**addressing (1)**
136:25
**adjourned (1)**
187:19
**adjust (1)**
75:13
**adjustment (3)**
165:20,25;167:5
**administer (1)**
24:13
**Administrative (3)**
1:15;7:12;175:2
**admission (11)**
121:18,22;124:20;
126:20;127:21;
128:18;130:12;131:9;
137:12;162:8,8
**admissions (1)**
164:2
**admit (1)**
123:1
**adopting (1)**
108:15
**advance (2)**
109:8,9
**advantage (2)**
52:9,14
**adverse (2)**
8:16;12:16
**advising (1)**
10:2
**advocacy (1)**
86:10
**advocate (1)**
107:20
**affect (5)**
37:24;38:3;62:16,
21,22
**affecting (2)**
38:7,18
**affidavit (16)**
144:25;145:5,11;
146:8;147:21;149:6;
150:23;162:14;164:5,
6;169:17;176:11;
179:8,20;181:2;
182:21
**affidavits (5)**
139:13;142:22;
144:24;145:3;177:5
**AFFILIATED (3)**
1:8;7:7;100:24
**affirmative (1)**
175:19
**affirming (1)**
17:10

**AFL-CIO (1)**
141:9
**afternoon (4)**
100:18,19;140:25;
141:1
**again (28)**
9:9;13:14;38:1;
43:21;50:8;57:12,16,
17,19;58:6,11;65:11;
81:13;89:10,20;90:6,
19;98:7;104:2;
108:13;122:10;
125:15;142:10;150:8;
152:4;165:9,22;
166:15
**against (14)**
18:15;19:13;21:16;
23:3;35:19;50:7;
57:23;85:24;87:6,10;
89:8,14;185:17,18
**agent (1)**
137:24
**ago (3)**
33:23;154:25;
157:25
**agree (8)**
11:2;53:12,14;88:2;
142:25;149:7;163:19;
169:5
**agreed (1)**
17:9
**agreement (3)**
85:19;152:18,19
**agrees (2)**
162:5,7
**ahead (20)**
12:13;16:3,16;25:5,
20;27:19;33:1;43:4;
47:1;50:17;52:6;
55:16;61:7;71:1;74:7;
89:5;95:13;123:3;
129:22;159:20
**aides (1)**
24:7
**aimed (1)**
18:2
**Akeeb (2)**
171:1,3
**akin (1)**
79:10
**Alexis (7)**
19:1;31:9,21;36:22;
92:7,8;96:8
**aligned (1)**
68:2
**allegation (10)**
163:7;166:12,22;
167:3,8;168:6;
180:18;187:3,4,7
**allegations (2)**
169:6;187:1
**allege (1)**
180:22

**alleged (13)**
12:20;26:2,8,11;
57:23;122:18,21;
146:9;153:2;166:17;
176:13;185:15,16
**alleging (1)**
187:4
**allies (3)**
131:23;132:1;179:1
**allow (3)**
40:6;100:3;106:11
**allowed (10)**
18:18;19:18;50:24;
51:18;52:14;64:7;
88:7;138:6;150:18,18
**allowing (1)**
187:5
**ally (1)**
179:1
**Almost (2)**
17:25;182:19
**alone (2)**
24:7;35:21
**along (2)**
58:13;159:9
**although (3)**
8:25;153:14;154:13
**Alvin (1)**
31:13
**always (3)**
10:10;56:20;79:7
**amend (1)**
11:3
**amendment (1)**
176:20
**America (1)**
131:24
**American (1)**
141:7
**among (8)**
17:17;24:12;34:16;
83:10;151:3;180:5,
18;181:15
**amongst (1)**
29:12
**amount (1)**
155:16
**amounts (1)**
156:8
**Amsterdam (4)**
119:25;120:2,18,20
**analogous (2)**
160:21;161:4
**analogy (3)**
79:16,19;161:3
**and/or (4)**
76:16;99:8;112:20;
168:4
**announced (5)**
83:18;84:16,19;
86:4;108:21
**answered (3)**
112:18;150:13;

186:25
**anticipate (3)**
13:4,19;42:16
**anticipating (2)**
167:19;187:15
**anti-Union (2)**
19:7;21:5
**apart (2)**
181:13;187:2
**apologize (1)**
12:22
**apparently (1)**
152:22
**appear (1)**
8:13
**appearances (1)**
7:19
**appears (2)**
90:8;135:15
**application (1)**
13:15
**applied (1)**
26:19
**applies (1)**
93:20
**apply (1)**
93:17
**appreciate (1)**
13:16
**approach (2)**
54:12;174:5
**appropriate (2)**
142:14;162:10
**appropriately (1)**
24:17
**approval (1)**
19:17
**approximately (16)**
14:15;33:23;36:25;
46:12,14;118:1,23;
119:17;120:5,25;
124:18;127:17;
128:14;130:10;
132:17;135:7
**approximation (1)**
46:14
**April (9)**
80:12;109:23,25;
110:2,3,4,6;113:14;
156:3
**A-r-a-m-a (1)**
171:12
**area (3)**
120:21;126:7;
183:12
**areas (1)**
31:7
**aren't (1)**
62:1
**arguendo (2)**
146:4;159:18
**arguing (1)**
161:14

**argument's (1)**
149:16
**arguments (1)**
162:5
**arise (1)**
52:16
**arose (1)**
147:22
**around (33)**
8:23;33:24,25;35:3,
7,8,8;48:15;54:5;
57:1;73:22;89:10;
114:22;116:23;118:2;
119:1,18;120:6;
121:1;124:19;126:5;
127:18,20;128:15;
130:11;131:8;136:5,
10,13,20;137:4;
142:23;143:1
**arrived (7)**
48:3;156:13,14,14,
15;164:23;165:2
**art (1)**
73:15
**article (40)**
39:2,7;57:22;58:25;
59:3,4,5,7,8,14;60:13,
16,18,19,21,21;
117:21;118:9,11,18,
21;119:6,12,15;120:7,
13,22;121:8,13;128:9,
22,23,23;129:3,6,8;
130:1,3,5,7
**articles (4)**
38:25;129:19;
155:6,11
**ascertain (2)**
156:11;176:9
**aside (2)**
22:2;131:19
**aspects (1)**
79:12
**asserted (2)**
121:25;122:3
**asserting (1)**
122:6
**assertion (3)**
121:22;122:5;
152:18
**assessment (2)**
44:22;180:6
**assessments (1)**
179:22
**assigned (1)**
7:13
**assignment (4)**
31:15,16,18,25
**assist (1)**
107:11
**Associate (1)**
7:16
**assume (3)**
123:1;141:18;143:9

**assumed (1)**
105:4
**assumes (1)**
165:15
**assuming (5)**
12:23;98:2;146:3;
150:1;159:18
**Astoria (5)**
103:2,2;124:3;
133:14,15
**attaching (1)**
130:1
**attachments (2)**
97:1,10
**attain (2)**
18:9;83:14
**attempt (4)**
108:18,22;109:11;
123:5
**attempted (7)**
109:13,14;115:25;
116:9;137:18,25;
138:3
**attempts (1)**
170:3
**attend (8)**
131:22,25;132:4,6,
15,22,23,25
**attendance (4)**
18:17;19:14;23:8;
48:18
**attended (4)**
132:18;160:4,6,10
**attention (15)**
10:9;14:24;16:21;
27:1;38:14;61:15;
77:10;117:17;118:12;
119:9,23;120:11;
121:6;135:9,12
**attitudes (1)**
9:25
**attorneys (1)**
91:16
**audibly (2)**
142:21;144:13
**audience (1)**
25:17
**audio (10)**
40:22,23,23;41:6,
20;55:8;76:25;77:25;
78:12;82:8
**audiotape (18)**
43:5,22;47:12;
49:17;52:20;56:7;
57:4,7;58:23;63:12;
65:1;68:11;77:22;
79:23;82:5;88:21;
90:9;94:14
**audit (1)**
54:5
**August (16)**
118:25;119:1,18,
18;120:6;121:1,15;

127:18,20;130:1,11;
132:6;135:8;136:15;
182:23;186:8
**Austin (5)**
123:24,25;124:1;
125:11;127:10
**authenticate (1)**
13:1
**authenticating (2)**
13:9;55:13
**authentication (1)**
13:24
**authorization (5)**
17:3,7;19:19;
111:22;143:7
**availability (1)**
156:20
**available (5)**
10:10;58:19;66:21;
139:14
**avoid (1)**
26:16
**awaits (1)**
170:16
**aware (39)**
34:9,11,15,24;
35:22,24;38:10;48:6,
19;50:8;51:15,18;
52:9;81:5;83:10,14;
85:14,15;86:9,13;
93:4;94:21,24;
113:19;115:20;
154:20;160:10,13;
166:11,16,21,23;
167:2,7;172:9;
177:22,24,25;184:7
**away (5)**
8:17;35:15;93:1;
109:13;147:6

**B**

**back (52)**
15:3;16:7,11;18:6;
19:7;35:15;44:18,20;
45:1;47:1;54:7;60:12;
67:1;69:10,20,24;
70:10,13;71:5,9,13,
15,17,20,24;72:1,8;
76:5;78:17;79:3,4,5;
80:8,9;82:12;83:19;
94:15;95:23;106:6;
117:8;133:10;135:16;
147:8;151:23;152:14,
15;169:21;170:4;
173:9;176:6;183:18;
185:8
**backdrop (1)**
23:3
**background (2)**
42:12;82:15
**ballots (4)**
19:22;84:9;109:7,

24
**banners (1)**
133:19
**bargain (3)**
17:11;24:15;133:4
**bargaining (20)**
17:12;18:10;20:11;
21:19;24:12,16;
51:11,21;64:14;
85:19,21;111:25;
112:4,12,14;145:24,
25;162:18,19;163:9
**barista (2)**
93:2,6
**baristas (1)**
169:18
**based (9)**
8:19;12:23;103:18;
104:2;138:10;154:21;
162:5;180:15;181:22
**basically (1)**
112:3
**basis (2)**
23:13,15
**BBC (5)**
121:8,10,13;130:1,
6
**Bear (1)**
40:13
**bears (1)**
153:11
**became (4)**
30:8;33:16,21;34:1
**become (5)**
62:19,22;113:10;
167:20;180:23
**beg (1)**
81:6
**began (8)**
17:3;19:6,12;21:2;
101:16;104:8;141:4;
178:20
**begin (4)**
12:7;101:15;104:6;
164:23
**beginning (6)**
7:8,19;12:19;16:17;
24:25;183:21
**begins (1)**
12:22
**begun (1)**
143:1
**behalf (10)**
7:23,25;8:7,8;
26:10;27:12;100:8;
115:25;168:6;169:6
**behavior (3)**
48:24;142:2;166:6
**behind (4)**
16:19;22:14;69:19;
145:9
**belabor (1)**
161:24

**belief (2)**
176:18;179:25
**believes (3)**
13:12;153:5;180:14
**bell (2)**
171:12;173:18
**below (1)**
125:9
**benefits (17)**
20:6;22:10;63:4;
64:11,12,15,18;76:11,
16,21;79:9,10,14;
112:4,15;147:6;
162:20
**besides (4)**
158:22;175:15;
185:21;187:2
**best (5)**
26:16;37:6;114:15;
135:25;154:12
**Beth (48)**
13:6;19:6;29:25;
30:3,8,12,13;35:12;
44:2,4,6,12;47:25;
48:3,13,15,17;50:5;
80:17;82:10,20,21;
84:2,11;89:18,20,23;
90:1,4,11,13,22;91:1,
13;92:18,19;93:6,7;
114:4;156:22;157:1,
6,10;158:9;164:10,
11;165:20;166:1
**better (1)**
76:21
**bickering (1)**
73:9
**big (1)**
118:13
**biggest (1)**
82:9
**bit (5)**
69:13;101:2;
110:25;137:23;
167:23
**black (1)**
94:22
**block (2)**
56:19;67:16
**BOARD (13)**
1:2,16;7:6;17:13;
24:12;26:19;37:16;
100:22;101:10;
104:19,24;139:14;
142:1
**Board's (2)**
21:25;24:10
**boards (2)**
100:25;101:7
**boss (2)**
36:16;92:7;97:12
**both (5)**
32:22;76:10;78:15;
107:21;111:8

**bother (1)**
88:3
**bothered (2)**
87:4,7
**bottom (2)**
136:23,24
**Boulevard (4)**
29:23;103:2;
133:14,15
**Brandy (3)**
133:6,11;136:24
**Brandy's (1)**
133:14
**break (7)**
46:17;77:16;95:7;
98:16;182:22,25;
183:6
**breaks (1)**
15:6
**Brianna (14)**
46:6;110:14;111:2,
8,15;112:3,6,13,20,
24;113:7;173:20,21,
25
**Brianna's (1)**
173:25
**Bridgemont (2)**
32:13,15
**B-r-i-d-g-e-m-o-n-t (1)**
32:16
**brief (5)**
15:24;33:11;46:15;
80:7;130:24
**Briefly (2)**
12:14;15:3
**bring (5)**
14:23;26:25;40:5;
61:15;102:15;143:14;
145:16
**bringing (1)**
22:21
**British (3)**
51:5,20;121:11
**Broadcasting (1)**
121:11
**broader (1)**
179:6
**broke (1)**
43:14
**Brooklyn (1)**
1:17
**brought (6)**
68:1;71:22;81:13;
112:21;133:21;168:6
**Buffalo (4)**
16:20;178:20;
181:14;182:9
**build (2)**
75:7;179:1
**built (1)**
73:15
**bunch (2)**
67:20;140:9

**burgeoning (1)**
18:3
**business (2)**
37:24;38:3
**bust (1)**
106:10
**buster (9)**
86:15,18;87:10,14,
22;88:3,4;89:2,11
**busters (1)**
86:10
**busting (18)**
114:6;145:8,13,14,
15,18;146:6,10,16,24;
147:7;149:10,23;
151:2,4;155:2;
163:17,17
**butcher (1)**
91:22
**buttons (2)**
35:19,20
**buy (2)**
60:22;75:25

# C

**calcified (1)**
24:12
**calendar (1)**
75:13
**call (24)**
10:9;73:9;74:14;
89:7;91:15,19;92:10,
12,15;93:10;103:16;
108:15,15;110:18;
117:17;118:8;123:22,
23;125:6;135:9,12;
139:24;158:2;174:5
**called (12)**
8:16;12:16;18:6;
27:12;29:5,5;78:23;
87:13,24;93:8;100:8;
158:4
**calling (4)**
15:24;89:10,13;
161:2
**calls (12)**
12:3;25:6;99:24;
148:25;149:21;
160:25;162:2;163:1;
175:3;180:8;181:25;
183:1
**came (17)**
1:14;35:15;38:15;
49:3,4;50:6;56:25;
60:9;62:8,11;75:19;
76:7;82:22,24;
104:11;109:15;113:5
**camera (1)**
135:15
**campaign (42)**
17:2,24;18:1,2,8;
19:20;21:15;22:14;

23:24;24:1,3,8,10;
38:25;40:10;43:25;
59:19;61:10;83:20;
84:3,6;102:17;103:5;
104:6,9,12,21;105:3,
4;106:10;107:12,15,
24;114:25;115:3;
118:5;134:12;138:5,
11,20;139:1;185:4
**campaigns (1)**
102:20
**can (98)**
11:10,11;25:7;
27:24;31:4;33:18;
35:5;37:5,24;38:1,3;
39:6;42:6;43:10,21;
48:9;52:3,5;53:10;
55:21;57:13;60:12;
62:19;66:19,22;
68:22;70:5,6,12;
75:11;77:12;80:4;
81:7;90:6,7,19;91:22;
94:15;97:13;98:19;
100:5;102:15;103:1,
9,13;105:23,24;
107:14;108:9;111:14,
23;117:20;118:12,17;
119:11,24;120:11,12;
121:6,7;123:20;
124:10;126:8;128:7,
21;129:24;130:21;
133:2,17;134:23;
135:13,23;136:3,8,12,
16,18;137:1,8;
139:14;143:14,14,18;
145:6,16;146:17;
147:13;148:23;
151:20;158:23;161:4;
166:25;170:20,23;
173:16;177:22;182:2;
187:12
**can't (12)**
48:7;76:20;85:5,20,
21;93:16;122:4,4;
136:11,20;159:17;
182:3
**caption (1)**
7:9
**capturing (1)**
162:20
**card (2)**
17:7;48:11
**cards (8)**
17:3;43:16;44:7,14;
48:7;102:4;105:6;
143:7
**care (5)**
87:12,16,19;153:8;
163:18
**Carez (1)**
116:6
**Carolina (1)**
141:9

**carried (2)**
54:9,10
**carry (1)**
19:13
**Case (27)**
1:3;7:7,10,11;10:5;
15:20;22:1;24:18;
25:1;26:17;27:8;
32:24;37:9;48:22,23;
51:20;99:9;100:24;
122:13,25;145:24;
148:21;150:16;153:1;
165:15;179:14;183:3
**cases (1)**
148:23
**cast (2)**
21:23;83:15
**casual (4)**
69:18,23;70:1;
71:22
**catch (1)**
175:23
**cause (1)**
26:6
**cease (1)**
22:3
**Center (2)**
1:17;121:11
**central (1)**
153:2
**CEO (16)**
17:10;22:11;33:4,6,
8,9,12,14,16,17,22;
34:1,2;35:23;106:2;
107:3
**certain (11)**
20:22;35:22;36:10,
12;93:13;95:15;97:1;
149:11;163:22;170:7;
177:5
**certainly (1)**
18:24
**chance (2)**
15:6;105:19
**change (8)**
9:25;49:5;61:25;
85:20;93:8;163:4,4;
187:5
**changed (1)**
126:11
**chanting (2)**
133:25;134:8
**chants (2)**
133:3;134:1
**characterization (2)**
53:13,15
**Charaz (1)**
45:14
**Charez (2)**
107:17;113:22
**charge (6)**
166:12,17;167:3;
169:7;185:16,20

**Charging (12)**
1:10;11:18;12:10;
14:6;16:19;24:20;
26:8,10;99:16;
100:23;139:6;186:16
**chat (6)**
69:24,25;70:6;72:3,
10;119:8
**chatter (1)**
42:13
**checked (1)**
186:3
**cherished (1)**
20:6
**Chief (1)**
7:16
**chill (1)**
24:11
**chilled (1)**
145:8
**chilling (1)**
21:18
**chimed (1)**
82:12
**chips (1)**
79:18
**choice (2)**
20:8;154:12
**choose (1)**
111:23
**chose (2)**
47:8;63:2
**Christina (1)**
96:12
**Chu (1)**
7:17
**Chuquillanqui (30)**
16:24;17:1,19,20,
23;22:16,17,20,22,22;
23:4,7,11,22,23;24:3,
5;45:8;59:18;60:1;
77:5;78:3,14;80:1,11;
83:8;87:13;89:19;
107:9;122:22
**Chuquillanqui's (1)**
23:16
**circle (1)**
15:3
**circumstance (1)**
13:2
**circumstances (3)**
24:14;113:25;
150:19
**cited (1)**
23:17
**claimed (2)**
20:24;23:21
**claims (1)**
181:2
**Clara (5)**
124:7,8;125:15;
135:21;137:7
**clarification (2)**

11:15;128:22
**clarify (2)**
68:22;178:24
**clarifying (1)**
65:7
**clarity (2)**
8:23;178:19
**classes (1)**
85:25
**clattering (1)**
82:11
**clear (7)**
13:4;21:24;22:23;
142:4;169:24;184:24;
186:25
**clearly (1)**
87:6
**clip (2)**
39:3,4
**close (2)**
23:12;70:22
**closed (1)**
26:14
**coach (3)**
29:11;142:7,13
**coached (1)**
157:7
**coaching (2)**
102:11;157:9
**Coast (1)**
29:5
**coda (1)**
23:23
**code (1)**
35:19
**coerce (1)**
18:24
**coercion (3)**
21:1,15;176:13
**coercive (3)**
20:17;21:5;22:10
**coffee (2)**
102:1;126:12
**cold (2)**
159:6,24
**colleagues (1)**
183:14
**collected (1)**
114:13
**collective (7)**
17:12;24:16;51:11,
21;64:13;85:18,21
**collectively (1)**
101:10
**colloquially (1)**
145:25
**colloquy (5)**
8:9,12;12:23;
117:12;163:22
**Columbia (2)**
51:5,20
**comfort (1)**
100:3

**coming (6)**
93:3;134:10;138:7;
143:2;163:2;186:13
**commenced (1)**
143:3
**commencing (1)**
141:11
**comment (1)**
112:13
**commentary (1)**
161:14
**commenting (1)**
160:16
**comments (2)**
112:16;160:24
**committed (1)**
8:21
**Committee (9)**
106:1;107:23;
108:2,10;109:4;
133:14;146:22;
174:20;183:9
**common (2)**
84:20;90:23
**commonplace (1)**
49:1
**communicate (3)**
108:24;113:6;
158:25
**communicated (2)**
154:21;169:10
**communicating (1)**
116:3
**communication (6)**
7:14;14:10;114:20;
115:15,18,21
**communications (2)**
116:14;164:9
**community (1)**
131:23
**companies (1)**
152:7
**company (14)**
13:12;28:3;29:11;
33:3;75:21;152:11;
153:21;156:12;
160:23;161:14,24;
163:8;166:13;176:14
**company's (7)**
15:12;156:3;
161:13;166:13,17;
167:4;180:4
**compared (1)**
160:22
**complete (3)**
14:22,22;163:25
**completed (2)**
26:18;84:9
**comprised (1)**
29:1
**compulsory (1)**
147:23
**concealing (1)**

23:22
**concept (1)**
148:19
**concern (1)**
75:3
**concerning (9)**
8:9;15:12;38:7;
44:16;45:5,12;62:16;
76:6;123:6
**concerns (1)**
75:14
**conclusion (7)**
10:5;149:1;161:1,3;
162:3;180:9;187:14
**Concurrently (1)**
19:6
**condition (2)**
44:22,24
**conditions (2)**
20:10;48:12
**conduct (17)**
20:17;21:2,18,25,
25;23:5;122:5,7,18,
19;146:9;149:9,13;
153:2;163:14,22;
176:14
**conducted (1)**
83:10
**conference (1)**
12:3
**confidence (1)**
13:7
**confidential (1)**
177:10
**confirm (6)**
143:19;144:6;
149:12;150:12;
176:17,24
**conjunction (3)**
17:15;40:23;169:12
**connect (1)**
170:11
**connection (3)**
86:10;102:7;153:22
**connections (1)**
137:22
**consent (3)**
80:23;81:2,4
**consisted (1)**
107:25
**consistent (1)**
155:10
**consisting (1)**
14:15
**consists (1)**
41:1
**consolidated (2)**
7:8,10
**constitute (2)**
147:6;149:23
**consulting (2)**
165:5,9
**contact (20)**

103:15;104:3;
108:4;115:6,10;
116:9,11;137:18,25;
138:3;170:16,17;
174:6,14,19;175:19;
176:7,19;185:1,11
**contacts (1)**
182:24
**contain (1)**
130:2
**content (2)**
26:22;121:23
**context (4)**
53:11;68:21;69:8;
146:5
**continue (4)**
22:23;50:3;52:2;
129:18
**continued (3)**
19:21;157:9;177:6
**continuing (2)**
55:10;185:7
**continuous (1)**
55:14
**contract (3)**
51:21;79:12;102:6
**contrary (1)**
19:17
**convenient (1)**
11:10
**convention (1)**
77:12
**conversation (33)**
8:20;44:25;45:21;
53:6,18;54:5,5,9,11,
12;55:14;57:8,10;
58:9;65:5;67:7;68:12;
69:23;70:1,19;71:22;
78:18,23;80:11;
82:22,25;83:19,22;
86:16;88:24;89:17,
18,22
**conversations (15)**
55:10,11;69:5,14,
17,18;75:17;80:17,
21;104:15;108:7,11;
138:8;149:5;153:12
**converse (1)**
139:3
**convey (2)**
108:19,22
**Cook (2)**
164:7;171:22
**Coordinator (2)**
118:4;175:24
**copies (2)**
95:14;117:4
**copy (9)**
10:23,24;17:14;
77:2;107:7;118:10;
145:7;151:19,20
**corner (1)**
132:14

**corporate (1)**
8:19
**CORPORATION (3)**
1:5;7:6;16:18
**corrective (2)**
48:21;50:4
**correctly (5)**
35:12;37:5;123:1;
141:2;162:21
**corresponded (3)**
158:11,14,19
**couldn't (1)**
45:13
**counsel (65)**
7:18,20;8:1;10:13,
18,18,24,25;11:1,16,
16,19;12:7,16,16;
13:25;14:6,8,25;
15:23;16:13;25:2,6,
12,22;26:10,20,25;
27:2,12,19;32:19;
40:22;41:5;53:18;
55:8;77:1;81:21;
88:14;97:4,4,18,23;
98:4,8;99:24;100:8;
117:5,12;122:14,16;
123:14;124:25;
126:24;128:2;129:15;
130:17;143:13;
145:24;146:5;151:19,
23;168:11,20;177:20
**Counsel's (32)**
10:5,22;12:1;14:13;
26:21;36:2;41:4;
58:16;77:6;82:1;
88:17;94:10;117:15;
123:2,16;124:24;
125:3;126:23;127:2,
25;128:5;129:12,17;
130:16,19;131:13,16;
137:16;143:19;144:7;
155:7;178:9
**count (2)**
114:2;173:9
**counter (1)**
69:19
**country (3)**
16:21;31:4;116:17
**counts (1)**
114:21
**County (2)**
29:2,4
**couple (4)**
15:25;29:2;134:19;
184:15
**course (11)**
13:20;36:24;72:13,
15;93:11;107:22;
110:13;141:20,25;
159:5;162:25
**Court (36)**
8:2;10:23;16:8,12;
20:21,24;35:25;

46:24;67:2;77:1;80:9;
81:21;88:14;94:5,8;
95:25;98:22;99:4;
100:13;117:6,12;
123:15;125:1;126:25;
128:2;129:15;130:18;
140:16,19,20;168:13;
182:15,18;183:16,19;
187:17
**Courtroom (1)**
27:3
**coverage (4)**
116:22;118:5;
120:17;130:6
**covered (3)**
38:11;116:19;
156:22
**covering (3)**
119:3,13;120:16
**covers (3)**
39:22,24;120:21
**coworkers (7)**
21:10;102:13,15;
104:16;108:8;115:7;
132:4
**cracking (1)**
164:11
**create (2)**
8:23;106:13
**created (1)**
131:2
**creating (4)**
21:13;45:18;89:8,
14
**Cristian (2)**
8:6;9:8
**C-r-i-s-t-i-a-n (1)**
8:7
**cross (9)**
95:6;96:1;98:16;
99:7;139:9,19;
140:14,23;148:12
**crossed (1)**
148:16
**crossing (1)**
151:11
**crowd (5)**
134:9,14;135:15;
136:10,25
**cumbersome (1)**
161:5
**cup (2)**
126:10,12
**cups (1)**
70:18
**curious (2)**
74:12;78:25
**current (11)**
33:17;49:25;
112:15;115:11,21;
116:1;133:6;137:18,
25;138:3;184:25
**currently (10)**

28:1,20;29:13;32:5,
6;33:6;64:16;100:21;
162:20;163:3
**customarily (1)**
152:22
**customary (1)**
24:11
**customers (3)**
45:19,19;179:6
**cut (1)**
118:11
**cutoff (1)**
140:5
**cuts (1)**
185:21
**cylinder (1)**
93:8

**D**

**daily (1)**
72:25
**Daniells (52)**
8:18;9:1;13:6;19:6,
10,12,18;20:17;21:4,
11;22:6,10,13,20,24;
29:25;30:3,8,12,13;
35:13;44:2,4,6,12;
47:25;48:4,13,15,17;
72:24;73:1;80:17;
82:10,20;84:2;89:18,
20,23;90:1,11,13,22;
91:1;149:7;156:22;
157:1,6,10;158:9;
165:20;166:1
**Daniells' (1)**
82:21
**Dante (2)**
172:6,6
**Darrell (1)**
48:9
**Darren (1)**
172:19
**date (7)**
18:8;30:10;39:6;
54:8;77:13;91:6;
110:1
**David (3)**
99:24;100:7,15
**D-a-v-i-d (1)**
100:15
**day (19)**
9:4;22:5,16;37:7;
51:1,3;60:10;61:24;
83:23,24;92:13;93:3;
106:25,25;134:24;
136:14;148:9;156:10;
180:5
**days (4)**
9:2;73:1;156:7;
182:23
**de (1)**
107:18

**dead (1)**
18:3
**deal (4)**
40:21;49:24;138:7;
145:22
**dealt (1)**
91:10
**Dear (1)**
143:13
**December (3)**
164:5,22;165:2
**decide (1)**
106:11
**decided (3)**
21:6;111:20;164:8
**deciding (1)**
106:4
**decision (5)**
65:21;76:2;91:7;
174:17,18
**declarant (1)**
20:24
**declarant's (1)**
20:21
**declare (1)**
17:8
**declined (1)**
24:4
**deducted (2)**
20:8;64:3
**deep (1)**
24:11
**deeply (1)**
20:25
**defeat (2)**
22:5;23:24
**defiantly (1)**
22:22
**define (3)**
145:14,15;155:2
**definitely (4)**
58:3;66:20;68:1;
107:18
**definition (3)**
146:10;149:23;
151:3
**definitions (1)**
148:8
**demanding (1)**
17:11
**Democratic (1)**
131:24
**demonstrate (1)**
122:5
**demonstrates (1)**
144:16
**denial (1)**
13:15
**densely (1)**
31:3
**Department (1)**
91:10
**departure (1)**

179:15
**depending (1)**
139:25
**depends (3)**
31:3;150:6,19
**depicted (1)**
136:9
**describe (6)**
107:14;115:2;
126:8;133:2,17;
135:13
**described (1)**
162:15
**descript (1)**
39:17
**description (3)**
10:20;38:13;42:24
**desire (1)**
17:10
**desired (2)**
9:23;16:22
**desperately (1)**
22:14
**despite (1)**
185:1
**destroying (1)**
23:1
**detail (1)**
157:25
**determination (2)**
150:17;153:3
**determine (2)**
34:17;76:20
**determined (1)**
22:24
**determining (1)**
149:12
**Devante (1)**
46:4;76:6,8;77:5;
78:10,13,16,24;79:2,
8;80:1
**development (1)**
162:1
**developments (3)**
9:25;37:24;38:3
**deviating (1)**
48:20
**device (1)**
38:21
**devices (1)**
80:25
**dice (1)**
80:3
**didn't (48)**
8:24;9:8;35:9;
36:18;43:20;44:9;
49:4;52:12;60:7,8,9,
15,21,21,22;61:1;
62:10;67:21;69:22;
70:2;71:23;72:6;
74:21;80:3,23;85:25;
86:19;88:3;90:24;
93:4,11;96:21;98:3,

10;110:24;116:18;
154:14;156:24,25;
157:3;162:16;164:22,
24;165:2,11;175:23;
181:8;184:5
**differ (1)**
81:6
**different (23)**
20:14;28:11,21;
30:25;51:6,10;54:13,
14;63:8;76:3;102:20;
131:19;137:23;144:3;
148:8;160:15;161:16;
162:24;168:22;171:5;
173:5;176:7;184:7
**difficulty (1)**
150:17
**digging (1)**
87:11
**dignity (1)**
89:15
**diligence (1)**
110:15
**direct (22)**
13:11;27:20;31:10,
21;77:10;97:25;99:8;
100:16;108:3;115:10,
18;118:12;119:9,23;
120:11;121:6;169:16;
175:12;176:7;178:17,
23;183:21
**directed (1)**
88:7
**directing (1)**
152:13
**directions (1)**
35:21
**directly (9)**
30:12,13;32:2;
86:12,14;154:15;
170:13;174:15,19
**Director (4)**
11:9;19:1;31:25;
124:9
**discharge (6)**
23:15;92:15;
116:19,23;123:6;
137:20
**discharged (3)**
155:9;178:10,13
**discharging (2)**
23:14,21
**disciplinary (1)**
48:11
**discipline (9)**
21:8;23:5;29:10;
155:15;157:8,14;
158:13,16,20
**disciplining (2)**
23:21;48:5
**discover (2)**
60:2,3
**discovered (1)**

**60:4**
**discriminatee (1)**
12:20
**discriminatees (3)**
26:2,8,12
**discuss (10)**
18:7;25:9;26:14,17;
52:12;71:5,17;108:4;
109:6;113:10
**discussed (7)**
80:12,15;83:20;
113:6,13;171:17;
181:7
**discussing (2)**
58:25;104:14
**discussion (9)**
10:10;14:2,6;48:9,
9;113:2,5;148:22;
178:25
**discussions (5)**
9:23;10:4;72:13,15;
91:12
**Disgusted (1)**
24:1
**dish (1)**
82:18
**dishes (5)**
78:18,21;82:11,16,
17
**display (2)**
133:19;156:2
**dispute (4)**
159:3,5;175:13,20
**dissemination (4)**
20:19;122:1,17,22
**distance (1)**
31:5
**distillation (1)**
148:1
**distributed (2)**
19:23;22:12
**distributing (1)**
41:5
**district (31)**
8:10;12:15;18:1;
28:4,5,8,9,11,12,13,
20,21,24,25,25;29:3,
6,8,13;30:18,20;31:6;
34:21;37:23,25;38:2,
4,7;73:3;75:6;107:5
**districts (5)**
30:14,17,25;31:1,2
**disturbed (1)**
21:2
**Ditmars (2)**
103:2;124:3
**dive (1)**
96:21
**Division (1)**
7:14
**document (64)**
21:3;36:1,5,6,8,15,
17;37:1;38:15;40:14,

15;50:10;55:5;66:3,5,
11,12;81:22;88:15;
95:12;96:3,5;97:5,5,8,
9,17,20;105:15,21,24,
25;106:9,13,14,16,20;
114:17;117:3,18,23;
118:15;119:11;
120:12;121:7;122:8;
123:15,18;125:1,5;
126:25;127:4;128:3,
7;129:24;130:18,21;
131:14;151:21;157:8;
167:13,18;168:4;
169:3
**documentation (1)**
144:15
**documents (9)**
10:20;11:4;14:16,
18,20;15:18,25;66:7;
121:24
**doesn't (8)**
63:13;93:17;
160:19;161:21;162:6;
163:17,25;167:12
**domain (1)**
175:20
**don't (82)**
8:20;9:5;10:7;16:2;
26:3;33:15;39:5;8;
36:21;37:10;38:12;
39:6,25,25;42:7,17;
48:10;49:10;53:12,
14;58:3;60:25;62:2,
23;65:16,18,24;66:3,
6,7,10,12;67:24;70:1;
73:9,14,14;75:8,24;
76:19,20;81:8;83:22;
84:13;86:17,21;
87:12,16,19;89:6,20;
90:20;92:13;93:9;
95:1;98:19;103:25;
115:14;136:22;138:7,
8;143:14;147:9;
151:13;153:8;155:5;
156:6,17;161:2,3,20;
163:17;164:1;168:1;
169:21;170:5,23;
176:20;177:17;178:5;
179:14;183:11
**done (8)**
56:21;96:4;143:19;
164:12;174:21;
175:15;182:19;
187:10
**door (3)**
70:7,9,22
**double (2)**
8:18;167:20
**down (5)**
96:10,25;139:24;
144:1;164:11
**dress (1)**
35:19

**drink (1)**
127:10
**drinks (1)**
123:23
**drive (7)**
23:2;72:21;74:15;
103:21;108:14;143:1;
181:24
**dropped (1)**
167:10
**DSA (1)**
131:23
**Due (1)**
110:15
**dues (2)**
20:8;64:3
**duly (2)**
27:13;100:9
**duplicates (1)**
168:2
**during (39)**
8:5;9:23;13:19;
18:8;28:8;47:5;55:18;
65:3;68:16,18;69:5;
72:13,15,20;74:14;
75:17;80:12;90:18;
101:19;102:6;109:5,
23;110:22;111:2,24;
112:4,25;113:3,14;
133:2;134:7,12,16;
136:25;139:19;
150:24;166:6;171:3,4
**duties (3)**
29:8,10;101:22

# E

**Earlier (4)**
14:14;53:17;68:25;
97:18
**early (11)**
87:5;92:16,17;
101:16;110:2,4,6,17;
142:5;164:20;178:21
**earn (1)**
52:10
**easiest (1)**
157:18
**east (1)**
29:6
**easy (1)**
149:14
**echoed (1)**
22:10
**educate (7)**
49:13;50:12;65:20;
75:23;76:4;87:16,19
**educated (2)**
34:6;81:14
**educating (2)**
47:19;51:14
**educational (1)**
154:7

**effect (2)**
147:16;155:8
**effective (1)**
21:16
**effectively (1)**
24:9
**efficiently (1)**
140:11
**effort (5)**
8:23;49:13;55:11;
116:15;148:5
**efforts (5)**
17:16;18:23;133:7;
138:12;178:18
**egregious (2)**
24:2;146:2
**either (17)**
13:13;15:19;24:3;
26:15;85:3;87:19;
102:21;111:2,15;
136:22;141:14;157:7;
158:9;165:24;169:1;
174:8;180:2
**elect (1)**
113:8
**election (46)**
7:10;17:14;19:22;
21:17,23;22:1,1,4,5,7,
16;23:4;24:13;34:16;
83:10,15,18,23;84:7,
14;85:4;102:5,8,22,
22,25;105:6;107:1;
108:17,21;109:9;
114:5;146:3,4,4;
151:24;159:18;166:5,
6,9;176:8,12;177:2,6,
13,18
**electronic (1)**
14:15
**electronically (1)**
10:25
**elevate (1)**
101:2
**elicit (1)**
183:7
**eligible (12)**
12:18;47:6,15;
50:20;153:13;160:14;
170:21;174:2,7;
176:8,17;177:17
**else (15)**
15:12;46:20;70:16;
76:22;91:19;92:10;
99:20;103:11;107:4;
113:13;131:21;
146:23;158:22;
169:11;187:2
**email (20)**
36:14,16,17,22,25;
96:8,9,10,12,20;
97:23;103:16;106:18;
114:9;143:22;144:1,
2,3,15;174:11

**email's (1)**
143:25
**emailed (2)**
37:7;106:21
**emails (2)**
12:4;107:6
**embedded (1)**
125:9
**empathetic (2)**
48:13,15
**employed (29)**
28:1,2,8,13;100:21;
104:25;113:16,22;
115:16;132:24;143:8;
170:12,22;171:14,24;
172:3,6,11,14,17,19,
24,25;173:3,4,25;
174:2;181:9;184:19
**employee (45)**
16:20,24;17:6,18,
23;19:25;21:6,12;
22:15;24:2;40:9;45:4,
8,14,23;46:1,4,6,9;
48:1,3,4;59:19;66:10,
12;73:12;76:6;77:4,5;
103:18;104:3;107:8;
116:1;137:25,25;
159:4;160:6,14;
161:17,18;164:7;
165:10;170:9;177:5;
179:22
**employees (153)**
16:17,22;17:3,4,7,
9;18:6,9,11,13,15,16,
18,24;19:2,4,8,9,13,
16,18,23;20:1,2,4,6,9,
14,16,25;21:1,7,9,11,
16,19,21;22:6,8,8,12;
23:6,19;24:6,12,17;
34:10,16,22,25;35:22;
36:10;46:12;47:8,16;
48:14;50:19,23;
51:15;52:9;55:19,23;
56:2,15;57:24;58:4,7;
59:6;63:2;64:2,6,7,10,
16;68:16,18;69:1,6,
11,17;72:7,9;73:13;
75:18,20;79:9;80:16,
20;83:11,15;84:22;
85:2,9;86:7;94:21,24;
102:7;108:18,19,23;
109:9,16,22;110:12,
15,19;111:24;113:14;
115:11,22;131:22;
132:24;137:19;138:4;
142:8,13;145:9;
146:21;147:1,15,23;
149:5,17;150:1;
159:6,13,24;160:3,10,
18,22;162:17,20;
169:21,22;170:11,21;
177:16,18;178:3,10,
13;179:5,6,7,8;180:1,

16;183:2,8;184:19;
185:1,5
**employees' (5)**
17:12;19:21;21:13;
93:14;180:6
**Employer (6)**
95:17;122:7;
146:15,19;160:16;
167:13
**employment (2)**
20:11;114:1
**encourage (1)**
131:21
**encouraged (2)**
131:23;159:5
**end (7)**
10:5;18:25;114:1;
118:2;136:4;148:9;
168:17
**ended (2)**
79:3;133:9
**enforce (2)**
18:17;19:14
**engage (2)**
24:6;169:11
**engaged (3)**
22:18;67:5;85:10
**engaging (1)**
149:11
**English (1)**
127:8
**enjoy (1)**
33:1
**enjoyed (2)**
21:20;76:12
**enormous (2)**
148:4,7
**enough (2)**
73:20;157:18
**enrolled (1)**
154:6
**entered (1)**
32:20
**enterprise (3)**
148:4;170:17,18
**enterprises (1)**
142:8
**enthusiastic (1)**
17:5
**entire (2)**
42:17;60:15
**entitle (1)**
13:2
**entitled (3)**
146:10;159:11;
163:9
**entrance (1)**
67:16
**environment (4)**
45:18;89:7,9,14
**equipment (2)**
41:19;44:23
**equipped (1)**

164:2
**error (1)**
23:13
**especially (2)**
13:8;67:18
**essence (1)**
81:14
**essential (1)**
26:5
**essentially (2)**
112:5;163:7
**establish (5)**
18:14;19:9;20:13;
23:20;179:10
**established (2)**
24:18;64:9
**establishing (2)**
20:18;122:1
**estimate (2)**
132:18;136:1
**estimation (1)**
67:16
**etc (1)**
11:12
**Europe (2)**
116:16;154:3
**even (24)**
17:7;19:8;24:6;
26:7;32:8;38:14;53:9;
55:9;60:25;62:11;
65:18;66:7;73:12;
75:24;87:9;93:3;
111:23;115:13;
122:23;139:3;151:9;
154:18;174:21;
185:10
**evening (1)**
15:6
**events (3)**
26:11;37:24;38:3
**eventually (1)**
138:22
**everybody (6)**
27:5;44:11,12,14;
76:3;87:15
**everyone (6)**
25:15;84:21;86:6;
95:17;105:7;134:10
**everyone's (1)**
8:2
**everything's (1)**
76:19
**everywhere (1)**
93:19
**evidence (31)**
10:17;11:12,19;
13:18,24;14:1;15:19;
18:5,14,24;19:9,12,
24;20:13,15,18,20;
21:17,24;22:15;23:9,
16,20;84:8;99:12;
122:3;146:6;162:6;
165:15;168:1;177:16

**evolved (1)**
143:6
**Exact (3)**
30:10;36:15;115:14
**exactly (12)**
60:10;62:23;67:6;
80:22;81:11;113:1,5;
122:25;133:25;136:4;
164:8;186:14
**EXAMINATION (17)**
27:20;95:6;96:1;
97:25;98:17;99:8;
100:16;139:20;
140:14,23;153:15;
169:16;175:12;
178:17;183:21;
184:16;186:23
**examine (2)**
139:10;182:3
**examined (2)**
27:13;100:9
**except (1)**
51:20
**exception (1)**
26:20
**exceptions (2)**
25:24;26:2
**exchange (2)**
12:4;19:16
**exclusive (1)**
24:16
**excuse (5)**
14:18;51:24;117:6,
11;152:12
**excused (2)**
23:10;187:13
**excusing (1)**
48:1
**execute (1)**
29:11
**Exhibit (92)**
10:19,22;12:1;36:1,
2;40:25;41:3,15,16,
24;47:10,21;49:16;
52:18;56:6;57:3;
58:12,14,15;76:25;
77:3;79:22;81:20,22,
23,25;82:3;88:13,15,
20;94:2,10,11;95:17,
22;97:4,18,23;98:4,8;
99:11,19;105:15,23,
23;117:4,15,18;
118:12;119:24;
120:12;123:15,16;
124:20,24;125:2,3;
126:23;127:1,2,22,25;
128:4,5,18;129:3,12,
16,17;130:5,13,16,19;
131:9,13,15,16;
134:21;137:12,16;
143:13,19;144:7;
151:19,24;167:13,14;
168:11,21,23;177:20;

178:9
**Exhibits (9)**
41:4;58:16;77:6;
82:1;88:17;95:15;
121:19;123:2;155:7
**existing (1)**
63:3;103:7
**expect (5)**
9:6;11:17;14:21;
26:25;74:10
**expectation (1)**
45:21
**expectations (1)**
150:7
**expected (4)**
26:12;149:18;
150:4,7
**expecting (2)**
15:1;67:19
**experience (14)**
49:7,8;50:8;51:4;
65:23,25;103:18;
104:2;138:11;141:5,
10,25;146:1;151:15
**experienced (1)**
151:14
**experiences (1)**
45:7
**expert (1)**
85:24
**explain (6)**
62:7;79:16;111:15;
114:14,15;182:2
**explained (3)**
49:25;53:16;170:15
**explanations (1)**
160:17
**explicitly (1)**
144:22
**explore (2)**
159:11;163:9
**exposed (1)**
20:16
**express (3)**
18:12;112:6;142:8
**expressed (2)**
58:5;75:19
**expressing (2)**
17:19;105:10
**extensions (1)**
7:15
**extensive (1)**
23:25
**extent (2)**
86:22;95:16
**extra (1)**
51:16
**extraneous (1)**
42:13
**eye-to-eye (1)**
73:10

## F

**fabricate (1)**
23:13
**face (2)**
20:3;21:8
**facility (4)**
102:18,21;103:5,21
**facing (1)**
135:15
**fact (16)**
9:3;13:25;35:24;
53:24;59:16;80:16;
85:1,8;96:14;117:6;
143:20;144:7,16;
147:24;156:1;174:21
**facto (1)**
107:18
**facts (3)**
65:19;162:5;165:15
**factual (2)**
38:22;181:23
**failed (1)**
21:22
**fair (14)**
21:25;22:4;24:13;
71:7;95:7;141:23,25;
148:1;150:9;151:24;
159:17;170:18;
176:12;177:2
**fall (3)**
178:21;184:9;185:6
**false (2)**
23:5;51:13
**familiar (7)**
36:9,19;39:20;
107:8;120:20;148:19;
174:6
**familiarity (1)**
174:8
**far (8)**
39:7;44:25;82:15;
92:12;110:6;120:15;
135:25;153:20
**Faustin (1)**
7:25
**favorable (1)**
162:1
**fear (3)**
116:4;176:21;
185:13
**featured (1)**
17:18
**featuring (1)**
40:8
**February (27)**
17:13,22;18:5,15,
25;30:4,5;32:9;33:15;
34:25;35:7;37:3,4;
44:16;47:6,24;48:16;
50:19;51:2;55:15,18,
22;57:20;143:1,1;

**February/March (1)**
34:8
**Federation (1)**
141:7
**feel (2)**
180:15
**feeling (1)**
72:4
**feelings (1)**
177:1
**feet (1)**
136:2
**fellow (1)**
156:19
**felt (8)**
58:1,5,7,8;67:7,9;
74:22;86:15
**female (4)**
78:2;90:13,14,15
**few (4)**
72:3;95:6;129:14;
163:4
**field (1)**
180:13
**fighting (1)**
22:23
**figure (1)**
179:5
**filed (24)**
14:9;15:12;17:13;
23:3;34:15,21,24;
35:3,6,9;37:8;85:3;
102:21,22,24;105:5,6,
8;106:25;166:11,16;
167:2;169:6;185:16
**files (1)**
14:15
**filing (2)**
17:15;171:4
**fill (1)**
103:13
**final (3)**
23:7;138:10;157:11
**finally (2)**
26:14;131:14
**find (4)**
19:10;35:11;
166:24,25
**finding (1)**
156:2
**fine (4)**
148:12,23;151:10;
168:14
**fined (2)**
148:15,16
**f-i-n-e-d (1)**
148:15
**finish (2)**
78:21;140:1
**finished (1)**
95:16
**fire (3)**

23:23;91:7;130:23
**fired (8)**
113:19;115:19,24;
120:1;124:1;132:5;
134:11;172:9
**firing (7)**
115:8;117:22;
118:19;120:13;121:8;
125:10;128:9
**firm (3)**
7:25;96:14,15
**first (35)**
9:2;10:4;12:20;
15:10,25;25:3;27:13;
42:5;54:17;60:7;65:4;
69:13;76:1;82:7,7;
90:7;94:13,21;96:19;
100:9,13;103:25;
116:23;117:17;118:1,
23;119:17;120:5,25;
136:21;142:22;
148:16;172:5;181:15,
16
**firsthand (6)**
139:1;143:5,8,15,
17;170:9
**firststarbucksworkersunited (1)**
106:21
**five (14)**
7:7;46:16,21,22;
70:6;73:1;95:9,17;
102:24;132:20,21;
139:16;140:12;180:1
**fix (2)**
48:21;50:2
**Floor (2)**
1:17;69:9
**flyer (3)**
123:23;127:8;131:1
**focus (1)**
131:1
**folks (18)**
101:24;102:9,10;
103:13;108:12;
109:18;115:5,8;
127:9;131:2,24;
133:21;134:8,19;
137:21;170:4;179:2;
185:9
**follow (6)**
38:6;48:10;71:7;
74:12;102:2;109:3
**followers (2)**
186:1,5
**following (4)**
48:7;156:7,8;171:4
**follows (2)**
27:14;100:10
**fomenting (1)**
181:3
**forever (1)**
85:17
**forget (2)**

10:8;186:13
**Forgive (1)**
132:15
**forgot (2)**
120:18;184:10
**forgotten (1)**
154:20
**form (2)**
104:13;106:17
**formal (7)**
7:5;10:16,20,21;
11:2,3;167:23
**format (1)**
77:14
**former (5)**
107:8;132:3;133:5;
174:20;177:17
**forming (4)**
102:13;104:15,16;
108:13
**forward (5)**
14:23;17:22;34:13;
96:22;167:9
**forwarded (2)**
36:16,22
**found (6)**
21:4;22:18;60:5;
93:1,7;156:3
**foundation (2)**
68:23;177:21
**Four (1)**
28:7
**fourth (1)**
143:18
**free (1)**
22:4
**freely (1)**
19:19
**freezing (1)**
75:1
**frequent (1)**
74:5
**friend (1)**
37:18
**fro (1)**
158:24
**front (9)**
27:17;70:10;
126:12,17,19;134:2,4,
5;175:1
**fruition (1)**
109:15
**full (2)**
105:7;179:14
**fully (1)**
179:10
**function (1)**
174:17
**further (13)**
9:2;17:7;18:14;
20:2;21:9;29:6;95:3;
96:25;99:6;139:5;
184:12;186:15;187:9

futile (1)
20:9
future (1)
186:13

## G

**gained (1)**
142:1
**Gallo (1)**
96:12
**gambling (2)**
79:10,14
**gap (1)**
53:9
**GARDNER (224)**
1:15;7:3,13;8:1,24;
9:11,13,15,18,22;
10:15;11:5,10,14,17,
24;12:2,10,13;13:16;
14:25;15:15,17;16:2,
6,9,11,13,16;24:20,
23;25:2,5,7,15;27:8,
15;29:16,19;32:14,16,
19,24;37:5,10,12,15,
18,21;40:16,19;41:6,
8,10,13,17,19,22;
42:1,5,9,14,19,23;
43:4;46:17,22;47:1;
50:15;52:5;53:1,4,8,
17,22;54:2,8,13,16,
21,24;55:2,7,16;
57:12;60:12,15,19,23;
61:1,3,7;66:23;67:1;
68:22;69:7,16;70:3,7,
12,15,21,24;71:1,7;
72:17,20,24;73:3,11;
74:2,5,7,11,17,20,24;
75:2,5,9,15;77:11,16;
80:6,8;82:2;89:5;
94:4,7;95:5,9,13,18,
20;98:15,20;99:3,5,
13,15,18,20,22;100:2,
11;101:1;117:9;
121:20;122:9,12,15,
20;123:3;124:23;
126:22;127:24;
128:21;129:6,10,18,
21;130:15;131:12;
137:15;138:16;139:6,
9,18;140:5,13,18,22;
145:21;146:11,17;
149:2,22;152:20;
153:8;154:10,11;
155:21;157:16,21;
159:14,19;161:2,8;
162:4,11;163:2,11,15,
20,24;165:16;167:19,
25;168:13,16,24;
173:3,6,10,13;175:4,
9;177:22;180:10,17,
21;182:1,14,17;183:4,
10,15,18;184:14;

186:16,19,22;187:10,
14
**gather (2)**
11:11;16:1
**gave (9)**
17:20;47:18;49:6;
65:15,19;66:5;151:3;
178:23;179:22
**Gavin (2)**
32:13,15
**gay (2)**
90:14,15
**gazebo (8)**
132:14;133:10;
135:17,24,25;136:17;
137:2,8
**GC (70)**
10:19;36:1;41:2,15;
47:10,21;49:16;
52:18;54:17;55:4,5;
56:6;57:3;58:12,14,
15;63:18;64:21,22;
68:9;76:25;77:2,18;
79:22;81:20,23;82:3;
88:13,15,19;94:10;
105:15,23;117:4,7,18;
118:12;119:7,9,23;
120:11;121:6,18;
122:12;123:15;
124:20,23;125:2;
126:20,22;127:1,21;
128:3,18,22;129:3,7,
16;130:5,12,15,18;
131:9,12,15;134:21;
137:12,15;167:20;
173:13
**GC-1 (1)**
11:24
**GC-13 (1)**
129:11
**GC-1jj (1)**
11:12
**GC-2 (1)**
40:18
**GC-3a (1)**
40:25
**GC-5a (1)**
79:25
**GC-Exhibit (1)**
63:11
**gender (1)**
154:9
**General (68)**
7:20;10:5,13,18,22;
11:16,19;12:1,7,16;
13:25;14:5,8,12;
15:23;16:13;25:2,6,
12;26:10;27:12;36:2;
40:22;41:4;55:7;
58:16;77:6;82:1;
88:17;94:10;97:4,4,
18,23;98:4,8,9;99:24;
100:8;104:18;117:15;

123:2,16;124:24;
125:3;126:23;127:2,
25;128:5;129:12,17;
130:16,19;131:13,16;
137:16;143:13,19;
144:7;145:24;146:5;
151:19,23;155:6;
168:11,20;177:20;
178:8
**generally (2)**
143:12;145:25
**generated (1)**
16:21
**gentleman (1)**
139:23
**genuinely (1)**
17:5
**given (5)**
14:20;26:16,22;
145:19;160:6
**giving (10)**
26:1,11;65:16;66:3,
6;81:8;93:2;106:18;
145:3;157:8
**glad (1)**
9:24
**goal (1)**
22:21
**God's (1)**
87:20
**goes (8)**
8:17;50:6;89:14;
140:11;156:19;
163:13;169:18;
173:20
**Gold (1)**
29:5
**good (10)**
13:21;27:22;67:18,
21;95:12;100:18,19;
140:25;141:1;155:3
**grain (2)**
86:20,25
**grant (1)**
9:24
**gravity (2)**
146:9;153:2
**Great (100)**
16:25;17:1,4,17,21;
18:3;19:2,3,23;20:5,
15;21:21;22:13,21,
25;23:12,24;24:10,
16;28:11;29:17,18,21,
25;30:9;34:10,16,20,
25;35:22;36:10;
38:25;44:18;45:3;
46:12;47:7,15;48:12;
50:19;51:15,19;
52:23,24;56:25;
57:24;59:19;64:8;
61:1;83:11;93:17;
94:24;103:3;104:7,
10,21;105:3;106:1;

107:9,12;108:18,23;
109:21;113:11,17,23;
114:24;115:11,16,21;
116:1;119:14;126:7,
13,14;131:21;132:10,
11,12,13,25;135:16;
136:17;137:2,19;
138:1,24;142:18;
145:22;146:21;147:1;
165:24;176:9,12,17;
177:16,18;178:3;
184:3,8;186:7
**Green (4)**
45:23;71:16;159:4;
171:24
**grievances (4)**
18:11,12;19:3,4
**ground (1)**
73:17
**grounds (2)**
23:18;153:7
**group (2)**
102:10;119:8
**groups (1)**
179:1
**guarantee (1)**
87:18
**guess (14)**
25:8;34:6;38:5;
72:24;110:4;114:16;
121:21;150:6;155:23;
161:20;175:5;182:3,
5;187:14
**guesstimate (1)**
31:19
**G-u-i-a (1)**
9:13
**guidance (2)**
92:18,19
**guide (1)**
80:24
**guys (1)**
179:22

**H**

**HAHN (20)**
7:23,23;8:6;9:10,
12,14,17,20;11:23;
12:12;24:22;96:15;
99:17;139:8;152:17;
154:8,16;157:13;
165:14;186:18
**half (1)**
141:13
**Hall (10)**
109:5,10,14;
146:23;147:23;
150:24;160:2,7,12,15
**hand (4)**
27:9;100:5;107:6;
135:13
**handbook (1)**

21:7
**handed (3)**
66:19;105:1;151:21
**handing (7)**
66:7,10,12;93:14;
117:4;123:14;124:25
**handling (2)**
23:16;175:2
**hands (1)**
48:25
**happen (5)**
69:24;72:6;76:18;
92:12;168:5
**happened (9)**
39:4,8;70:15;71:25;
72:18,19;78:17;86:1;
87:9
**happening (4)**
85:17;113:9;
129:22;134:7
**happens (4)**
42:5,11;47:19;
111:23
**hasn't (4)**
138:3;150:13;
184:25,25
**haven (1)**
107:23
**haven't (4)**
9:5;12:22;77:9;
186:3
**he's (10)**
8:11,12,12,16;33:8;
53:10,10;151:13;
173:4;177:22
**healthy (1)**
89:7
**hear (22)**
16:3;20:18;25:9;
43:20;53:5;57:10,16;
69:7,12;75:8;82:11;
87:3;99:15;144:20;
157:3,4,5;159:3,23;
162:6,16;171:8
**heard (37)**
9:5;10:2;43:7,11;
49:19;56:9;57:6;59:9;
69:8;72:17;74:8;
77:24;78:2,18;82:7;
83:6;89:16,21,25;
111:5,7,10,11,17;
112:8;148:11,12,15;
159:9;166:2;170:4;
171:7,9;176:19;
181:8,11,18
**Hearing (14)**
1:14,18;7:3;14:3;
15:10;25:19,25;26:6,
9,14,18;42:8;90:17;
187:18
**hearsay (1)**
20:20
**held (8)**

28:5,18;31:24;32:7;
49:1;132:9,13;177:2
**hello (1)**
45:20
**help (7)**
103:19;115:25;
131:21;138:19;158:2,
4;181:10
**helped (1)**
24:2
**here's (1)**
48:20
**herself (1)**
125:11
**hey (6)**
48:19;50:1;61:24;
71:24;72:5;73:18
**hierarchy (2)**
32:3;155:3
**himself (2)**
66:20;110:24
**Hines (2)**
46:6;173:18
**hire (1)**
29:10
**history (2)**
48:17;114:17
**hold (2)**
131:18;158:25
**holding (4)**
42:2;48:17;126:10;
136:24
**home (1)**
39:25
**HON (1)**
1:15
**honest (3)**
38:14;87:8,20
**Honor (43)**
8:20;10:14;11:13;
12:9,12;13:10;14:14;
16:15;20:18;24:22;
25:4,11,12;27:6;
40:13,21;42:6;46:15;
77:2;81:22;88:14;
94:1;95:8;98:14;99:7,
14,17,21,25;117:5;
122:10;123:14;
124:25;126:25;128:2;
129:9,15;130:17;
139:5,8;154:8;
182:12;186:18
**Honor's (1)**
14:23
**hope (1)**
32:25
**hoping (1)**
95:11
**horseshoed (1)**
136:10
**hour (4)**
155:19;156:4,5;
185:21

Starbucks Corporation

- Vol. 1
October 19, 2022

**hourly (1)**
63:1
**hours (11)**
18:19;50:20;73:20;
166:14,18;167:5,5;
187:2,3,4,5
**house (6)**
60:1;61:14;62:13;
70:10,11;75:25
**housekeeping (1)**
187:16
**how's (4)**
73:19,19,19,23
**Howard (13)**
22:11;33:6,9,13;
34:1;84:16,19;86:4,9,
18;89:2;94:22,23
**H-s-i-e-h (1)**
172:2
**hundred (1)**
136:2
**HV (1)**
127:24
**hyphenated (1)**
176:4

**I**

**I'd (16)**
40:14;41:15;43:2;
51:25;52:18;57:10;
63:10;64:20;68:8;
78:21;79:21;82:2;
87:24;88:4,19;181:11
**I'll (36)**
10:23;24:25;40:24;
41:2,24;44:21;53:4;
58:12,14;69:5,16;
71:8;76:25;81:12,20,
21;88:13,15;94:10,
12;96:13;117:17;
118:8;128:3;129:14;
131:19;138:16;
153:10,13,14;156:8;
161:10;166:24;
169:21;173:8,15
**I'm (171)**
9:20;10:1,7;11:19;
12:23;25:19;28:2;
29:16;30:19;31:19,
19;32:10;34:12;
36:12,15;37:16,17;
40:13,20;41:5;42:2,9;
47:10;48:6,6;49:12,
15;50:10,11,11,15;
51:18;53:9;56:5;
58:21;61:18,24;62:5,
11,12,21;63:7;64:20;
65:22;68:20;70:4;
73:13,17;75:7,22;
77:7,17;78:16;81:7,
19,22;85:6,15,24;
86:15;87:6,8,9,10,11,

19;88:10,12,13;90:14,
15;91:22;92:18,24;
93:3,15;95:11,16;
97:5,17;101:9,14;
105:14;110:4,4;
112:17;113:1;117:2,
3,4;120:20;121:21;
122:10,24;123:14,15;
124:25;125:1;126:24;
127:19;128:2;130:17,
18;131:18;132:2,2,5;
135:22;136:20;
137:10,23;139:25;
140:4;141:19;144:5,
21;145:20,23,25;
146:9;147:13,15,21;
149:11;150:12,20;
151:2,4,23;152:9;
153:6;154:10,20;
155:1,23;156:2,9,10,
10;159:11;160:13;
161:16,24;162:11,15;
163:9;164:6;165:3;
167:11,12;168:20;
169:10;170:25;
171:10,10;172:24;
173:1,7,10;176:23;
177:25;178:8,18;
179:9;180:12,13,24;
182:19;184:1;185:2,
22
**I've (19)**
10:2;31:2,2;64:21;
68:9;77:2,18;102:24;
104:12;119:7,23;
120:11;139:21;140:9;
150:15;154:20;155:5,
6,8
**ice (1)**
70:19
**idea (4)**
56:20;60:1;74:2;
112:7
**identification (27)**
10:19;36:1;40:15,
17,22,25;41:2,15;
58:12,15;64:22;68:9;
76:25;77:2,18;81:20,
23;88:12,15;94:9;
105:16;117:3,4;
125:2;128:3;129:16;
131:15
**identified (23)**
10:22;33:12;36:1,2;
41:4,10;58:16;77:6;
82:1;88:17;94:11;
95:22;117:15;123:16;
125:3;127:2;128:5;
129:17;130:19;
131:16;167:14;
168:21,23
**identifies (1)**
42:2

**identify (5)**
13:21;41:22;43:10;
58:12;108:1
**illegal (1)**
22:3
**image (3)**
126:9;130:25;131:1
**imagine (1)**
93:21
**imbedded (4)**
126:9;130:25;
131:1;135:10
**immediately (5)**
17:25;24:15;27:1;
141:8;153:18
**impact (3)**
21:18;114:24;
138:11
**impeachment (1)**
13:19
**implementing (2)**
22:7;85:22
**implications (2)**
115:3,4
**implied (1)**
18:12
**impliedly (1)**
19:4
**implored (1)**
22:20
**important (3)**
86:23,24;139:23
**imposed (1)**
157:10
**impossible (1)**
115:5
**impression (1)**
21:13
**improve (1)**
20:10
**improved (1)**
76:15
**inaccurately (1)**
177:4
**incident (2)**
155:24;157:23
**inclined (2)**
8:20,21
**included (5)**
11:3;160:17;
166:12;167:3;174:10
**including (10)**
12:4;18:16;20:7;
26:8,20,22;70:3;
125:21;146:22,23
**increase (5)**
18:18;74:14,16,21;
148:5
**increased (1)**
20:3
**increases (6)**
22:8;84:16,19;85:2;
86:4,5

**Indeed (1)**
20:14
**index (1)**
10:20
**indicate (5)**
114:7,11;142:6;
144:18;180:13
**indicated (27)**
8:17;13:10,17;43:5;
47:12;49:17;52:20;
56:7;57:4;58:23;
63:12;65:1;68:11;
77:22;79:23;82:5;
88:21;90:9;94:14;
147:18,22;150:23;
153:21;163:25;
165:20;169:17;
179:20
**indicates (1)**
97:1
**indicating (1)**
13:12
**indication (1)**
153:20
**Indirectly (1)**
33:5
**individual (1)**
70:13
**individual's (1)**
154:9
**individually (3)**
70:3,4;117:7
**inform (3)**
26:21;27:2;44:6
**informally (1)**
48:4
**information (15)**
66:20;80:16;86:3,7;
103:14,16;108:19,22;
123:5;175:5;178:2;
180:23;183:7;185:1,
11
**informed (4)**
35:19;43:15;80:25;
182:22
**informing (2)**
92:25;183:8
**infraction (7)**
50:7;92:19,22;
93:10;106:6,7;157:24
**infractions (2)**
23:8;48:18
**initial (6)**
79:2;82:19;89:25;
90:2;95:6;105:1
**initially (3)**
48:19;61:10;74:9
**initiate (1)**
103:4
**initiated (1)**
17:2
**initiating (2)**
170:17;174:6

**initiative (2)**
138:6;154:7
**inject (1)**
11:21
**input (1)**
176:25
**inquire (2)**
42:25;43:2
**inside (3)**
17:24;103:18;104:3
**installation (1)**
162:16
**instance (3)**
155:18;174:7;
181:23
**instantly (1)**
93:7
**instead (1)**
162:18
**intend (6)**
10:3;11:3;26:16;
42:17;154:14;167:22
**intended (3)**
8:18;85:2,9
**intense (1)**
21:18
**intent (4)**
23:22;50:14;85:5;
183:11
**intention (3)**
168:1;171:5;186:10
**interest (4)**
105:11;138:8;
142:8;160:18
**interested (4)**
25:16;102:10;
103:8;139:25
**interfere (1)**
106:10
**interfered (1)**
21:25
**interim (3)**
33:14,16;34:1
**interjected (1)**
82:24
**internally (1)**
33:11
**international (1)**
122:24
**Internet (1)**
98:5
**interns (3)**
32:22,22,24
**interrogated (2)**
19:24;21:9
**interrupt (3)**
29:16;51:25;156:1
**interviewing (1)**
134:19
**interviews (1)**
175:17
**intimidate (2)**
18:23;67:20

**into (28)**
10:7;11:12;13:18,
24;14:1;15:19,24;
18:6;22:21;25:20;
35:15;51:7;56:25;
69:13;71:20;76:1;
81:12,12;82:22,24;
96:21;99:11;143:2;
146:5;162:23;167:25;
175:20;183:11

**introduce (1)**
10:16

**introduced (2)**
15:19;110:24

**introduction (1)**
168:11

**invite (3)**
12:7;71:9;109:20

**invites (1)**
73:7

**inviting (2)**
12:23;109:16

**invoke (1)**
21:6

**invoked (1)**
25:22

**involved (13)**
49:14;91:12,14;
115:5;116:4,12;
147:9,10;154:6;
169:23;183:2;185:9,
24

**involvement (1)**
142:22

**involves (1)**
94:2

**involving (5)**
102:17,21;104:7;
108:17;181:24,18

**Island (8)**
39:23;118:13,18;
119:2,3,5,6,12

**isn't (9)**
47:24;53:11;76:12;
91:7;148:3,21;
150:16;166:7;184:2

**issue (6)**
15:20;146:9;
147:22;161:14;
162:14;181:22

**issued (2)**
23:7,12

**issues (6)**
14:23;68:17;74:15;
112:20,24,25

**issuing (1)**
157:8

**It's (97)**
7:10;23:22;29:5,5;
30:5;32:6;35:19;
36:14;38:6;39:21,22,
24;40:5;41:20;42:7,
25;48:7,25;50:3;54:2;

63:17;68:5;73:5,25;
74:3;75:4,10;79:17,
20;80:24;81:6,10;
85:17,17;87:4,7,7;
89:6,8,8;91:8,15;
95:18;98:6;100:25;
101:6,6;102:11;
105:15;108:12;115:4;
117:9,10;119:3;
121:11;122:18,21;
123:13;125:7,16,23;
126:10;127:7;135:15;
138:15;140:11;
144:25;146:18;
147:16,21,23;148:9;
149:15;150:6,20,22;
152:24;155:23;161:2,
3,4,5;162:10;165:16,
16;168:16,20,21,21;
171:11;174:6;176:4,
11;181:13;183:5,6;
185:4

**items (1)**
14:11

---

## J

**Jack (1)**
91:22

**jacks (1)**
150:21

**Jackson (189)**
7:21,21;10:12,14,
18,23;11:8,13;12:9;
13:17;14:14,18;
15:23;16:5,15,17;
25:4,6,11;27:6,21;
29:20;33:2;35:25;
36:3,7;37:22;40:13,
18,20;41:5,7,9,12,14,
18,20,24;42:4,6,12,
17,22,24;43:2,6,23;
46:15,19;47:2,3,4,13;
49:15,18;50:18;52:1,
8,21;55:4,13,17;56:5,
8;57:2,5,15;58:11,20,
24;60:14;61:8;63:10,
15;64:20,25;65:2,9;
66:22;67:3;68:8,13,
25;69:4,15;71:2,3,12;
75:16;76:24;77:9,17,
21,23;79:21,24;
80:10;81:19;82:6;
88:12,18,23;90:6,12;
94:1,9,12,15,16;95:3;
97:14,18;99:22,24;
100:17;101:8;105:14,
17,22;117:2,10,14,16;
121:18,24;122:10;
123:4,14,17;124:20,
25;125:4;126:20,24;
127:3,21;128:1,6,18;
129:1,13,20,23;

130:17,20;131:9,14,
17;137:12,17;139:5,
13,16;140:3;142:6;
145:7,20;147:14,19;
148:25;149:21;
150:11;151:18,20;
152:12,15;153:6;
159:7;160:25;162:2;
163:1,12;167:22;
173:20,22;175:3,22;
177:21;178:16,24;
180:8;181:25;182:12;
183:1,7;184:15,17;
186:15,25

**Jedd (1)**
7:24

**JEFFREY (2)**
1:15;7:13

**Jerry (9)**
46:1;61:17,19,22,
23;62:15;71:19;
156:19;173:14

**Jersey (3)**
100:22;101:10;
104:18

**Jessica (1)**
7:24

**job (12)**
29:8,10;38:6,13;
45:20;101:13,22;
141:8;164:7;165:25;
175:7;179:11

**Johnson (10)**
34:2,4;35:23;36:11;
96:17;106:2;107:3,
22;144:19,22

**join (4)**
70:19;78:23;
108:12;150:4

**joined (2)**
104:21;110:12

**joining (3)**
9:19;100:20;187:11

**Joint (6)**
100:22,25;101:7,
10;104:19,24

**Jones (9)**
46:4;76:6;77:5;
78:10,13,17;80:2;
172:6,6

**J-o-s-e-kl-y-n (1)**
12:21

**Joselyn (131)**
12:21;16:24;39:3;
45:8,11;59:18;71:4,9,
10;73:8;76:5,8;77:4;
78:2,13,17;79:8;80:1,
11,15,20;82:10,10,12,
12,16,22;83:7,19,23;
84:2,12;86:9;87:13,
21;89:1,18,23;90:4,
21,22;91:2,2,7,13;
92:14;93:7,11;

104:23;107:9,11,14,
16,18,25;108:9,11,24;
109:13,15,18;110:13;
111:9;112:19,21;
113:12,19;114:23;
115:18,24;116:2;
118:20;119:13;120:1,
14;123:24;125:10,11;
126:11;127:10;
131:20;132:3,6,22,23;
133:5;134:8,9,10,20;
137:21;139:2;155:8,
18;156:4,7,18,21;
157:1,6,14,16,17,23;
158:11,24;159:3,5,23,
24;164:9,13,15;
169:24;170:8;171:20;
174:9,23;176:19;
177:20;178:25;
179:21;181:4,9,11,23;
182:22,24,25;183:22;
184:20

**Joselyn's (20)**
87:25;90:17;92:24;
115:7;116:19,22;
117:22;121:8;123:6;
126:18;128:9;130:24;
133:3;137:20;138:1,
12,19;159:12;175:13,
19

**Judge (235)**
1:16;7:3,12,16,16;
8:1,24;9:11,13,15,18,
22;10:15;11:5,10,14,
17,24;12:2,10,13,14;
13:16;14:25;15:15,
17;16:2,6,9,11,13,16;
24:20,23;25:2,5,7,15;
27:8,15;29:16,19;
32:14,16,19,24;37:5,
10,12,15,18,21;40:16,
19;41:6,8,10,13,17,
19,22;42:1,5,9,14,19,
23;43:4;46:17,22;
47:1;50:15;52:5;53:1,
4,8,17,22;54:2,8,13,
16,21,24;55:2,7,16;
57:12;60:12,15,19,23;
61:1,3,7;66:23;67:1;
68:22;69:7,16;70:3,7,
12,15,21,24;71:1,7;
72:17,20,24;73:3,11;
74:2,5,7,8,11,17,20,
24;75:2,5,9,15;77:11,
16;80:4,6,8;82:2;
89:5;94:4,7;95:5,9,13,
18,20;98:15,20;99:3,
5,13,15,18,20,22;
100:2,11;101:1;
117:9;121:20;122:9,
12,15,20;123:3;
124:23;126:22;
127:24;128:21;129:6,

10,18,21;130:15;
131:12;137:15;
138:16;139:6,9,18,21;
140:3,5,8,13,18,22;
145:21;146:11,17;
149:2,22;152:20;
153:8;154:10,11;
155:21;157:16,21;
159:14,19;161:2,8;
162:4,11;163:2,11,15,
20,24;165:16;167:19,
25;168:10,13,16,24;
173:3,6,10,13;175:4,
9;177:22;180:10,17,
21;182:1,14,17;183:4,
10,13,15,18;184:14;
186:16,19,20,22;
187:10,14

**Judges (1)**
7:14

**Julie (8)**
104:11,17,24,25;
105:2;142:18;143:22;
179:21

**July (11)**
23:14;75:7;91:5;
113:19;118:2;124:11,
19;126:5;128:15;
129:6,7

**jumped (2)**
110:18,25

**jumping (1)**
150:21

**June (5)**
23:7;156:13,13,14,
15

**justice (1)**
138:21

**justify (1)**
163:8

**Justin (76)**
40:9,11;43:10,24;
44:4,8,9,10,15;45:3,6;
47:5,14,22;49:4,22;
50:23;52:22;55:18,
19,22;56:1,12,14,23;
57:8,16,22;58:1,4,5,7;
59:1,12,21,22,24;
61:9;63:2,19,21,24;
64:2,6,10;65:3,5;66:3,
5,14;67:4,25;68:2;
76:10;79:9;107:17,
18;110:13;113:16;
114:23;165:18,23;
169:24;170:9;171:9;
172:22;174:9;179:11;
185:17,18;187:2,5

**Justin's (7)**
61:14;62:13;
166:14,18;179:15;
185:2,3

## K

**keenly (1)**
139:22
**keep (7)**
27:16;63:3;71:21;
93:15;100:3,12;186:4
**keeping (1)**
21:11
**Kelly (11)**
104:11,17,20,24,25;
105:2;142:19;143:9,
22;144:10,18
**Kelly's (1)**
144:2
**Kenneth (1)**
7:17
**Kevin (10)**
34:2;35:23;36:11;
96:17;106:2;107:3,
22;143:13;144:19,22
**key (8)**
23:11,17;122:21;
157:24;158:2,5,5,8
**keys (9)**
23:19;92:24;93:2,2,
4,7,9,14;155:24
**Kiba (1)**
173:3
**killed (1)**
24:9
**kind (11)**
42:13;44:22;62:1;
75:4;85:25;102:11;
136:10;153:15;154:7;
157:8;161:5
**knew (16)**
17:23;20:16;21:11;
43:24;44:4,10,12;
59:18;80:20;81:15;
82:25;158:25;159:12;
182:24;184:6;186:13
**knowing (3)**
37:23;38:2;139:25
**knowledge (18)**
84:20;137:24;
138:11;142:1;143:5,
10,15;151:10;154:18;
169:11;170:7,7,9;
171:14,25;178:9;
181:13,14
**knowledgeable (1)**
50:13
**known (2)**
143:12;168:17
**knows (3)**
75:11;103:8;175:4

## L

**label (4)**
76:25;81:20;88:13;

94:10
**LABOR (25)**
1:2,16;7:5;20:19;
21:22;23:25;24:18;
34:9;37:16;118:19;
122:2,4;141:5,15,22;
146:2;148:5,23;
163:8;164:1;166:12,
16;167:3;169:7;
185:15
**lacks (1)**
177:21
**larger (1)**
138:18
**largest (1)**
114:13
**last (15)**
9:8;12:21;32:14;
91:21;100:13;101:4,
4;115:15,19;118:6;
129:20;171:11;172:2,
16;176:2
**Late (25)**
39:5;48:3;50:1,2,3,
6;110:3;155:9,10,15,
18;156:4,5,8,13,14,
14,15;157:10;164:8,
16,19,23;165:2;
178:20
**lately (1)**
72:21
**lateness (4)**
48:1,14,15;164:12
**later (7)**
13:25;19:12;21:23;
39:4;54:8;82:14;
145:1
**launched (1)**
18:2
**Laura (6)**
91:20,20,21,25;
92:1,2
**Lavender (15)**
46:9;62:12;110:14;
111:2,8,15;112:3,6,
13,20,24;113:7;
172:14;173:1,8
**Law (10)**
1:15;7:12;81:10;
85:24,24;96:14;
141:16,22;146:1;
152:21
**lawful (6)**
142:2;148:22;
149:9,13;163:14,23
**lawsuit (1)**
153:25
**lawyer (5)**
96:14;141:18,19;
152:4;180:13
**lay (1)**
149:13
**layout (1)**

69:21
**lazy (1)**
97:3
**lead (3)**
24:3;102:2;103:6
**leader (3)**
61:9;107:16,18
**leading (4)**
10:12;17:23;53:6;
59:19
**leads (2)**
101:24;138:7
**Leann (10)**
118:4,6,8,9;119:8,
20;120:8;121:3,15;
175:23
**learned (3)**
35:3,6;50:5
**learns (1)**
93:6
**least (13)**
8:23;12:5;14:11;
20:16;30:4;35:9;42:1;
55:7;90:6;142:1;
159:9;167:5;174:18
**leave (9)**
15:8;31:14;35:20;
40:4;70:20;75:12;
87:25;140:3;187:12
**leavings (1)**
115:7
**led (5)**
18:1;57:10;59:24;
78:22;185:5
**Lee (1)**
173:3
**left (10)**
110:17,23;120:13,
15,16,22;136:3;
164:20;170:25;
179:11
**left- (1)**
135:12
**leftist (1)**
120:16
**Legal (13)**
91:10,11,14,15;
148:25;152:6,10;
153:5,9;160:25;
161:3;162:2;180:8
**legally (1)**
64:13
**length (1)**
22:15
**lengthy (2)**
12:21;139:15
**lenient (1)**
19:18
**Leon (60)**
8:10,10;9:3,7;
12:15;13:4,19,20;
18:1,5,8,14;19:13,24;
20:2,5,13,17;21:4,9;

22:5,10,13,17,20,24;
25:6,7;27:8,11,22,22;
33:3;36:4;43:7;47:5;
77:4,24;93:23;94:17;
96:3,17;98:17;99:6;
147:16;149:7,16;
150:1,24;158:9,12,15,
20,25;159:10;162:15,
17;181:21;182:2,3
**L-e-o-n (2)**
8:10;27:25
**Leon's (2)**
13:3;99:8
**less (2)**
75:3;184:3
**Let's (20)**
16:11;46:22;48:21;
50:2,2;67:1;72:3,5,10,
20;74:14;77:14;87:3;
94:4,13;140:13;
149:16;183:4,15;
187:15
**letter (15)**
17:9;35:23;36:10;
105:9,9,12,18;106:25;
107:22;114:3,8,18,19;
143:13;167:20
**letters (2)**
11:6;118:13
**letting (1)**
81:8
**level (3)**
13:7;62:6;92:20
**lie (11)**
145:16;149:18,20,
22,23;150:1,6,18;
151:3,5,7
**lies (1)**
24:1
**lieu (1)**
76:21
**life (2)**
81:6;148:3
**lightly (1)**
87:23
**likely (1)**
50:24
**liken (1)**
73:15
**limited (3)**
31:15,17,18
**line (18)**
93:22;119:20;
124:14,16;125:25;
127:11,15;128:12,14;
131:5;135:3;140:1;
148:16,21,24;151:11;
165:14;180:16
**lines (1)**
148:12
**linger (1)**
134:2
**link (3)**

118:11;130:2,5
**linked (2)**
128:24;129:3
**linking (1)**
128:8
**list (4)**
21:11;115:14;
170:12;174:10
**listed (1)**
103:16
**listen (4)**
13:6;42:10;93:19;
138:16
**listened (3)**
53:3,23;54:25
**listening (4)**
42:15,20;53:8;
110:25
**literature (1)**
160:23
**little (10)**
29:5;31:3,5;69:13;
75:10,13;88:5;101:2;
110:25;140:10
**Littler (1)**
7:25
**live (1)**
73:16
**living (2)**
45:20;73:23
**lobby (7)**
44:21,23;45:1;
53:19;54:3,6;69:9
**local (2)**
17:21;122:23
**located (4)**
16:25;29:21,23;
132:11
**location (9)**
102:11,14;103:3;
106:1;124:2,3;
132:12;133:15;
142:15
**locations (3)**
50:21;102:1,1
**locks (1)**
93:9
**London (1)**
154:2
**long (19)**
28:5,16;31:17;32:7;
39:23;54:20;60:1;
73:22;92:14;118:13,
18;119:2,3,5,6,12;
134:5;139:20;172:6
**longer (7)**
11:7;19:16;31:12;
33:8;40:7;154:2;
172:19
**look (11)**
36:18;38:13;65:18;
81:6,12,12;96:25;
97:6,19;167:16;178:3

**looked (1)**
37:1
**looking (9)**
44:23;54:23;56:20;
61:24;76:1;77:7;
136:11;151:23;
154:22
**looks (5)**
36:9;77:13;96:8;
126:12,19;128:22
**lose (1)**
20:6;23:19;64:10,
16,19,19;79:9;112:4
**losing (1)**
92:24
**loss (1)**
22:16
**lost (2)**
22:7;157:24
**lot (8)**
74:22,22;76:2;
120:17,17;132:14;
139:22;150:21
**loud (1)**
172:25
**Luiza (3)**
171:11;172:25;
173:8
**L-u-i-z-a (1)**
171:11
**lunch (4)**
15:4;95:7;98:16,16
**luncheon (1)**
98:23
**lying (6)**
147:3,3,4;149:10;
154:25;155:2
**Lynda (2)**
7:22;94:15

**M**

**magazines (1)**
40:3
**mail (2)**
19:22;109:24
**main (1)**
60:7
**majority (2)**
21:22;83:15
**makes (5)**
15:1;106:23;108:1;
126:16;162:24
**making (5)**
21:2,10;55:8;
160:24;174:18
**man (2)**
34:1;37:18
**manage (4)**
28:21;29:3,4,14
**managed (4)**
28:9,22,24,25
**management (11)**

19:17;22:12,18;
23:9;67:19;143:16,
20;160:8,12,19;165:5
**management's (1)**
166:5
**manager (42)**
8:10;12:15;13:6;
18:1;19:6;20:23;28:4,
6,9,14,19;29:9,25;
30:3,8;33:3;37:23;
38:2;48:23;61:24;
62:19,22;73:3,19;
74:22;92:25;104:18;
107:5,5,6;114:4,8,10,
20;144:8;149:7;
160:15,19,22;161:19,
21;175:1
**manager's (2)**
21:2;66:9
**managers (22)**
18:20;20:22;21:1;
23:1;29:10;48:8;
57:23;62:1,5,19,24,
25;86:5;111:5,7,18;
112:9;161:25;180:4,
14,18,22
**managing (1)**
185:24
**mandatory (7)**
18:21;56:24;
111:13,16;112:16;
147:17;150:25
**manner (1)**
26:20
**many (13)**
20:13;29:13;30:14,
25;46:12;93:11;
102:20;109:8;132:17;
141:10;178:10,13;
186:1
**Mar (1)**
111:18
**March (17)**
19:24;57:16,18;
59:18;101:16;104:8;
105:1;133:9,9,17;
141:4,11;142:19,23,
23;164:8;179:21
**marched (2)**
133:23,24
**marching (1)**
135:16
**Maria (1)**
7:23
**Mario (9)**
8:10;18:1;25:6;
27:11;77:4;96:17;
111:11;181:2,7
**M-a-r-i-o (1)**
27:25
**mark (6)**
35:25;40:24;76:24;
88:12;95:17;168:14

**marked (28)**
40:15,16;41:2,14;
58:11,14;64:21;68:9;
77:2,18;81:19;88:15;
97:4,18;105:15,23;
117:2,3,7;119:7,23;
120:11;121:6;126:25;
128:3;129:16;131:15;
168:21
**marking (7)**
40:22;58:18;81:22;
94:9;123:15;125:1;
130:18
**marks (1)**
10:19
**mask (1)**
100:1
**mastered (1)**
12:22
**material (2)**
19:8;161:12
**Matter (4)**
1:4,14;25:18;
187:19
**matters (2)**
15:9;121:25
**Matthew (1)**
7:21
**Matthew's (1)**
50:1
**Max (10)**
164:7,8,9,11,16,19,
22;165:2,4;171:22
**may (43)**
11:21;15:4,18,20;
21:7;22:5,13;25:19,
19,25;26:9,14,20;
32:17;48:4;49:25;
61:5,5;73:6;76:3;
83:11;84:5,6,9,10,10,
14,16,18;94:3;96:13;
140:21;145:2;152:22,
22;154:8;164:6;
172:5;177:4;178:17;
179:8,9;183:8
**maybe (25)**
31:5,20;44:1;49:8;
54:12;62:11,12;
69:10,12;72:22,22;
73:3,5,6;75:5;79:19;
94:1;95:9;111:8;
114:22;117:10;
141:13;159:9;167:25;
170:20
**mean (21)**
38:19;54:14;63:7;
74:11;84:7;85:11;
86:14,24;87:1;122:6,
20;128:21;147:4,9;
159:14;161:4;163:16,
17;177:17;180:17;
182:2
**meaning (5)**

38:12,20;62:25;
147:2;157:7
**meaningful (1)**
163:23
**means (9)**
22:25;25:23;26:13;
65:7,20;68:21;
103:10;174:14,14
**meant (1)**
44:1
**meantime (1)**
15:8
**media (9)**
16:21;116:20,22;
120:17;122:6,24;
134:16;146:6;187:6
**meet (7)**
69:19;70:12;71:4,
16;72:7;79:4;108:4
**meeting (31)**
47:5;55:18;57:18;
59:25;61:13,22;62:9,
10,13;69:23,23;76:5,
8;77:4;79:2,2;91:1;
109:5,11,17,21;
110:10,12,16,16,20,
23;111:3,24;113:14;
160:11
**meetings (13)**
18:8;65:3;68:16,19,
21,23;69:12;70:2,2;
75:17;108:7,15;109:8
**megaphone (1)**
136:24
**member (3)**
92:3;108:10;160:8
**members (7)**
106:2;139:2;
146:22;148:16;
151:10;174:20;185:7
**membership (2)**
148:13,17
**Mendelson (125)**
7:24,24;8:8;11:15;
12:5,13,14;14:17,21;
15:11,16;24:25;27:7;
51:24;52:25;53:2;
64:24;68:20;71:6;
74:8;77:7,20;89:4;
95:5,8,11,14,19,21,
23;96:2;97:14,16;
98:13,18;99:7,14,21;
101:4;121:21;122:3,
14,16;124:22;126:21;
127:23;128:20;
130:12,14;131:11;
137:14;138:15;
139:11,15,17,19,21;
140:7,21,24;145:22;
146:13,20;149:4,25;
150:12,14,15;153:10,
16;154:14,17;155:25;

157:22;159:8,16,22;
161:7,10,11;162:7,13;
163:6,13,19,21;164:4;
165:17;166:25;167:1,
15,21;168:3,19,25;
173:4,7,12,14,17,21,
23,24;175:10;178:1;
180:12,20,25;181:1;
182:5,7,19,20;183:5,
11,13,20;184:12;
186:20,24;187:9
**mental (1)**
150:21
**mention (2)**
44:9;51:4
**mentioned (9)**
50:6;59:7;64:15;
67:15;76:18;103:12;
104:17;133:11,17
**mentions (1)**
181:2
**mentor (1)**
29:11
**mere (1)**
23:22
**message (4)**
44:2;60:18;114:16;
125:21
**messages (5)**
19:7,10;108:19,22;
114:13
**met (3)**
57:16;92:14;179:21
**Metro (1)**
1:17
**Michelle (6)**
125:8,9;126:6,9,10,
16
**microphone (1)**
27:17
**mid-April (1)**
110:2
**Middle (2)**
31:4;85:20
**mid-February (1)**
17:4
**might (11)**
15:18;62:16;79:17;
111:16;113:10;
122:20;135:21;148:7;
157:16;163:3;180:23
**mimicked (1)**
67:10
**mindful (1)**
32:19
**mine (1)**
49:7
**minor (1)**
23:8
**minute (2)**
54:18;183:13
**minutes (25)**
42:18;46:16,21,22;

54:22;70:6;72:3;
95:10;134:6,7;
140:13;155:9,10,16;
156:4,5,8,13,14,14,
15;164:16,19,23;
165:2
**mischaracterizes (2)**
53:3;152:17
**misplaced (2)**
23:11;158:2
**misrepresent (1)**
145:15
**missing (2)**
173:1,7
**mission (2)**
89:8,15
**misspeak (1)**
122:21
**misspoke (1)**
98:11
**mistaken (2)**
51:7;147:13
**moment (7)**
36:4;80:5;98:13;
105:18;153:4;154:25;
182:13
**momentarily (1)**
16:7
**money (3)**
51:17;52:11;76:14
**month (5)**
31:19;33:23;73:12,
17;116:7
**months (1)**
21:23
**moot (1)**
15:20
**more (40)**
10:1;11:25;18:17;
19:14;29:17;31:3,4,5,
20;35:8;45:13;50:9;
52:11;56:13;63:4;
74:22;75:2,2,10;
76:12,14;93:22;
108:9;115:8;129:14;
133:8;138:19;140:10,
11;147:15;154:18;
160:7,10,11;170:8;
173:15;183:14;186:3,
4,5
**morning (2)**
14:14;27:22
**Mosdel (1)**
32:6
**most (4)**
20:15;29:1;61:11;
146:11
**motion (1)**
15:9
**motions (1)**
10:17
**motivation (1)**
23:21

**move (16)**
25:12;62:3,4;99:11;
121:18;124:20;
126:20;127:21;
128:18;130:12;131:9;
137:12;153:14;
162:11;167:25;
168:11
**moved (5)**
11:19;62:3;129:10;
168:22,22
**movement (3)**
18:3;54:7;141:5
**moving (3)**
11:12;13:18;53:25
**Mozdel (4)**
32:6,7,9,12
**much (8)**
27:15;29:4;38:14;
75:22;87:8;148:8;
155:5;187:11
**multiple (2)**
18:8;45:11
**Munav (4)**
46:1;61:18,19;62:7
**M-u-r-g-i-a (1)**
9:10
**Murguia (1)**
8:6
**M-u-r-g-u-i-a (1)**
8:7
**murky (4)**
148:23;149:13,15;
153:20
**Murphy (1)**
118:7
**must (1)**
22:17
**mutually (1)**
22:20
**myself (2)**
7:12;84:25

## N

**name (33)**
8:3;9:8;12:20,21;
27:24;32:14;33:18;
36:19;37:11;61:5;
77:13;89:8,11;91:17,
21;100:13;103:1;
107:16;118:6;126:11;
141:2;156:19;171:10,
11,12;172:2,5,16;
173:18;176:2,4,7;
177:11
**named (11)**
34:2;45:14,23;
60:23;61:4;76:6;
107:9;133:11;172:2;
176:8;177:8
**names (8)**
17:9;89:11,13;

127:10;170:24;
173:10,13;176:4
**naming (1)**
77:12
**Nanuet (2)**
103:2,3
**Nassau (2)**
29:1,4
**NATIONAL (7)**
1:2,16;7:5;141:15,
22;148:22;164:1
**nationwide (3)**
22:8;93:20;138:19
**natural (2)**
26:2;46:17
**nature (1)**
153:12
**nearly (3)**
14:22;42:18;115:4
**necessarily (4)**
38:12;121:23;
141:21;181:23
**necessary (4)**
22:25;24:17;
142:13;146:4
**Neck (99)**
16:25;17:1,4,17,21;
18:3;19:2,3,23;20:5,
15;21:21;22:13,21,
25;23:12,24;24:10,
16;28:11;29:17,18,21,
25;30:9;34:10,16,20,
25;35:22;36:11;
38:25;44:18;45:3;
46:12;47:8,16;48:13;
50:19;51:15,19;
52:23,24;56:25;
57:24;59:20;64:8;
69:1;83:11;93:17;
94:24;103:3;104:7,
10,21;105:3;106:1;
107:9,12;108:18,23;
109:21;113:11,17,23;
114:24;115:11,16,21;
116:1;119:14;126:7,
13,14;131:21;132:10,
11,12,13,25;135:16;
136:17;137:2,19;
138:1,24;142:18;
146:22;147:1;165:24;
176:9,13,17;177:16,
18;178:3;184:3,8;
186:7
**need (14)**
15:9,21;16:1,1;
42:9;46:19;65:24;
75:11;93:8;94:1,3;
98:19;139:20;162:6
**needed (2)**
15:7;74:22
**nefarious (1)**
183:11
**neglected (2)**

46:20;74:12
**negotiates (2)**
76:21;163:7
**negotiating (1)**
85:23
**negotiation (8)**
64:13,14,19;76:19;
79:13,20;102:6;
162:23
**negotiations (1)**
76:18
**neither (1)**
157:14
**Nellie (1)**
173:18
**nervous (1)**
115:8
**neutral (1)**
106:11
**New (19)**
1:17;7:13;16:20;
17:1;39:23;49:2;
56:21;72:11;75:6;
81:1,2,10;85:16,17;
100:22;101:10;
104:18;120:21;125:7
**news (23)**
38:6,11,12,17,20,
23;39:22;40:8;43:14;
44:3;57:22;59:3;
116:20,22;119:3,5,25;
120:2,19,20;121:12;
122:24;134:16
**Newsday (7)**
39:20;59:3,14;
117:21;119:4,5;128:9
**newspaper (19)**
17:21;38:24;39:2,4,
7,21,24,25,25;40:1,1,
11;58:25;59:5,8;
60:12,16,22;155:6
**newspapers (3)**
40:3,7;177:19
**next (7)**
8:11,21;12:2;93:3;
94:2;147:8;162:12
**nice (2)**
43:19,25
**Nicole (11)**
45:23;62:12;71:16;
73:8;159:4,4,6,24;
171:24;172:25;173:8
**night (2)**
114:2,21
**nine (2)**
46:14;54:22
**NLRB (10)**
19:22;34:16,21;
83:10;84:9;102:5,23;
116:12;185:16,19
**noise (2)**
42:12;82:15
**non- (1)**

51:6
**Non-audible (1)**
152:1
**None (2)**
70:25;183:14
**non-interference (4)**
106:6,7,13;151:24
**non-natural (1)**
26:4
**non-Union (2)**
51:9,10
**nor (4)**
38:13;59:8;81:5;
157:14
**normal (1)**
144:21
**North (3)**
1:17;29:4;141:9
**Northern (1)**
29:23
**Nos (1)**
1:3
**note (1)**
42:1
**Noted (1)**
7:2
**notes (1)**
140:10
**Notice (5)**
1:15;16:23;90:24;
91:3,4
**notification (3)**
38:17,20;39:17
**notified (4)**
11:1;19:15;90:20,
22
**notify (1)**
92:14
**November (2)**
164:16,19
**Number (16)**
7:11;9:2;11:6;29:6;
32:19;42:15;53:12;
64:22;95:14;107:19;
127:1;152:5,5,14;
168:22;174:11
**numbers (2)**
7:7,9
**Numerous (2)**
17:7;18:15
**nut (1)**
86:15
**NY (6)**
123:22;127:7;
128:8;129:25;130:22;
134:24

## O

**o'clock (1)**
114:22
**oasis (1)**
87:24

**oath (2)**
27:14;100:10
**object (3)**
122:4;145:20;153:6
**objecting (1)**
11:18
**objection (43)**
9:6;11:14,16,20,21;
52:25;53:1,4;68:20;
71:6;89:4;99:13,14,
17;121:20;122:8,15;
124:22;126:21;
127:23;128:20;
129:11;130:14;
131:11;137:14;
138:15;148:25;
149:21;150:11;
152:17;157:13;159:7;
160:25;162:2;163:1,
12;165:14;175:3;
177:21;180:8,24;
181:25;183:1
**objections (2)**
7:10;23:3
**objective (2)**
23:1;140:1
**obligated (1)**
152:24
**obligation (4)**
27:2;152:6,11,19
**obligations (2)**
27:3;153:5
**obscure (1)**
21:6
**observe (2)**
134:16,18
**obtain (1)**
21:22
**occasionally (1)**
51:16
**occur (1)**
92:15
**occurred (3)**
44:25;91:5;133:2
**occurs (1)**
55:8
**October (3)**
1:18;28:7;187:19
**off (39)**
10:12;15:3,4,13;
16:6,8;35:20;46:22,
24;66:22,24;73:16;
80:4,6,7;82:13;94:2,4,
5,6;98:19,20,22;
105:1;110:18;111:1;
131:18;140:15,16;
156:21;173:11;
182:12,14,15,16;
183:15,16;187:16,17
**offense (4)**
87:24;88:5,6;
154:15
**offer (1)**

10:3
**offered (6)**
20:20;121:24,25;
122:17,22;168:17
**offering (1)**
122:10
**Office (4)**
7:13,15,16;32:23
**official (2)**
32:11;115:20
**often (5)**
72:17,19;74:17;
75:3,3
**Ollie (1)**
171:1
**Olsen (1)**
172:11
**O-l-s-e-n (1)**
172:11
**omissions (1)**
11:2
**omitted (1)**
11:9
**Once (10)**
11:11;23:2;72:22;
73:4,6;74:19;75:5;
150:16;165:9;179:21
**one (79)**
9:1,4,21;10:23;
11:8;16:24;19:17;
25:16;26:19;29:10,
17,21;37:20;38:18;
53:24;54:4;55:9,14;
61:12,24;65:3;67:9;
71:19;73:12,17;77:7;
81:3;82:11;87:12,16;
90:20;93:22;95:7;
96:10;97:10;100:25;
101:6;103:6,7;
106:20,20;109:2,10;
111:11,18;112:8;
123:22;129:19,20;
130:23;138:10;
139:16;142:7,21;
144:6,23,24;145:1;
147:15;154:11;
155:18;158:21;160:7,
10,11,14;161:18;
162:9;164:3;167:9,
10;170:8;173:15;
177:4;179:25;182:13,
24;185:4;186:20
**one's (1)**
119:13
**one-by-one (1)**
18:7
**ones (2)**
172:24;185:21
**onestarbuckcom (1)**
65:19
**one-tenth (1)**
142:22
**online (2)**

103:9,12
**only (20)**
13:19;22:8;25:16,
25;34:20;45:3,6;
65:17;70:23;81:3,3;
85:9;93:17;122:21;
154:11;157:9,17;
181:18;184:2,2
**open (4)**
23:12;158:2;
164:24;186:7
**opened (1)**
11:1
**opener (1)**
164:24
**opening (4)**
16:4,5,14;24:24
**operate (1)**
68:5;125:7
**operational (1)**
143:25
**Operations (1)**
31:25
**Operators (1)**
19:1
**opinion (11)**
47:18;49:6,9,11,24;
50:8;51:14;57:1;
65:24,25;138:16
**opinions (6)**
44:16,17;45:4,7,12;
75:19
**opportunities (3)**
10:9;52:15,16
**opportunity (3)**
10:3;14:19;52:10
**oppose (1)**
145:19
**opposed (3)**
48:5;170:17;180:2
**opposes (1)**
146:15
**opposing (1)**
26:23
**order (13)**
7:4;8:25;11:8;19:3;
24:14;25:13,21;
52:10;53:9;129:22;
145:24;156:20;163:9
**ordering (1)**
127:9
**orders (2)**
123:23;145:25
**ordinary (1)**
162:25
**organization (2)**
32:3;100:23
**organizations (1)**
133:21
**organize (8)**
17:17;101:25;
104:4;109:11,14;
140:11;142:14;

181:10
**organized (2)**
109:8,10
**organizer (6)**
60:7;101:14,20,23;
107:16;182:8
**organizing (38)**
16:19,20;17:2;
19:21;59:19;74:15;
102:13,17;103:4,9,10,
20,21;104:6,21;105:3,
25;107:11,15,23;
108:1,10;109:4;
114:24;115:3;120:14;
133:14;134:12;
138:12;142:8,25;
146:22;174:20;
178:20;181:15,24;
183:8;185:7
**original (2)**
125:9;126:9
**originally (1)**
104:11
**others (2)**
150:2;153:13
**ought (1)**
32:21
**ourselves (1)**
138:8
**out (54)**
15:1;17:1,8;19:13;
20:20,23;21:4;35:11;
40:2;43:15;48:25;
53:11;60:5,22;69:11;
70:10,18;72:4;75:1;
85:16,16;92:20,25;
93:1,11,12;95:12;
102:9,14;103:13,15,
19,25,25;104:23;
105:10;109:19,24;
115:5;116:2,4,17;
129:6,7;131:2,24;
138:9;170:3;172:24;
179:1,5;184:25;
185:10,13
**outstanding (1)**
15:8
**over (12)**
16:18;21:23;30:10;
75:12;78:23;93:11;
104:11;110:11;
139:18;148:6;155:15;
175:13
**overall (1)**
28:16
**overlap (1)**
141:21
**overrule (2)**
53:4;71:8
**Overruled (2)**
89:5;165:16
**own (9)**
26:21;42:7;125:21;

133:21,22;142:4;
161:13;174:18;
176:10

**P**

**page (6)**
54:17;127:7;178:4,
6;185:24;186:2
**pages (6)**
14:17,18,19;15:5;
139:16;140:8
**paid (8)**
38:14;111:9;
112:22;181:4,10,11,
16;182:8
**paint (1)**
79:20
**paper (1)**
39:8
**papers (5)**
10:16,21;11:2,3;
167:23
**Paragraph (3)**
164:6;179:8;182:21
**parameters (2)**
114:5;163:10
**parking (1)**
132:14
**part (27)**
38:6,13;54:11;
55:14;62:1,20,24,25;
63:1;65:8;68:6;71:11;
82:19;89:25;91:16;
101:5,6;147:24;
149:8;152:12;155:1,
1,13;166:2;168:10;
174:18;176:20
**partial (1)**
11:6
**participant (2)**
107:20;147:10
**participants (3)**
133:19,23;134:2
**participate (10)**
18:21;56:24;115:9;
116:13,18;147:17;
149:18;169:22;170:5;
185:13
**participated (1)**
109:22
**participating (2)**
13:22;154:19
**participation (3)**
111:13;150:25;
154:22
**particular (10)**
44:8;68:23;103:19;
104:3;108:9;131:22;
138:24;142:14;
164:11;167:7
**parties (10)**
7:18;8:4;10:11;

14:10;26:3,4,9;42:6;
58:19;162:23
**partner (16)**
43:15;45:6;48:9;
51:6,7,9,11,14;56:20;
61:15;91:11;92:5,20;
124:1;165:6,10
**partner's (2)**
48:7,11
**partners (31)**
35:16,17;43:16;
48:17,25;49:13;50:8;
51:5,18,22;52:3,9,12,
16;59:25;60:21;
61:13;67:21;70:18;
75:1;76:2;89:7,10;
103:7;109:19;133:5,
5,6;169:17,18;185:5
**parts (1)**
16:21
**Party (16)**
1:10;8:4;9:18;
11:18;12:10;14:6;
16:19;24:21;26:5,10,
20;81:2;99:16;
100:23;139:6;186:16
**party's (2)**
26:6;151:25
**past (4)**
19:18;23:18;116:7;
165:3
**patience (1)**
93:25
**pause (3)**
66:24;80:7;183:17
**pay (3)**
63:4;76:11,16
**paycheck (1)**
64:4
**paychecks (1)**
20:8
**Pearl (2)**
91:20,20
**pending (1)**
50:16
**people (24)**
25:19;32:20;40:4,4;
55:9;61:19;67:16,20;
68:6;81:15;82:25;
89:13,15;103:9,24;
132:17;148:12;170:4,
17;174:19,21;176:19,
25;181:9
**people's (1)**
109:6
**perceive (1)**
142:1
**perceived (1)**
154:9
**percent (1)**
167:9
**performance (1)**
45:18

**performing (1)**
141:20
**period (10)**
19:22;28:10;33:13;
101:20;109:5,5,23;
171:4;185:2,3
**permit (1)**
8:21
**permitted (5)**
19:9,16;87:21;89:2;
163:23
**perpetrated (1)**
20:17
**persists (5)**
48:24,24,24,24,25
**person (28)**
9:4,16,17;12:24;
13:5,9;25:17;26:5;
32:5;33:21;60:24;
70:23;78:5;81:3;
109:20;116:3;143:9;
148:9;149:13;158:5;
159:8;171:10;175:22;
177:9,9;180:13;
181:14;182:25
**person's (1)**
174:10
**personal (5)**
103:14;123:13;
174:10,11,11
**persons (3)**
12:18;25:23;26:3
**perspective (2)**
21:19;159:10
**petition (17)**
14:9;15:11;17:14,
15,16;34:15,21,24;
35:3,6;37:7;38:10;
43:16;44:6,13;85:3;
171:4
**petitions (3)**
14:4,5;35:17
**phone (1)**
174:11
**photo (18)**
125:11;128:25;
135:12,14,18,23;
136:3,8,9,12,16,19,23,
24;137:1,5,9,10
**photographic (1)**
126:8
**photos (1)**
135:10
**phrase (1)**
125:17
**pick (4)**
40:1;51:16;52:16;
59:8
**picked (1)**
142:17
**picket (3)**
148:12,16;151:11
**picketing (1)**

148:6
**picking (2)**
39:8;157:1
**picture (6)**
39:3;59:17;114:17;
126:10;136:20,21
**pictured (1)**
137:10
**pictures (2)**
134:19,25
**pin (3)**
177:6,9,13
**ping (15)**
38:17,19,20;39:9,
10,11,12,14,15,16,16,
17;43:19,25;44:1
**p-i-n-g (1)**
39:15
**pings (2)**
38:22;44:2
**pins (1)**
35:16
**place (12)**
25:13;53:18,24;
54:6,6;69:9,21;98:5;
110:10;163:3;176:9;
187:20
**placed (1)**
148:4
**places (1)**
155:7
**planned (1)**
131:20
**planning (1)**
108:7
**plans (2)**
29:12,12
**play (21)**
41:17,21,24;42:8,
17,25;43:2,21;47:10;
49:15;52:18;53:6;
56:5;57:2;58:21;
64:20;90:6,7,19;
94:12,13
**played (15)**
43:5;47:12;49:17;
52:20;56:7;57:4;
58:23;63:12;65:1;
68:11;77:22;79:23;
82:5;88:21;94:14
**playing (4)**
41:23;53:10,10;
65:8
**Plaza (6)**
119:14;132:10,11,
13;136:17;137:2
**pleadings (1)**
10:16
**please (13)**
7:19;10:9,15;27:9,
24;52:2;96:3;100:5;
140:22;152:4,23;
169:1;187:12

**plenty (1)**
50:11
**plural (1)**
183:23
**plus (2)**
63:4;76:12
**pm (14)**
54:15;55:2;94:6,6;
98:23,24;99:2;136:6,
7;140:17,17;183:17,
17;187:18
**point (23)**
11:22;13:25;17:22;
26:13;29:1;33:9;
40:21;44:22;58:19;
60:5,9;65:5;71:19;
74:23;77:12;82:22;
87:19;110:17;132:5;
145:6;156:10;179:10,
25
**pointed (1)**
146:13
**pointing (1)**
54:16
**pointless (2)**
185:11,12
**points (3)**
68:17;75:22;160:3
**poker (2)**
79:18;80:3
**police (1)**
26:25
**policies (3)**
18:18;19:14;23:17
**policy (9)**
35:19;80:13,24;
81:7;93:13,16,17,19,
20
**political (1)**
124:9
**politician (1)**
126:7
**politicians (1)**
133:8
**politics (1)**
120:16
**polls (1)**
106:6
**pong (1)**
39:16
**popular (1)**
119:5
**populated (1)**
31:4
**population (1)**
179:6
**portal (2)**
103:9,12
**portfolio (1)**
31:7
**portion (54)**
41:16,24;43:5,22;
47:12,21;49:16,17,19;

52:18,20;56:6,7;57:3,
4,6;58:21,23;63:11,
12,18,22;64:21;65:1,
4;68:9,11;77:4,18,22,
24;78:12,18;79:22,23,
25;82:3,5,8,9,19;83:6;
88:19,21;89:16,17,21,
22;90:1,9,18;94:12,
14;125:12
**portions (6)**
41:1,8,9;58:13;
81:24;178:8
**posed (1)**
149:8
**position (13)**
12:19;13:21;28:3,5;
31:24;32:7,9;48:8;
53:16;65:22;92:2;
101:13;165:19
**positions (1)**
28:18
**positive (1)**
30:19
**possessive (1)**
145:7
**possible (2)**
10:1;98:6
**Possibly (7)**
37:14;49:9,9;61:18;
68:4;76:22;90:25
**post (10)**
19:10;74:9;124:4,
12;127:13;128:10;
130:8,9;131:3;135:1
**posted (21)**
84:20;98:4;106:20;
124:10,11,14,16;
125:8,24;127:11,15,
20;128:12,14,16,17,
22,23;131:5;134:24;
135:3
**posting (6)**
19:7,8;123:22;
125:11;131:19;
134:25
**post-it (1)**
66:8
**potential (3)**
26:15,18;27:2
**potentially (3)**
13:13;25:18;162:8
**Power (1)**
160:3
**practice (15)**
23:18;47:25;56:21;
67:15,18,21;68:3;
69:11;90:23;122:2;
163:8;166:12,17;
167:3;185:16
**practices (10)**
19:18;20:19;21:22;
22:3;24:1,18;67:5;
118:19;122:4;146:3

**pre (3)**
    74:9;75:3,4
**preceded (1)**
    32:11
**preceding (1)**
    32:11
**precluding (1)**
    153:14
**preference (1)**
    100:2
**prejudicial (2)**
    13:13,13
**preliminarily (1)**
    8:14
**preliminary (2)**
    10:17;15:9
**pre-marked (3)**
    95:15;167:13;
    168:15
**pre-organizing (1)**
    74:9
**preparation (1)**
    26:23
**prepare (1)**
    46:19
**prepared (2)**
    13:11;40:25
**preparing (1)**
    40:14
**pre-petition (1)**
    164:16
**prescribe (3)**
    48:11;75:23;87:20
**prescribing (2)**
    50:11;65:22
**present (29)**
    8:9;9:2;10:23;
    25:25;27:3;30:6,7;
    40:14;41:15;63:10;
    64:21;68:8;78:15;
    79:21;81:21;82:2;
    88:14,19;91:2;
    105:14;115:10;
    129:14;134:16;
    136:18;137:8,10;
    152:6,11;162:19
**presentation (2)**
    26:6;99:8
**presented (2)**
    91:2;94:3
**presenting (5)**
    77:1,17;126:24;
    128:2;130:17
**presently (1)**
    115:16
**President (2)**
    32:4;106:3
**presiding (1)**
    7:12
**press (15)**
    17:16,18;107:21;
    108:13;118:4,13,18;
    119:2,6,12;130:6;

**175:**16,17,19,24
**pressed (1)**
    159:24
**pressing (1)**
    73:7
**pressure (2)**
    148:4,8
**presumably (1)**
    14:11
**pretending (2)**
    93:3,4
**pretense (1)**
    23:22
**pretenses (1)**
    23:5
**pretrial (5)**
    11:8;12:3,4;14:6;
    139:24
**pretty (3)**
    29:4;75:22;93:15
**pre-Union (2)**
    72:20,22
**prevent (1)**
    146:3
**previous (1)**
    40:15
**previously (8)**
    10:1,25;11:7;28:21,
    24,25;98:1;164:12
**primary (1)**
    115:6
**principals (1)**
    151:25
**principle (3)**
    145:18;146:14,18
**printed (1)**
    41:10
**prior (12)**
    8:9,12,17,20;12:15;
    13:3;14:2;15:10,19;
    56:18;141:5,10
**private (1)**
    70:17
**privately (1)**
    70:12
**pro (3)**
    19:8;65:23;92:3,4
**Probably (18)**
    34:8;37:2;39:6;
    50:3;65:8;71:10;
    75:24;86:8,15;88:4,5;
    98:2;115:18;118:25;
    125:15;136:5,13;
    168:14
**problem (1)**
    9:5
**problems (1)**
    26:17
**proceed (6)**
    9:6;13:14;15:2;
    25:3,24;140:21
**proceeded (2)**
    23:4;72:2

**proceedings (2)**
    27:16;116:13
**proceeds (1)**
    25:19
**process (10)**
    76:2;95:16;102:4,5,
    6,8;105:1;106:19;
    139:4;143:6
**production (2)**
    14:12,21
**program (2)**
    154:19,23
**prohibited (2)**
    18:20;20:5
**prohibiting (2)**
    19:8;80:13
**prominent (1)**
    17:20
**promise (2)**
    19:4;22:10
**promises (1)**
    18:12
**promoted (4)**
    47:7,15,18;61:24
**promotion (1)**
    18:10
**promotional (1)**
    29:12
**promotions (1)**
    62:17
**prompted (1)**
    14:6
**pronoun (1)**
    154:9
**pronouns (1)**
    154:12
**proper (2)**
    13:24;93:10
**properly (1)**
    164:2
**proposal (1)**
    152:21
**proposals (1)**
    162:24
**propose (1)**
    152:23
**proposed (1)**
    152:17
**prospects (1)**
    17:5
**protected (1)**
    22:18
**protocol (2)**
    144:21;174:5
**provide (3)**
    12:17;13:7;92:21
**provided (5)**
    11:15;15:19;52:10;
    81:24;139:13
**provides (1)**
    21:17
**provision (1)**
    21:6

**PTR (1)**
    15:11
**public (2)**
    17:25;175:20
**publication (5)**
    39:22;116:20;
    119:3;120:16;121:12
**publicize (1)**
    123:5
**publicized (1)**
    175:13
**publicizing (2)**
    130:23,23
**publicly (4)**
    17:8;24:7;108:13;
    176:21
**published (6)**
    17:16,21;116:24;
    117:21;118:2,25
**pull (4)**
    33:18;60:21;66:20;
    95:11
**purported (1)**
    13:22
**purporting (1)**
    152:21
**purpose (6)**
    9:24;116:11;
    121:22;122:1,25;
    123:1
**pursuant (1)**
    1:14
**put (13)**
    8:22;12:11;14:1;
    15:13;17:9;22:14;
    25:13;40:5;79:18;
    97:13;126:11;148:8;
    175:19
**putting (5)**
    66:8;97:3;127:10;
    146:5;161:13

**Q**

**quarter (1)**
    155:19
**Queens (1)**
    29:2
**quick (1)**
    159:19
**quit (2)**
    164:7,8
**quite (3)**
    53:19;54:2;120:20
**quitting (1)**
    73:25
**quo (1)**
    162:25
**quote (8)**
    93:16;125:6,16,19,
    20,20,22,24
**quoted (3)**
    155:12,12;179:9

**quotes (1)**
    81:11

**R**

**R-10 (1)**
    168:14
**R-19 (1)**
    168:16
**R-53 (1)**
    99:18
**race (1)**
    89:11
**raise (3)**
    27:9;100:5;161:8
**raised (4)**
    12:15;112:20,24;
    181:21
**raises (5)**
    85:8,11,12,12;
    161:23
**raising (1)**
    181:22
**rally (23)**
    119:13;126:18;
    130:23;131:20,22,25;
    132:4,6,9,13,25;
    133:2,19;134:2,16,25,
    25;135:21;136:4;
    175:15;178:25;
    182:23;186:8
**rallying (1)**
    126:19
**Rampow (1)**
    31:13
**range (1)**
    30:24
**rapport (1)**
    73:23
**rarely (2)**
    19:1;40:1
**rate (1)**
    63:1
**Rather (3)**
    13:5;148:23;174:19
**RC-290364 (1)**
    22:2
**reach (14)**
    92:20;93:11,12;
    102:9;103:15,24;
    109:19;115:5;116:2,
    15;131:24;137:21;
    138:9;170:3
**reached (4)**
    17:1;43:15;104:23;
    184:25
**reaches (1)**
    103:19
**reaching (3)**
    103:25;179:1;
    185:10
**read (25)**
    10:7;25:20;39:25;

59:3,4,7;60:15,21;
65:15;66:4,6;83:2;
84:21;87:5;90:24;
98:3;119:21;120:9;
121:4,16;140:8;
152:4,8,9;177:19
**reading (6)**
63:7;65:6,10,12,13;
168:4
**reads (1)**
145:6
**ready (3)**
11:4,11;25:2
**real (1)**
148:3
**really (12)**
36:18;37:17;70:17;
75:7;87:8;91:13;
96:21;153:8;163:18;
164:1;182:3;184:21
**reason (11)**
96:18,23,24;
150:22;157:15,16;
159:18;161:17;166:2,
3;180:4
**reasonable (1)**
9:24
**reasons (2)**
52:13;179:11,16
**rebuttal (1)**
26:23
**recall (104)**
33:13,19,20;34:4;
36:25;37:10;40:12;
44:20,25;45:2,16;
47:14;49:10;51:3;
52:22;56:4,14;57:18,
21,25;58:1,3,9,25;
60:25;61:4,21,23;
62:15,20;64:5,15;
65:13,16,18;66:3,6,7,
7,10,12,13;67:4,6,13,
14;72:7,9;76:8;80:22;
81:17;82:15;83:21,
22,22,24;84:1,13,18;
86:3,15,16,21,21;
87:3;88:9,11,22,24;
89:1;91:1;92:13;95:1;
109:8,25;110:1,6,12,
22;111:14,19;112:2,
19;113:1,2,5,13,15;
114:19;118:1,23;
126:4;127:15;144:23;
145:2,4;156:6,17;
158:7,10;166:3;
177:11;179:11;181:5
**recalling (2)**
147:15;177:4
**receive (5)**
38:17;44:2;96:23,
24;141:14
**received (30)**
11:24;12:1;14:15;

36:22,25;39:18;
40:17;43:19,25;
80:16;99:18,19;
116:14;122:12;123:2;
124:23,24;126:22,23;
127:24,25;129:11,12;
130:15,16;131:12,13;
137:15,16;164:10
**receiving (4)**
96:19;97:22;98:8,9
**recent (2)**
115:21;146:11
**recently (2)**
12:4;75:2
**recess (7)**
9:24;15:24;16:10;
46:16,25;98:23;
140:17
**recognize (12)**
17:11;24:15;36:8;
94:22;96:7,12;97:9;
117:18;118:15;
123:18;168:4;169:1
**recognizes (1)**
106:5
**recognizing (1)**
152:4
**recollection (14)**
35:12;37:6;53:23;
97:22;98:8,9,10,12;
155:11;167:11,17,24;
168:5;169:2
**reconvene (1)**
187:19
**record (65)**
7:3,19;8:22;11:1;
12:3,6,8,11;13:12,14,
17;15:3,4;16:6,8,11,
12;25:20;27:24;
46:23,24;47:1;58:17;
66:22,24;67:1,2;80:4,
6,7,8,23;84:8;94:2,4,
5,6,7,8;98:19,19,21,
22;99:3,4;140:15,16,
18,19;144:5;154:8;
178:16,20;182:13,14,
15,16,17,18;183:15,
16,18,19;187:16,17
**recorded (2)**
21:5;27:17
**recording (37)**
21:12;40:24;41:2,6;
42:18;43:7,11,13;
47:10;49:20;55:6,11;
56:9;58:12,14,18,22;
59:9;63:24;76:25;
78:12;79:25;80:16,
21,25;81:15,20,24;
82:19;83:1,3,6;88:13;
89:16,21;90:1,18
**recordings (14)**
12:17,24;13:1,3,7,
18,21,23;21:3,8,10;

40:23;80:13;82:13
**records (2)**
156:4,12
**recross (3)**
186:19,21,23
**redirect (2)**
184:14,16
**reduced (1)**
166:14
**reduction (2)**
166:18;167:4
**re-employment (1)**
24:4
**refer (4)**
34:12;101:9;118:9;
125:22
**reference (4)**
96:9;156:10;
175:22;177:5
**referenced (3)**
92:22;96:10;157:24
**referencing (1)**
59:15
**referred (1)**
175:23
**referring (7)**
41:11;43:13,17;
62:2;92:23,24;154:13
**reflect (12)**
12:3;13:14,17,23;
58:17;63:21,24;65:4,
6;80:1;89:17,22
**reflected (1)**
63:18
**reflecting (1)**
78:16
**reflects (6)**
49:22,24;55:5;
63:19;78:13;83:7
**refresh (4)**
167:11,12;168:5,8
**refreshes (4)**
167:16,23;169:2,4
**refreshing (1)**
53:23
**refusal (3)**
166:13,17;167:4
**refused (2)**
22:22;166:13
**regard (3)**
38:6;49:5;134:18
**regarding (16)**
26:11;38:25;40:9,
11;48:14;57:17,23;
66:11;67:16;68:17;
69:2;75:18;84:3;
93:13;157:24;164:11
**regardless (1)**
64:4
**Region (1)**
1:16
**Regional (7)**
11:9;19:1;31:25;

32:4;100:25;101:7;
104:18
**regularly (1)**
108:4
**Rehire (6)**
123:23,24;126:11;
127:10,10;134:8
**reimbursements (1)**
20:7
**reinstated (2)**
138:23;139:3
**reinstatement (5)**
126:18;133:3;
138:13,19,25
**reject (1)**
22:8
**rejected (2)**
18:13;19:5
**relate (2)**
141:22;149:8
**related (5)**
39:22;100:23;
123:6;141:10;185:16
**RELATIONS (10)**
1:2,16;7:6;91:11;
92:5,20;141:16,22;
148:23;164:1
**relationship (2)**
73:15;159:12
**relationships (1)**
75:8
**relatively (2)**
23:8;155:15
**relay (1)**
113:8
**relayed (2)**
49:7;149:5
**release (2)**
17:16,18
**released (1)**
67:10
**releases (1)**
175:16
**relentlessly (1)**
19:21
**relevance (5)**
145:20,23;153:6;
159:7;163:12
**relevant (2)**
159:14,16
**relieved (1)**
22:6
**relish (1)**
22:16
**reluctant (2)**
169:22,22
**rely (1)**
175:5
**remain (2)**
26:6,9
**remaining (3)**
8:5;24:6;176:16
**remarked (1)**

155:8
**remedies (1)**
24:11
**remedy (4)**
18:12;19:4;24:17;
50:2
**remember (39)**
36:17;39:6;45:22;
60:10;61:17;62:7,18,
23;64:18;67:7,24;
84:2,13,15;86:17;
87:2;90:2,5,17,19;
91:19,21;96:19,21;
110:2;111:24;112:23;
120:5;133:25;136:4;
157:25;158:1,1;
171:1;177:8,10;
178:19;179:4;186:12
**reminding (1)**
25:12
**remove (2)**
24:11;100:1
**removed (2)**
22:25;24:5
**render (1)**
15:20
**repeat (8)**
35:5;55:21;108:20;
148:14;149:24;150:8,
15;159:21
**repeated (2)**
20:13;150:16
**repeatedly (2)**
157:7,9
**rephrase (1)**
149:2
**replaced (1)**
34:4
**replayed (2)**
43:22;90:10
**report (9)**
31:8,9,13;38:18,20;
40:8,11;156:4;158:9
**reported (3)**
38:10;122:23;150:2
**Reporter (34)**
8:2;10:24;16:8,12;
35:25;46:24;67:2;
77:1;80:9;81:21;
88:14;94:5,8;95:25;
98:22;99:4;100:14;
117:6,13;123:15;
125:1;126:25;128:3;
129:15;130:18;
140:16,19,20;168:13;
182:15,18;183:16,19;
187:17
**reports (10)**
30:12,13;33:3;38:7;
116:23;122:6,18,18;
146:6;185:8
**reposting (2)**
125:20,21

**represent (10)**
  11:6;34:10,22,25;
  35:18;55:10;77:3;
  81:23;96:13;113:8
**representation (12)**
  12:6;16:23;17:10,
  14;18:13;20:21;22:9;
  42:10;55:8;57:17;
  108:17;145:10
**representations (1)**
  14:20
**representative (12)**
  8:4;19:9;19:17:12;
  18:11;20:3,12;24:16;
  34:18;143:16;153:4;
  159:12
**representatives (2)**
  7:18;26:4
**represented (3)**
  13:8;105:25;155:14
**represents (1)**
  96:14
**request (5)**
  10:11;46:15,21;
  166:14,18
**requested (1)**
  167:4
**requests (2)**
  7:15;103:10
**require (1)**
  165:19
**required (3)**
  18:21;51:12;56:23;
  165:25
**requiring (3)**
  22:1;24:14;25:22
**rerun (1)**
  24:13
**re-run (1)**
  146:4
**re-running (1)**
  146:3
**reserve (2)**
  24:25;103:3
**reserved (1)**
  146:2
**residential (1)**
  174:12
**resign (1)**
  148:13
**resigned (5)**
  24:3;151:11;
  165:18,23;166:7
**resigning (1)**
  148:17
**resolve (1)**
  179:18
**resolving (1)**
  14:11
**respect (7)**
  89:15;141:15;
  142:13;143:12;
  153:10;154:12;169:5

**respective (1)**
  179:22
**respects (1)**
  153:3
**respond (2)**
  112:16;145:21
**Respondent (30)**
  1:6;7:25;8:8,14;
  11:1,20;13:2;14:9,16;
  16:18;17:15,23;18:1,
  17,25;21:14;23:4,6,7,
  12,13,17,18;24:14,23;
  95:18,19;99:5;139:9;
  168:21
**Respondent's (24)**
  15:20;18:23;19:20;
  20:4,19;21:3,6,15,18,
  21,24;22:3,12;23:14,
  20,25;24:9;95:22;
  99:9,11,19;122:2;
  167:14;168:23
**Respondents (1)**
  14:5
**responding (1)**
  178:8
**response (10)**
  14:12;19:20;63:20;
  78:5;112:12,20;
  116:15;142:5;147:18;
  152:1
**responsibilities (5)**
  29:8;101:22;
  141:20;142:18;175:2
**responsibility (1)**
  105:4
**responsible (4)**
  37:23;38:1,2;
  174:25
**rest (1)**
  115:7
**restroom (1)**
  46:20
**result (3)**
  21:17;64:16;166:9
**results (4)**
  22:1;83:18;108:21;
  166:5
**resume (2)**
  98:16;99:7
**retain (1)**
  76:11
**retaliation (10)**
  18:2;19:15;116:5;
  120:14;170:5;176:22;
  185:14,17;187:1,6
**return (1)**
  93:2
**returned (2)**
  33:11;109:15
**returns (1)**
  99:9
**re-Tweet (1)**
  125:22

**reveal (3)**
  142:12;158:11;
  183:2
**reveals (1)**
  142:12
**review (12)**
  10:24;13:2,5;14:20;
  15:5,6;36:4;42:7;
  96:3;105:18;139:19;
  169:1
**reviewed (8)**
  14:7;36:6;96:5;
  97:8,20;105:21;
  167:18;169:3
**revisit (1)**
  15:17
**Revna (25)**
  107:17,25;108:15,
  24;109:14,19;110:13;
  153:17,21;154:2,11,
  19,21,22;167:2;169:5,
  6,9,10,12,23;170:9;
  171:17;174:9;186:10
**Revna's (1)**
  154:12
**Revnov (14)**
  45:14,18;113:22,
  25;114:2,7,8,19,23;
  116:6,9,11,12,14
**revoke (4)**
  14:4,5,9;15:11
**right (61)**
  10:15;11:5,24;
  25:17;27:9,15,17;
  33:19,20;35:1;38:4;
  40:18;42:20;48:20;
  50:12;51:6;52:18;
  53:16;55:16;57:2;
  58:10,21;61:7,19;
  65:25;74:12;76:1;
  79:15,18,19;80:13;
  81:13,18;84:14;
  93:20,25;97:12;
  100:5;101:1;111:14;
  113:4;129:10;130:2;
  135:9;136:8,10,23,24;
  141:3;143:9;150:25;
  152:20;159:19;160:7,
  9;161:24;164:13;
  171:11;178:18;180:2,
  22
**ring (2)**
  171:12;173:18
**Road (63)**
  16:25;17:4,17,22;
  19:2,3;20:5,15;21:21;
  22:13,21,25;23:12,24;
  24:10,17;29:21;30:1,
  9;34:10,16,20,25;
  35:23;36:11;38:25;
  44:18;45:3;46:12;
  47:8,16;48:13;50:19;
  51:15;52:24;56:19,

  25;57:24;59:20;64:8;
  69:1;83:11;93:17;
  94:24;104:7,10;
  105:3;107:9,12;
  108:23;113:17,23;
  114:24;115:11,16,21;
  126:13,14;131:21;
  132:25;137:19;138:1;
  186:7
**Robin (2)**
  91:16,18
**role (7)**
  56:19,22;66:9;
  104:9,20;107:14;
  108:10
**roles (1)**
  142:7
**Room (18)**
  1:18;18:7;19:7;
  25:25;26:7,9;32:20;
  44:18,20;45:1;54:7;
  69:10;76:5;79:3,4,5;
  83:19;110:16
**routinely (1)**
  23:6
**Ruddeman (3)**
  91:16,18;92:6
**rule (5)**
  25:22;26:13,19,25;
  27:4
**rules (4)**
  51:6,10;85:20;
  93:13
**ruling (2)**
  13:12;153:11
**rumors (1)**
  181:4
**running (3)**
  138:5;175:1;185:5
**ruthlessly (1)**
  21:16

## S

**Sadly (1)**
  21:15
**safe (3)**
  92:25;158:6,8
**Saff (13)**
  99:25;100:7,15,18;
  123:18;127:4;128:7;
  129:2,24;130:21;
  139:13;140:25;
  184:18
**S-a-f-f (1)**
  100:15
**said/she (1)**
  150:21
**sake (1)**
  149:16
**Salages (1)**
  125:8;126:6,9,16
**salt (2)**

  86:20,25
**salvage (1)**
  138:25
**same (26)**
  9:16,17;20:14;28:9;
  30:23,24;35:4;36:15;
  47:7,15;54:17;61:19;
  75:20,22;76:1,9,11;
  77:14;96:15;127:8;
  129:3;130:7;179:20;
  180:5;181:11;187:20
**sample (1)**
  94:13
**Sande (1)**
  46:9
**Sandi (1)**
  172:14
**S-a-n-d-i (1)**
  172:14
**sat (1)**
  90:23
**saw (19)**
  38:24;39:2;40:8,11;
  59:14,16;60:16;
  118:1,24,25;120:5;
  126:4;127:15,18;
  128:17;130:9;131:8;
  134:19;144:24
**saying (37)**
  12:22;13:3;39:2,3;
  45:19,20;51:8;54:23;
  56:4;60:18;64:18;
  67:7;71:21;76:13,23;
  84:6,10;85:11;86:15;
  87:2;88:2;106:3,9;
  111:19;114:4;122:17;
  123:23;141:2;147:15;
  155:12;160:21
**scale (2)**
  138:18,19
**scared (1)**
  185:9
**scenarios (1)**
  181:8
**schedule (3)**
  73:20;165:19,25
**scheduled (4)**
  109:4;164:23;
  165:4,8
**scheduling (1)**
  15:3
**scheme (1)**
  22:4
**school (3)**
  20:7;165:19,25
**schooling (1)**
  154:7
**Schulte (1)**
  33:6
**Schultz (14)**
  22:11;33:9,14;34:1,
  4;84:19;85:1,9;86:4,
  10,18;89:2;94:22,23

**Schultz's (1)**
85:5
**Schulz (1)**
84:16
**scope (2)**
48:6,10
**scratch (2)**
111:25;112:13
**scrutiny (1)**
23:15
**seat (2)**
25:8;187:12
**second (4)**
10:5;29:16;54:18;
143:18
**seconds (1)**
94:13
**secretly (1)**
21:12
**section (1)**
42:2
**secure (1)**
93:15
**secured (3)**
93:5;176:16,25
**seek (1)**
24:4
**seeked (1)**
92:18
**seeking (2)**
92:19;145:24
**seeks (2)**
13:25;34:9
**seem (5)**
118:8;154:6;162:6;
185:11,12
**seemed (1)**
110:25
**seems (3)**
54:3;150:6;153:20
**segments (1)**
42:15
**SEIU (3)**
1:9;7:7;100:24
**seized (1)**
23:13
**select (1)**
41:1
**selected (7)**
18:10;20:2;41:9;
58:13;77:3;81:24;
113:11
**selecting (1)**
20:11
**self-experience (1)**
148:11
**sell (1)**
40:6
**send (2)**
67:16,20
**sending (1)**
106:24
**sends (3)**

107:2;118:5;152:22
**sense (2)**
181:3;185:4
**sent (30)**
18:25;35:23;36:11,
14,15,17,18;60:17;
96:8,16,17;97:12;
98:2;106:16,18;
114:8,11,18;119:8,20;
120:8;121:3,15;
143:15,22;144:7,10,
19,22;152:22
**sentence (2)**
145:5,11
**separate (1)**
123:12
**separated (8)**
153:17;154:23;
171:17,20,22;172:22;
173:14;174:21
**separation (6)**
90:24;91:3,4;
122:23;169:23;
175:13
**September (7)**
33:24,25;131:8;
144:25;145:1,5;
182:21
**sequestered (1)**
25:23
**sequestration (4)**
8:25;25:10,13,20
**serially (1)**
18:6
**series (1)**
55:10
**seriously (1)**
139:22
**served (3)**
14:3,4;17:14
**serves (1)**
35:12
**services (3)**
147:24;150:5;
153:23
**session (1)**
112:4
**set (3)**
22:2;92:25;93:2
**sets (2)**
51:6,10
**setting (1)**
116:17
**settlement (4)**
9:22,25;10:3,10
**seven (8)**
30:10;42:18;
170:22;174:2,8;
176:8,16,25
**several (2)**
142:5;155:10
**shady (2)**
67:4,15

**shambles (1)**
24:1
**shape (1)**
106:17
**share (7)**
52:3;58:19;77:12;
118:10;156:15,18;
161:25
**shared (16)**
10:25;49:8,9,10;
50:7;51:4,13;57:1;
66:1,1;86:1,2,5,7;
118:11;156:11
**sharing (2)**
49:24;86:3
**She's (20)**
12:25;31:12,13;
87:24;88:2;91:18;
92:3;124:9;126:7,10,
11,11;154:2,2,3,6;
171:14;176:19;
183:24;184:2
**shift (12)**
51:16;62:3;156:19,
20,21,22;157:2;165:6,
10;169:18;174:23,25
**shifts (5)**
18:19;19:17,19;
50:20;52:17
**Sholar (2)**
124:7,8
**shop (9)**
50:6;51:7,9;85:12,
18;113:3,8,10;159:10
**Shortly (3)**
83:18,25;84:3
**shot (1)**
84:22
**shoulder (2)**
159:6,25
**show (20)**
18:5,25;19:12,24;
20:15;22:15;23:9,16;
97:5,17;122:17;
127:9;145:6,7;
156:12;160:3,7,11;
167:12;176:21
**showed (5)**
114:7,9,12,16,19
**showing (7)**
26:21;114:18;
125:10;127:8;160:14,
22;161:18
**shown (6)**
26:5;114:3;126:8;
135:13;138:9;144:15
**shows (1)**
138:20
**shut (2)**
139:24;143:25
**side (6)**
26:23;29:4;97:13;
135:13;151:23;

152:15
**sides (1)**
105:19
**sign (4)**
17:3;43:16;75:24,
25
**signed (8)**
17:6;35:17;44:14;
102:4;105:9;106:1,5;
107:22
**significant (1)**
162:9
**signing (3)**
44:6;75:23;152:19
**signs (3)**
133:19,20,22
**similar (4)**
20:1;79:8;128:25;
139:4
**similarly (1)**
138:7
**simpler (1)**
161:9
**simplify (1)**
161:10
**simply (2)**
11:20;26:17
**Sing (1)**
46:1
**Singh (2)**
62:15;71:19
**single (3)**
17:6;72:11;81:2
**sink (2)**
77:12;82:18
**sit (1)**
76:20
**site (2)**
58:19;74:18
**sitting (3)**
55:9;96:18;98:7
**situation (3)**
73:24;147:11;174:6
**situations (2)**
146:2;160:21
**six (5)**
7:7;73:2;139:16;
143:2;173:1
**skip (1)**
165:3
**slide (1)**
160:22
**slides (6)**
160:2,5,7,11,15;
161:18
**small (1)**
155:16
**smiling (1)**
45:19
**smoothly (1)**
15:1
**sneakers (1)**
73:16

**snipped (1)**
60:17
**snippet (3)**
53:7;59:16;60:16
**Socialists (1)**
131:24
**solicit (1)**
19:3
**solicited (1)**
18:11
**soliciting (1)**
17:3
**solidarity (2)**
125:10;127:9
**somebody (7)**
73:7;84:24;151:14;
153:21;173:2,7;
177:12
**Somehow (1)**
21:4
**someone (27)**
36:20,21;37:6,12;
39:3;49:7;59:7;60:17;
70:1;73:7,21;82:17;
83:3;103:7,8,11;
109:1;115:16;116:2;
133:11;143:20;158:2,
4;164:2;169:10;
170:16;172:2
**someone's (1)**
73:22
**something's (1)**
73:7
**sometime (6)**
84:18;142:23;
143:1;164:7;177:12;
184:8
**sometimes (4)**
9:25;73:2;140:10;
149:12
**somewhere (5)**
116:16,17;135:24;
154:3;159:9
**Sorry (13)**
9:12;55:21;57:14;
77:8;95:25;112:17;
127:19;144:14;
154:10;164:6;167:2;
168:20;179:9
**sort (2)**
98:5;123:22
**sought (2)**
170:11;176:24
**sound (1)**
63:13
**sounded (1)**
90:16
**sounds (5)**
44:1;53:11;144:20;
182:1;187:10
**source (1)**
119:5
**sources (1)**

Starbucks Corporation

**- Vol. 1**
**October 19, 2022**

115:6
**space (2)**
73:21;75:13
**spam (1)**
38:16
**Spanish (1)**
127:8
**spare (1)**
92:25
**speak (18)**
46:13;55:9;57:19;
69:20;71:13,20;72:2;
79:6;85:5;102:12,14;
111:24;112:25;
143:24;146:6;172:24;
181:9;184:20
**speaker (1)**
136:11
**speakers (1)**
41:21
**speaking (13)**
12:18;18:20;45:17;
61:21;62:15;67:4,24;
78:5;82:20;84:2,15,
18;145:25
**spearheading (1)**
108:14
**special (2)**
87:25;88:2
**specific (12)**
10:3;25:24;64:15,
18;95:7;97:22;98:8,
10,12;110:1;156:10;
177:11
**specifically (7)**
12:8;13:6;45:17;
71:23;84:17;109:25;
181:9
**specifics (1)**
175:7
**spectrum (1)**
76:3
**speculation (5)**
149:21;157:13;
163:1;175:3;181:25
**speculative (2)**
138:15;182:2
**speech (1)**
136:25
**speeches (2)**
133:6,8
**spell (1)**
27:24
**spelled (1)**
8:7
**spelling (2)**
9:8;100:13
**spellings (1)**
8:2
**spirit (1)**
185:4
**spoke (32)**
22:15;44:15,18;

45:4,6,8,11,14,17,23;
46:1,4,6,9;57:22;
59:12;66:1;67:23,25;
69:1,17;71:10;72:13;
75:20;84:22,24;85:1,
6,7,8;108:13;180:18
**spoken (4)**
19:2;146:21;157:7;
178:17
**spreading (1)**
181:4
**staff (4)**
17:9;101:14,20,22
**stages (1)**
10:4
**stamp (18)**
41:25;47:11;49:16;
52:19;54:17;55:4,5;
56:6;57:3;58:22;
63:11;64:22;68:10;
77:8,10,19,20;79:22
**stamped (2)**
82:3;88:20
**stand (4)**
53:15;76:4;89:9;
99:25
**standards (2)**
48:20,21
**standing (4)**
54:2;55:9;126:12,
17
**stands (1)**
108:5
**stapled (1)**
117:8
**Starbuck (1)**
101:25
**Starbuck's (1)**
31:1
**STARBUCKS (98)**
1:5;7:6;16:18,20,
22,25;17:10,11,17;
18:19;21:1;22:7;24:2;
28:2,14,16;30:14;
32:2;33:6,8,9;34:2;
36:20,21;37:7;50:20;
52:10;55:20,24;
56:16;57:23;65:19;
67:10,17;73:18;
80:12,24;91:11,11;
93:13;101:25;102:1,
18,21;103:5,19,21;
106:1,3,4,9,17,22;
107:9;113:19;115:24;
117:22;118:19;
120:13;124:1,2;
125:10;126:12,19;
127:9;132:12,24;
133:4,5,9,15;134:11;
135:16,24,25;138:6,
20;143:21;144:8;
145:18;146:15;147:4;
152:18,23;154:23;

155:9;165:24;169:18;
171:5;173:4;178:10,
14;181:16,24;183:24;
184:6;186:7;187:5
**Starbucks' (7)**
81:7;104:3;114:6,8;
134:3,4;145:7
**stark (1)**
21:17
**start (11)**
15:22;27:19;78:17;
91:23;100:13;101:1;
112:5,14;117:17;
140:14;162:18
**started (7)**
49:2;61:21;62:8;
72:4;75:7;104:22;
119:13
**starting (1)**
40:24
**starts (1)**
162:19
**state (7)**
7:19;49:25;81:2,3,
10;164:5,6
**stated (3)**
23:14;28:20;43:14
**statement (13)**
16:5,14;17:18;
24:24;40:8;43:13;
130:24;131:2;139:12;
156:9;170:18;179:2;
182:22
**statements (6)**
16:4;17:20;20:22;
21:5;22:11;169:25
**States (5)**
16:18;30:15;
118:13;152:5;154:3
**status (1)**
162:25
**stay (5)**
106:11;110:15,19;
134:5;140:4
**step (2)**
12:2;103:25
**Stephanie (3)**
172:11;173:1,8
**steward (4)**
113:3,8,10;159:10
**still (23)**
28:12;113:16,22;
115:13;132:24;
134:21;137:22;
170:12,22;171:14,24;
172:2,11,14,16,25;
173:3,25;174:2;
177:12;179:14;
184:19,21
**stint (1)**
33:11
**stock (1)**
128:25

stood (2)
64:16;79:9
**stop (4)**
18:24;22:17;50:15;
70:19
**stoppage (1)**
148:6
**stopping (1)**
18:3
**store (203)**
12:18;13:6;16:25;
17:2,4,6,17,22,24;
18:6,7;19:2,6,7,23;
20:5,15;21:12,21;
22:13,22,25;23:9,11,
13,16,24;24:4,6,10,
17;28:12,19;29:25;
30:1,3,4,8;34:10,17,
20,20,22,25;35:16,23;
36:11;39:1;44:19,24;
45:3;47:8,16;48:13;
50:20,23;51:5,15,19,
19,20;52:24,24;
54:20;56:25;57:24;
59:20;64:6,8;65:24;
66:8;67:17;69:1;
73:17;75:11;80:25;
83:11,19;84:10,14,15,
17,18;87:15;93:14,
18;94:24;103:2,8,14,
19;104:3,4,7,10,13,
21;105:3,7;106:2;
107:5,9,12,17,19,20,
21;108:5,12,18,19,23,
25;109:21;113:9,11,
17,23;114:24;115:8,
11,17,21;116:1;
126:14,17;131:21,25;
132:25;133:9;134:3,
4,5,13;135:25;137:18,
19;138:1,24;142:14,
18;145:9,19;146:21,
22;147:2;149:7;
150:4;153:14,17;
155:24;157:10;158:3;
159:4,13;164:7,11,24;
165:11,24;170:10,12,
22,25;171:3,6,15,24;
172:3,7,12,14,17,20,
25;173:5,15,25;
174:3;175:1,1;176:9,
13,17;177:5,12,16,18;
178:3;179:3,6,7;
181:10,15;182:23,24;
183:23;184:3,8,8,19;
185:1,7
**stores (31)**
16:22;17:18;18:19;
20:4;29:1,2,13;30:17;
31:4,5;37:24;38:4,7,
18;40:2,4;50:25;
51:16,18,20,22;52:23;
64:7;73:5;75:8,13;

101:25,25;106:19;
133:7;181:16
**stories (2)**
39:22;120:17
**story (4)**
17:21;87:17;
119:25;120:2
**stranger (2)**
73:11,13
**street (1)**
37:19
**strictly (2)**
18:17;19:14
**strike (21)**
111:12,20,21,22,23;
112:17,17;114:4;
133:17;147:10,16,17,
24;148:6,10;149:17;
150:3,4,25;169:12;
176:10
**strikes (2)**
18:22;56:24;
111:13,16;148:3
**striking (1)**
169:11
**strings (1)**
96:9
**strong (1)**
180:1
**struggling (4)**
73:24;74:25;150:9,
20
**study (1)**
186:10
**stuff (3)**
38:13;40:5;72:4
**subject (5)**
45:9;75:18;162:12;
170:7;180:24
**subjected (1)**
21:1
**submit (3)**
102:4;103:10;109:6
**submits (1)**
102:2
**submitted (1)**
105:9
**subpoena (5)**
14:4,8,13;15:12;
154:2
**subpoenas (1)**
14:3
**subsequent (1)**
177:13
**subsequently (1)**
158:5
**substance (1)**
153:12
**substantive (1)**
140:9
**substitute (1)**
8:18
**substitution (1)**

8:21
**successful (1)**
22:4
**Successfully (1)**
109:10
**suffice (1)**
98:13
**sufficiently (1)**
162:16
**suggest (1)**
161:16
**suggested (1)**
113:12
**suggesting (1)**
42:9
**summarize (1)**
147:22
**summer (1)**
178:21
**Sunday (1)**
67:19
**super (1)**
70:17
**supersedes (1)**
81:10
**supervisor (5)**
31:10,22;62:4;
174:23,25
**supervisors (1)**
169:19
**support (19)**
17:8,19;19:25;
21:20;24:7;40:9;
74:22;86:11;92:21;
131:2,20;132:6;
133:20;176:21,21;
179:2,22;180:6;183:5
**supporter (1)**
60:6
**supporters (1)**
180:1
**supposed (1)**
93:15
**sure (34)**
8:1;9:20;31:6;
32:10;36:15;37:16,
17;40:20;50:10;53:9,
20;60:14;61:18;
62:11,12;68:20;
93:15;100:11;110:4;
117:9;122:24;132:2,
5;135:22;145:23;
162:15;169:10;
170:25;171:10;
175:11;183:14;184:1,
21,24
**surrounding (1)**
114:1
**surveillance (1)**
21:14
**sustain (2)**
103:20;180:24
**swap (3)**

19:19;156:19,23
**swapped (2)**
165:6,10
**sway (1)**
87:20
**swear (2)**
25:8;50:11
**sweater (1)**
94:22
**swings (1)**
70:9
**sworn (3)**
27:13;100:9;139:11
**sympathizer (1)**
89:11

**T**

**table (4)**
76:20;79:17;80:3;
133:4
**tactic (1)**
145:15
**tactics (5)**
114:6;145:8;
146:19;147:5;149:11
**talk (18)**
15:2;50:1;57:11;
70:5,23;71:10,24;
72:1,3,5;73:8;78:20,
20,21;79:7;84:17;
180:5,23
**talked (4)**
48:19;71:23;
134:11;170:15
**talking (28)**
45:22;62:8;68:17;
69:9,18;73:15,23;
75:1,22;78:16,16,19;
79:1;82:10;84:4,11;
85:6;91:13,14;93:10;
109:20;125:9;144:21;
154:25;178:24;179:5;
180:15;185:2
**tally (3)**
84:9;153:18;166:7
**tardiness (2)**
23:10;48:1
**target (1)**
23:4
**task (1)**
185:6
**Taydoe (8)**
78:7,8,10;110:14,
17,22;172:6,9
**T-a-y-d-o-e (1)**
172:5
**teach (1)**
29:11
**Teachers (1)**
141:7
**Team (3)**
92:3,4,5

**Tech (1)**
1:17
**technology (1)**
94:3
**telling (6)**
10:7;62:18;86:17;
127:8;158:1;185:8
**tells (1)**
44:22
**temporary (4)**
31:14,15,15,24
**ten (6)**
140:12,13;156:14,
15;165:2;179:25
**tendency (1)**
47:25
**tender (1)**
156:9
**tenure (1)**
93:12
**term (8)**
144:25;145:13;
146:7,8,14,24;147:2;
153:13
**terminated (3)**
90:21,23;138:22
**termination (4)**
23:18;138:1;185:2,
3
**terms (5)**
20:10;108:5;
138:24;142:18;163:3
**testified (4)**
26:7;27:13;61:12;
66:14;68:25;100:9;
159:8;170:8;176:11;
179:17
**testify (9)**
25:24;26:7,12;
55:14;87:15,17,18;
97:25;142:17
**testifying (2)**
9:3;25:14
**testimony (33)**
8:5;10:2;13:3,20,
23;15:2;25:9;26:1,11,
15,22,24;38:24;
46:18;66:10,15;69:8;
71:4;74:10;87:12;
99:9;142:5;145:23;
149:6;150:23;159:9;
162:14;169:16;
178:23;183:21;
184:24;187:11,15
**texted (1)**
39:3
**texting (2)**
109:20;116:3
**thanked (2)**
134:10;157:1
**thanking (1)**
125:8
**thanks (1)**

71:1
**that's (99)**
9:6,17,20;11:25;
13:22;26:4;29:10;
32:17;43:16;46:14;
47:17;48:6,22,23;
49:1,1,3;50:13;51:3,
13,14,23;54:24;55:2;
56:12;59:3;62:7,18,
24;64:13;65:7,25;
68:5,15;71:7;72:10;
74:3;76:4,22;78:2,22;
80:19;82:13,18;
85:15,23;86:1;87:10,
20;89:13;90:1,11,16,
20;92:19;93:10;
94:22;95:8;96:9,13;
103:8,13;105:7;
106:18,24,24;107:7;
111:14,22;113:15;
118:8;129:7;141:3;
142:20,24;143:4;
145:10;147:25;
148:19;151:2,7,13;
155:13,14,22;159:14,
16;161:16,20;162:9;
164:13;167:13;171:7;
173:1,13;175:18;
178:22;183:12;
187:14
**theft (1)**
172:9
**Theoretically (1)**
163:24
**theory (1)**
176:20
**there's (31)**
8:22;11:8,20;12:7,
20;14:8;15:25;31:5;
38:17;50:16;54:15;
56:13;70:9;84:8;
118:5;121:22;122:6;
140:8;145:5,22;
147:16;148:3;149:17;
150:3;152:18;153:20;
154:11;163:7;171:10;
173:15;180:14
**thereafter (1)**
83:25
**therein (1)**
121:25
**they'd (2)**
67:20;116:18
**they'll (4)**
70:19,19,20;87:18
**they're (9)**
31:5;58:19;69:19;
73:17;122:3,6;
160:21;163:2
**thinking (4)**
73:25;87:8,9;182:4
**third (2)**
78:5;143:18

**Thirteen (1)**
28:17
**though (10)**
19:9;33:15;42:20;
56:13;69:7;146:12;
151:9;168:14;174:21;
185:10
**thought (9)**
10:1;13:1,14;38:15;
61:9;111:20;122:16;
142:11;160:17
**thoughts (1)**
140:11
**thousand (3)**
186:3,4,5
**threat (1)**
19:13
**threaten (1)**
50:14
**threatened (5)**
18:9;20:2;58:2,5,8
**threatening (4)**
18:16;60:20,24;
147:6
**threats (6)**
18:2,15;20:14,17,
25;57:23
**three (8)**
45:13;95:17;
104:12;108:1,3,3;
109:2,18;115:6;
146:22;155:9,10,16;
170:4;174:20;180:5
**throughout (7)**
19:22;28:9;101:20;
102:5;104:25;110:16,
19
**throw (1)**
40:2
**Thursday (1)**
187:19
**thus (2)**
21:24;23:20
**tidbit (1)**
154:18
**till (2)**
57:12;140:12
**timely (1)**
23:3
**times (10)**
10:8;30:4;41:11;
42:22;45:11;50:11;
51:24;53:12;155:10;
177:6
**time-to-time (1)**
158:12
**T-i-o-s-h-i-t (1)**
172:16
**title (1)**
101:13
**TLA (2)**
31:13,14
**today (25)**

8:9,10,17;12:20,25;
15:6,14;39:12,13;
70:5;96:15,18;97:4,
18;98:7;100:20;
117:24;118:21;
119:15;120:3,23;
121:14;177:19;
187:11,15
**together (2)**
10:20;97:3
**told (66)**
20:6;21:11;22:6;
35:17;43:18,24;44:4,
12;47:6,14,17,21,23,
23;49:22;50:23;
52:22;56:1,12,23;
58:8;59:25;61:13,16;
62:12;63:2,21,24;
64:2,6,10;65:20;
76:10,10,13,15;79:8,
8,14;87:21;88:3,4;
89:1;105:5;111:21;
112:14;113:7;139:23;
143:22;144:10,22;
147:23;151:5,14;
154:2,20;155:18,21;
157:18;162:17,17;
164:13,15;166:1;
182:25;186:14
**tolerated (1)**
23:6
**tolerating (1)**
23:19
**tomorrow (1)**
15:4
**took (9)**
16:23;52:9;54:5,6;
82:13;86:25;158:5;
162:14;176:8
**Tooker (9)**
7:22,22;32:22;
58:17;77:11,15;80:4;
140:3;168:15
**top (4)**
96:10;118:13;
136:8,10
**topic (6)**
71:11;76:6;80:15;
95:7;113:4,5
**topics (1)**
72:16
**Tori-Murphy (1)**
176:3
**Torre (1)**
118:7
**touch (2)**
103:11;116:6
**towards (3)**
48:13;135:16;136:4
**town (12)**
93:1;109:5,10,14;
125:7;146:23;147:23;
150:24;160:2,6,11,15

**track (1)**
186:4
**tracks (1)**
18:4
**Tracy (2)**
32:13,15
**training (3)**
73:19;85:17;141:14
**transcript (7)**
41:1,8;42:2;58:13;
77:3;81:24;142:11
**transcripts (2)**
26:21;87:5
**transferred (1)**
184:8
**transferring (1)**
171:5
**transit (1)**
110:17
**transmitted (4)**
143:20;144:11,16,
18
**traumatically (1)**
145:8
**traveling (2)**
8:11,12
**treat (1)**
89:15
**treatment (1)**
164:10
**trial (8)**
7:5;9:23,24;10:4,6;
13:25;33:1;116:18
**tricks (1)**
94:3
**tricky (1)**
161:5
**tried (5)**
116:2,6;132:3;
137:21;154:1
**trouble (2)**
81:7;156:2
**troubled (1)**
20:25
**troubling (1)**
19:11
**true (12)**
23:22;47:24;48:2;
66:14,18;121:23;
148:3;166:7;181:13,
19;184:2,21
**truth (3)**
20:22;87:20;121:25
**try (11)**
56:2,17;62:20;
106:10;109:3;116:11;
142:14;156:2;161:10;
167:11;179:1
**trying (13)**
75:7;110:5;116:12;
121:21;144:5;147:21;
155:23;156:11,22;
161:16;179:4,18;

183:7
**tuition (1)**
20:7
**turn (1)**
139:18
**turned (1)**
95:24
**turning (2)**
21:16;187:6
**tweet (23)**
123:21;125:6,8,9,
12,16,19,20,20,20,21,
22,24;126:9;127:7;
128:8,24;129:3,25;
130:22,25;134:24;
135:10
**Tweets (3)**
129:7;146:7;175:16
**Twelve (1)**
29:15
**twice (1)**
179:21
**Twitter (21)**
103:11;106:20,20;
123:8,10,12,21;
124:17,18;126:3;
127:16,17;128:17;
130:9,10;131:8;
135:6;178:4,6;
185:24;186:1
**Two (20)**
1:16;10:4;21:23;
29:18;45:13,13;51:5,
10;54:18;63:7;75:5;
105:19;134:6,7;
139:13;142:22;
144:24;145:1;176:4;
182:23
**type (2)**
68:23;154:19
**types (1)**
149:11
**typically (9)**
11:18;70:15;103:4;
107:2,3;109:2;
139:24;170:16;185:6

**U**

**ugly (1)**
20:14
**u-i-a (1)**
9:12
**ultimate (2)**
153:2;159:16
**ultimately (4)**
33:3;157:11;
166:21;180:16
**Um-hum (5)**
97:7;110:7;132:21;
142:20;144:12
**Umm (1)**
155:20

**unaffiliated (1)**
37:6
**unanimous (1)**
21:20
**unanimously (1)**
105:8
**unauthorized (1)**
21:7
**unclear (1)**
150:19
**undecided (1)**
180:2
**under (12)**
21:14;23:5;24:13;
26:19;27:3;68:4;
123:23;132:14;
136:17;137:2;148:22;
149:22
**underlying (1)**
20:22
**undermine (1)**
22:4
**understands (2)**
153:1,5
**understood (13)**
8:19;47:25;59:5;
97:25;142:6,11,17,21;
147:1;154:14;170:10;
176:23;181:21
**unfair (14)**
20:19;21:21;23:25;
24:18;118:19;122:2,
3;146:2;163:8;
166:12,16;167:3;
169:6;185:15
**unhappy (1)**
164:10
**Union (298)**
7:23;8:7;15:12;
16:23;17:2,3,6,8,10,
13,16,19,24,25;18:3,
8,10,13;19:5,8,15,21,
25;20:3,8,11;21:13,
17,20,22;22:7,9,14,
18,21,24;23:2,3,24;
24:7,7,10,15;34:9,12,
15,17,21,24;35:3,6,
16;37:13;38:13,25;
40:9;43:14,24;44:5,
12;45:22,22;47:7,8,
18,19;49:2,4,8;50:5;
51:6,7,7,9,12;56:19,
24,24;57:11,17;
59:19;60:6,61:9,13,
22;62:1,5,5,6,9,10,20,
21,24,25;63:1;64:3;
65:23,24;66:11;67:5,
9;71:10,10,24;72:5,
12,15,21;74:15;
75:18;76:12,16,21;
83:14,20;84:3,6;85:3,
10,11,12,12,18,23;
86:10,11,15,18;87:10,

13,22;88:3,4;89:2,11;
96:14;101:10,13,15,
16,19,23;102:13,15,
20,21,22,24;103:4,6,
19,20;104:2,13,15,16,
22;105:6,8;106:5,10,
13,16,25;107:2,11,16,
21,23;108:5,6,7,8,12,
14,16,18,22;109:1,6,
16,17;110:25;111:4,6,
10,20;112:22;113:6,9,
11;114:6,21;115:6,9,
10,20,25;123:5,8;
125:24;129:7;131:21;
133:5,21;137:18,24;
138:3;139:1,2;141:4,
10;142:9,14;145:8,9,
13,14,15,16,18;146:6,
10,15,24;147:4,4,6;
148:13,17;149:10,23;
150:2;151:2,4;
152:21;153:4,25;
155:2;158:21;159:11,
17,18;160:16,17,20,
22,23;161:12,17;
163:16,16,17;166:11,
16,21;167:2,7;169:6,
23;170:11;174:7;
175:12,15,18,25;
176:1,7,12,16,24;
177:1,6,13,15,15;
178:2,10,13,20,25;
179:23;180:1,2,7;
181:3,4,10,12,16;
183:2,5;184:25,25;
185:9,15,19
**Union's (18)**
22:5,16;24:1;38:10;
104:9;107:14;114:24;
123:12,21;138:12;
163:10;174:5,18;
176:18;178:3,18;
185:24;186:1
**Unionization (10)**
44:16;45:5;62:16;
64:17;68:17;69:2;
75:19;80:18;146:15;
151:25
**Unionize (3)**
63:3;65:20;106:4
**Unionized (11)**
18:16;47:16;50:24;
52:24;64:3,7,11;79:9;
85:3;106:19;145:19
**Unionizing (8)**
17:5;20:9;79:10;
102:4,11;105:11;
133:7;161:25
**Unions (28)**
35:18;45:12,15,17,
24;46:1,4,6,9,13;
57:20;67:15;71:5,14,
17,20,21,22;72:2,14;

76:7;87:10;133:8;
141:15;148:12,15;
151:10;170:16
**unison (1)**
148:5
**unit (4)**
21:19;24:12;
111:22;113:8
**Unite (1)**
141:11
**UNITED (23)**
1:8;7:6;16:18,19;
17:12;30:15;34:9,12;
100:22,24;101:7,9,9;
123:22;125:7;127:7;
128:8;129:25;130:22;
134:24;144:4,6;154:3
**unlawful (18)**
18:23;19:20;20:16;
21:24;23:23;122:2,5,
7,18,19;145:8;
148:22;149:13;
163:16;166:14,19;
167:5;180:22
**unlawfully (4)**
21:13,15;22:17;
153:22
**unless (1)**
86:14
**unlikely (1)**
24:11
**unrelated (3)**
158:12,16,20
**unrelenting (1)**
23:23
**unsuccessful (1)**
109:12
**up (52)**
11:11;22:21;25:7;
27:16;33:18;39:8;
40:1;45:20;51:16;
52:16;53:6;57:10;
59:8;62:3,3,4;64:12,
14,19;66:8,20;68:1;
71:7,22;72:16;74:12;
75:19,23;76:7,19;
77:12;78:21,22;79:3,
12,20;81:6,13;84:21;
100:12;102:2;109:3;
112:21,25;113:5;
126:10;142:17;
143:24;147:8;148:9;
157:1;180:16
**update (1)**
84:21
**updates (2)**
108:25;118:4
**upload (1)**
77:11
**uploaded (1)**
114:18
**uploading (1)**
58:18

**upon (7)**
8:19;10:10;17:15;
148:4;150:19;181:22;
185:6
**upper (1)**
22:12
**upsetting (1)**
22:19
**use (8)**
39:9;46:20;80:3,25;
81:5;139:19;153:13;
154:12
**used (22)**
39:10,11,12,16,17;
40:6,6;79:16,17,19;
80:3;106:19;122:25;
125:17;128:24;142:7,
12;144:24;145:13;
146:8,13;160:11
**useful (1)**
42:7
**using (4)**
13:18;42:7;146:7;
169:21
**usually (1)**
23:9
**utilize (1)**
168:12
**utilized (2)**
146:24;160:3

## V

**vacation (1)**
109:13
**values (2)**
89:8;155:3
**various (9)**
14:3;16:22;68:16;
69:1;72:7,9;75:17,20;
153:3
**verbally (1)**
171:18
**verbatim (2)**
80:22;93:16
**Vertucci (7)**
19:1;31:9,17,21;
32:2;36:23;92:8
**via (3)**
116:2,10;143:22
**Vice (1)**
32:4
**video (8)**
8:15;63:22;94:2,10,
13,17,25;95:2
**view (1)**
161:25
**views (8)**
18:7;44:15;45:4,11;
57:17,19;62:16;75:19
**violate (1)**
23:17
**violation (2)**

24:9;27:1
**violations (2)**
21:4;24:2
**virulent (1)**
18:2
**visit (2)**
56:18;72:11
**visited (2)**
18:6;19:2
**visits (3)**
72:17,19;74:14
**visual (1)**
79:20
**vocal (4)**
60:6;107:20,20,20
**voice (30)**
27:16;43:7,9,10,11;
49:19,21;56:9,11;
57:6;59:9,11;63:16,
17;68:14;77:24;78:2;
82:7,9,21;89:25;90:7,
13,17;100:12;101:2;
120:13,15,16,22
**voices (1)**
13:21
**voluntarily (1)**
106:5
**vote (13)**
84:3,7;108:6;
111:22;114:2,21;
153:18,22,25;160:19;
161:21;166:7;180:16
**voter (3)**
160:14;170:12;
174:10
**voters (8)**
12:18;153:13;
170:21;174:2,7;
176:8,17;177:17
**votes (2)**
21:23;83:15
**voting (2)**
109:5,23

## W

**wage (6)**
22:7;84:15,19;85:2;
86:3,5
**wages (2)**
112:15;162:19
**wait (2)**
57:12;103:6
**wake (1)**
23:25
**walk (1)**
35:15
**wants (3)**
62:4;73:8;174:19
**warn (1)**
21:7
**warned (1)**
22:17

**warning (2)**
23:8;157:11
**warnings (1)**
157:11
**washing (4)**
82:11,16,17,18
**wasn't (10)**
36:18;71:21;82:12;
86:22;111:10;112:21;
166:9,23;167:9;182:5
**watch (3)**
38:12;94:25;95:1
**way (30)**
26:16;47:7,15;53:5;
54:24;55:25;63:7,13,
17;69:10;83:2;86:16;
87:12,16,19,25;
106:17;107:11;109:3;
118:8;119:2;138:5,6,
9;144:6,23;159:9;
168:2,12;177:15
**ways (2)**
102:7;104:14
**we'll (16)**
9:4,6;13:13;15:3,7,
17;16:6;69:13;78:20;
87:25;98:16;99:7;
102:10;103:16;
140:14;168:17
**we're (32)**
12:19,25;15:2;16:2,
8;31:3;46:24;54:23;
60:20;65:8;67:2;
73:15,16,23;80:9;
85:22,22;93:10,15;
94:5,8;98:20,22;99:4;
140:16,19;167:19;
182:15,18;183:16,19;
187:17
**we've (8)**
40:21;56:20;69:18;
106:24,24;137:21;
138:5,6
**wear (2)**
35:18;177:6
**wearing (3)**
35:16;177:9,13
**web (1)**
38:20
**website (9)**
65:18,19;67:10,10;
103:13;160:16,23;
161:13,13
**Wednesday (1)**
1:18
**week (11)**
8:11,11,15,22;9:4;
72:22;73:2,4,6,6;
74:19
**weekly (1)**
84:21
**weeks (2)**
75:5;143:2

**welcome (1)**
32:24
**weren't (4)**
53:19;67:8,19;93:5
**western (1)**
29:1
**What's (16)**
53:1;60:19;63:18;
73:24;103:12;118:6;
121:6;125:19;130:25;
132:11;133:7;136:9;
142:13;143:12;
160:22;176:2
**Wheatley (2)**
124:7,8
**whenever (1)**
118:4
**Whereas (1)**
21:20
**Whereupon (36)**
16:10;27:10;36:6;
43:5,22;46:25;47:12;
49:17;52:20;56:7;
57:4;58:23;63:12;
65:1;66:24;68:11;
77:22;79:23;80:7;
82:5;88:21;90:9;
94:14;96:5;97:8,20;
98:23;100:6;105:21;
117:12;140:17;
151:21;167:18;169:3;
183:17;187:18
**wherever (1)**
70:7
**white (1)**
75:13
**who's (9)**
73:12;89:10;91:16;
123:25;126:16;
133:13;164:2;170:25;
171:10
**whole (7)**
15:20;50:13;67:20;
74:3;75:6;87:17;
102:3
**whose (1)**
12:20
**widely (1)**
122:23
**widespread (2)**
16:21;20:19
**Williamsburg (1)**
103:3
**willing (3)**
24:6;140:4;170:5
**willingness (1)**
145:9
**wish (1)**
174:19
**wished (1)**
158:25
**Wisher (1)**
172:19

Starbucks Corporation

- Vol. 1
October 19, 2022

**W-i-s-h-e-r (1)**
172:19
**withdrawals (1)**
11:6
**withdrawn (3)**
168:9;169:7;187:7
**withdrew (2)**
166:21;167:7
**withhold (4)**
85:2;147:24;148:5;
150:4
**withholding (1)**
153:23
**within (11)**
7:10;28:12;36:20,
21;37:25;38:4;49:8;
84:22;116:6;143:20;
150:2
**without (15)**
13:24;19:17,19;
47:7;75:25;76:12;
85:18,23;148:16;
151:11;152:19;157:7;
163:22;165:5,9
**withstand (1)**
23:15
**witness (132)**
8:13,16;12:16;
15:10,14,25;16:1;
25:3,9,13,18;26:14,
18,21,23;27:12;
29:18;32:15,17;36:6;
37:9,11,14,16,20;
41:16;42:19;43:1,3;
49:15;52:7;53:5,14,
21;54:1,4,10,14,19,
22;55:1,13;56:5;57:2,
14;60:17,20,25;61:2,
4;63:10,13;64:21;
68:9,12;69:3,22;70:4,
9,14,17,22,25;71:9;
72:19,22;73:1,5,13;
74:3,6,16,19,21,25;
75:4,6,10;77:17;
79:21;82:3;88:19,22;
89:6;90:11,23;95:4,
23;96:5;97:8,20;
99:10,23;100:1,8,15;
101:3,6;105:14,21;
116:13;117:5;129:9;
138:18;139:10,11;
140:2;146:7,8,18;
149:24;151:20,21;
152:16;153:1,12;
155:23;157:14,17,20;
159:11,21;163:6,21,
24;167:18;169:3;
175:7;177:25;183:1;
186:17;187:13
**witness' (1)**
167:23
**witnesses (4)**
25:22;26:9,15;27:2

**woman's (2)**
89:25;90:7
**won't (2)**
167:25;168:11
**Wooster (36)**
40:9,12;43:18,24;
44:4,15;45:3;47:5,14,
22;49:4,22;50:23;
52:22;55:18;56:12,
14,23;57:16;59:1,12;
61:9;63:2,19,21,25;
64:2;65:3,5;66:3;
67:4;69:8;107:17;
113:16;165:23;168:6
**Wooster's (1)**
43:10
**word (13)**
39:9,10,11,12,16,
17;68:21;122:21;
142:7,12;146:24;
147:16;157:14
**words (3)**
69:16;176:10;182:2
**work (36)**
18:19;19:16;48:3,6,
10;49:3;50:20,24;
51:5,9,16,19,22;
52:23;64:8;89:7;93:6;
101:24;102:2,3,7,9,
10,12;103:7,14,24;
108:6;133:15;147:25;
148:6;156:20;164:17,
19;165:4,8
**worked (17)**
16:25;28:14,16;
73:12;101:19;102:17,
20,24;107:17;108:14;
141:7;183:22,24;
184:2,3,6,7
**WORKERS (31)**
1:8;7:6;16:19;
17:11;34:9,12;
100:22,24;101:7,9,9;
102:3;104:13;105:10;
106:11;108:3;123:22;
125:7;127:7;128:8;
129:25;130:22;
134:24;138:6,20;
139:1;141:11;144:3,
6;148:4,8
**working (19)**
14:25;18:19;20:5;
50:5;69:19;101:15,
16;104:6,12,12,14,22,
25;141:4,5,9;171:3;
173:10;177:12
**workloads (1)**
20:4
**workplace (7)**
21:3;24:5;80:13;
81:16;83:1;102:16;
145:17
**works (4)**

64:13;103:18;
115:13;184:21
**worksite (1)**
147:5
**world (1)**
121:12
**worry (2)**
62:2,19
**wouldn't (9)**
62:6;75:24;84:24;
85:12;138:9;148:7,7;
156:25;175:4
**write (2)**
124:4;125:12
**writing (2)**
139:21;179:12
**written (6)**
23:7;105:9;114:3;
157:8,10,11
**wrong (3)**
32:18;178:19;
180:14
**wrongful (2)**
146:9;176:13
**wrongfully (3)**
134:11;138:21;
153:22
**wrote (1)**
128:9

**Y**

**year (6)**
32:8;101:17;
141:13;145:1,2;184:3
**years (8)**
28:7,17;30:11;
107:19;141:10;
183:23,24;184:6
**Yep (1)**
43:12
**yesterday (2)**
12:5;43:14
**York (10)**
1:17;7:13;16:20;
17:1;39:23;81:1,2,10;
120:21;125:7
**York/New (3)**
100:22;101:10;
104:18
**you'll (2)**
27:17;50:10
**you're (52)**
9:15;34:24;37:23;
38:10;39:2,3,20;
41:11,17,22;47:19;
50:2;51:15;52:9;
54:16;57:12;73:11;
74:12;75:23;76:2,13,
22,23;81:8;83:14;
84:6,10;85:11,13;
87:10;88:2;89:13;
90:14;94:24;96:4;

100:3,12;139:18;
141:18;144:20;
149:17;150:9,16;
152:4;154:12,13;
160:21;162:4;183:7;
184:7,21;187:10
**You've (10)**
39:11;79:18;94:17;
97:11;105:19;150:15;
170:15,15;176:11;
182:8
**Yuki (3)**
172:2,25;173:8
**Y-u-k-i (1)**
172:2

**Z**

**zero (6)**
42:5,11;112:5;
132:20,21;162:18
**Zoom (2)**
110:11,15

**0**

**020 (1)**
79:22
**055 (1)**
58:22

**1**

**1 (6)**
10:22;12:1;30:4;
32:9;167:20;168:11
**1,055 (1)**
82:3
**1,300 (1)**
56:6
**1,337 (1)**
56:6
**1,340 (1)**
82:4
**1,659 (1)**
68:10
**1,731 (1)**
68:10
**1:01 (1)**
98:23
**10 (10)**
31:3;123:15,16;
124:21,23,24;143:1,2;
165:2;187:19
**10:00 (2)**
1:18;165:5
**10:01 (1)**
16:10
**10:15 (1)**
16:10
**100 (1)**
167:9
**1009 (2)**

64:24,25
**1012 (1)**
52:19
**1019 (2)**
64:22,24
**10th (5)**
17:13;35:1,7,9,10
**11 (16)**
17:8;18:15;31:2;
44:16;47:6,24;48:16;
50:19;51:2;55:15;
125:2,3;126:22,23;
140:8;143:1
**11:00 (1)**
165:9
**11:05 (1)**
46:25
**11:16 (1)**
46:25
**11:56 (1)**
66:24
**11:58 (1)**
66:25
**1125 (1)**
52:19
**11th (7)**
17:22;18:5;37:2;
55:18,22;57:20;120:6
**12 (8)**
30:17,20;73:5;
127:1,2,22,24,25
**12:49 (1)**
94:6
**12:51 (1)**
94:6
**12th (1)**
121:1
**13 (11)**
31:2;69:11;105:10;
106:1;128:4,5,19;
129:12;156:13;
164:16;173:10
**1318 (1)**
64:23
**14 (7)**
129:16,17;130:13,
15,16;156:14;164:19
**15 (19)**
17:8;105:6,10;
121:15;130:1,18,19;
131:10,12,13;156:4,5;
168:21,23;170:21;
173:13;174:2;182:23;
186:8
**15th (3)**
130:11;132:7;
136:15
**16 (6)**
131:15,16;134:21;
137:13,15,16
**16th (3)**
119:18,18;135:8
**18 (1)**

**Burke Court Reporting & Transcription**
**(973) 692-0660**

165:4
**19 (6)**
1:18;145:2;156:3;
165:8;167:13,14
**1977 (1)**
29:7
**19th (2)**
164:6;179:8
**1a (3)**
10:19;11:25;97:5
**1ii (1)**
10:19
**1st (1)**
30:5

**2**

**2 (15)**
1:18;36:1,2;97:18,
23;98:4,8;105:15,23;
143:13,19;144:7;
151:19,24;173:13
**2,114 (1)**
57:3
**2,232 (1)**
57:3
**2,357 (2)**
88:20;90:7
**2,555 (1)**
88:20
**2:10 (2)**
98:24;99:2
**2:35 (2)**
54:15;55:2
**20 (2)**
140:13;156:13
**2020 (1)**
178:11
**2021 (4)**
164:16,19;178:21;
184:9
**2022 (24)**
1:18;16:17;17:4;
30:4,5;32:9;33:10,13;
35:1;47:24;50:19;
80:12;83:11;101:18;
104:8;124:11;141:4;
142:19,23;156:3;
158:17;178:18;
179:21;187:20
**210 (1)**
58:22
**22 (4)**
126:20;141:12;
142:23;156:13
**23 (1)**
164:16
**234 (2)**
42:5,11
**235 (2)**
42:3,15
**238 (1)**
79:22

**24 (1)**
156:14
**240 (2)**
41:25;42:21
**25 (3)**
19:24;57:16;59:18
**25th (1)**
57:18
**26 (2)**
156:15;164:19
**27 (1)**
91:5
**27th (3)**
23:7,14;113:20
**28th (4)**
124:11,19;126:5;
129:7
**29 (1)**
1:16
**29- (1)**
22:1
**29-CA-292741 (2)**
1:5;7:8
**29-CA-294928 (1)**
1:6
**29-CA-298919 (1)**
1:7
**29-CA-299049 (1)**
1:8
**29-CA-300213 (1)**
1:9
**29-CA-300564 (2)**
1:10;7:9
**29-RC-290364 (2)**
1:4;7:11
**29th (2)**
128:15;129:7
**2nd (2)**
127:18,20

**3**

**3:22 (1)**
140:17
**3:30 (1)**
140:11
**3:43 (1)**
140:17
**3029 (1)**
178:14
**33 (1)**
164:23
**335 (2)**
41:25;42:22
**35 (1)**
54:18
**3a (11)**
41:4,15,16,25;
47:10,21;49:16;
52:19;55:5;56:6;57:3
**3b (6)**
41:3,4,8,15;54:17;
55:4

**3rd (4)**
84:9,10;118:25;
119:1

**4**

**4 (4)**
152:5,5,14;182:21
**4,000 (5)**
14:15,17,18,19;
15:5
**4:00 (3)**
140:12,12,13
**4:51 (1)**
183:17
**4:53 (1)**
183:17
**4a (6)**
58:12,14,16;63:11,
18;64:22
**4-a (1)**
68:10
**4b (2)**
58:15,16
**4th (7)**
22:5,13;84:5,6,10,
14;119:1

**5**

**5:00 (2)**
139:25;140:4
**5:02 (1)**
187:18
**5:30 (3)**
139:25;164:23;
165:8
**5:45 (1)**
140:6
**50 (1)**
132:19
**53 (5)**
95:17,20,22;99:11,
19
**5-3 (1)**
95:20
**55 (1)**
29:23
**5a (4)**
77:1,6,18;79:22
**5b (2)**
77:3,6
**5th (1)**
1:17

**6**

**6 (1)**
29:21
**6:00 (1)**
165:4
**611c (2)**
13:20,20

**6a (5)**
81:20,22,25;82:1,3
**6b (2)**
81:23;82:1

**7**

**7:30 (2)**
136:13;137:4
**722 (1)**
28:25
**728 (1)**
47:11
**748 (2)**
77:10,21
**748to (1)**
77:19
**7a (3)**
88:13,17,20
**7b (2)**
88:16,17
**7th (3)**
144:25;145:1,5

**8**

**8 (5)**
80:12;94:10,11;
164:6;179:9
**8:00 (3)**
136:5,6,7
**833 (2)**
47:11;49:16
**853 (1)**
63:11
**8th (1)**
164:22

**9**

**9 (3)**
69:11;117:4;143:2
**9:00 (1)**
114:22
**9:10 (2)**
54:15;55:3
**9:30 (1)**
187:20
**9:43 (1)**
7:2
**90 (1)**
94:13
**910 (3)**
42:3,15;49:16
**928 (1)**
63:11
**955 (3)**
77:10,19,21
**9a (12)**
117:7,15,18;
121:19;122:12;123:2;
128:23;129:4,7;
155:7;177:20;178:9

**9b (2)**
118:12;119:7
**9c (1)**
119:9
**9d (1)**
119:24
**9e (1)**
120:12
**9f (4)**
117:15;121:7;
123:2;130:5